UNITED STATES COURT OF APPEALS
SECOND CIRCUIT

ALVIN L. BRAGG JR., in his official capacity as District Attorney
for New York County,

*Appellant,*

v.

JIM JORDAN, in his official capacity as Chairman of the
Committee on the Judiciary, et al.,

*Appellees,*

No. 23-____

# MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY APPLICATION FOR AN ADMINISTRATIVE STAY AND STAY OF RETURN DATE PENDING EXPEDITED APPEAL

THEODORE J. BOUTROS, JR.
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7804

MYLAN L. DENERSTEIN
LEE R. CRAIN
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
(212) 351-3850

KATHERINE MORAN MEEKS
Gibson Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8258

ALVIN L. BRAGG, JR.
*District Attorney*
*New York County*

STEVEN C. WU
*Chief, Appeals Division*
LESLIE B. DUBECK
*General Counsel*
STEPHEN J. KRESS
CAROLINE S. WILLIAMSON
*Assistant District Attorneys*
District Attorney's Office
New York County
One Hogan Place
New York, NY 10013
(212) 335-9000

*Counsel for Appellant*

Dated: April 19, 2023

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE ........................................................ 4

    A. Factual Background ............................................................ 4

        1. Even before the indictment, the Judiciary Committee attacks the pending investigation and seeks testimony to support its criticisms .................... 4

        2. After the indictment, the Judiciary Committee continues to demand information to undercut the pending criminal proceeding, including by issuing a subpoena to Mr. Pomerantz ...................................... 7

    B. Procedural Background ...................................................... 9

ARGUMENT .................................................................................. 11

POINT I

    THE COURT HAS JURISDICTION OVER THIS APPEAL ............................................................................... 11

POINT II

    THE EQUITIES WEIGH HEAVILY IN FAVOR OF AN IMMEDIATE ADMINISTRATIVE STAY AND STAY PENDING APPEAL ......................................... 12

POINT III

    THE DISTRICT ATTORNEY IS LIKELY TO SUCCEED ON THE MERITS ............................................. 29

        A. The Subpoena Lacks any Valid Legislative Purpose and Therefore Exceeds Congress's Authority to Act under Article I .................................. 31

B. The Committee's Purported Legislative Interests Do Not Justify a Subpoena to a Former Employee Regarding His Knowledge of a Pending Investigation ................................................................. 39

C. The Subpoena Does Not Survive the Heightened Scrutiny Imposed by *Mazars* ................... 45

CONCLUSION ...................................................................... 54

# PRELIMINARY STATEMENT

This motion seeks a stay pending appeal—and an interim administrative stay pending resolution of this motion—of the return date of a subpoena, issued by the House Committee on the Judiciary, seeking testimony from a former employee, Mark Pomerantz, regarding the District Attorney's criminal investigation and prosecution of Donald J. Trump. *See Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 496 (1975) (noting that lower courts had granted similar stays "to avoid mootness and to prevent possible irreparable injury"). Absent a stay, Mr. Pomerantz will be compelled to testify to the Committee by 10 a.m. tomorrow morning. The Committee and its chairman, Representative Jim Jordan ("congressional defendants"), have never identified any reason that Mr. Pomerantz's testimony must be heard tomorrow, before an opportunity for expedited appellate review. By contrast, there is a serious risk that Mr. Pomerantz's testimony will interfere with the District Attorney's pending criminal prosecution of Mr. Trump, undercutting critical principles of federalism that protect the states' sovereign powers to enforce criminal laws. The equities thus

overwhelmingly favor an immediate interim administrative stay and a stay of the return date pending appeal.[1]

On March 30, 2023, a New York County grand jury returned an indictment charging Mr. Trump with 34 felony counts under New York law. Mr. Trump was arraigned on April 4. Two days after the arraignment, Representative Jim Jordan, Chairman of the House Committee on the Judiciary, served a subpoena on Mark Pomerantz, a former Special Assistant District Attorney who had participated in an investigation of Mr. Trump and his businesses. The letter accompanying the subpoena explained that the Committee was "conducting oversight of the New York County District Attorney's unprecedented indictment of a former president," and the subpoena sought to compel Mr. Pomerantz to provide "documents and testimony pertaining to [his] role as a special assistant district attorney leading the investigation into the former President's finances."

---

[1] As required by Federal Rule of Appellate Procedure 8(a)(1)(A), the District Attorney requested at the April 19, 2023, hearing that the court below enter an interim stay of any order denying relief, which the court orally denied. The District Attorney has also filed a written request for interim relief with the district court, which the court has also denied.

New York County District Attorney Alvin L. Bragg, Jr., then brought this suit in the United States District Court for the Southern District of New York (Vyskocil, J.) to challenge the subpoena on the ground that it exceeded Congress's constitutional authority and violated basic principles of federalism. The District Attorney also moved for a temporary restraining order and preliminary injunction. Following a hearing on April 19, 2023, the district court issued an opinion and order denying a temporary restraining order.

Although the district court's order "encouraged [the parties] to speak with one another to reach a mutually agreeable compromise regarding how the deposition of Mr. Pomerantz will proceed" (Exh. 11 at 25), Chairman Jordan has not agreed to adjourn the return date of the subpoena beyond the originally scheduled date and time of 10:00 a.m. tomorrow. Because Mr. Pomerantz's compliance with the subpoena would cause irreparable injury to the District Attorney and impair an ongoing criminal proceeding, the District Attorney seeks emergency relief from this Court.

## STATEMENT OF THE CASE

### A. Factual Background

### 1. Even before the indictment, the Judiciary Committee attacks the pending investigation and seeks testimony to support its criticisms.

The Judiciary Committee's focus on the criminal prosecution of Mr. Trump began weeks before his indictment. According to press reports, on March 10, 2023, one of Mr. Trump's criminal defense lawyers in the pending prosecution "wrote to Mr. Jordan calling on Congress to investigate." (Compl. (Exh. 1) ¶ 33.) On March 18, after Mr. Trump (incorrectly) announced on social media that he would shortly be arrested (Compl. (Exh. 1) ¶ 34), Speaker Kevin McCarthy responded on Twitter by calling the still-pending investigation "an outrageous abuse of power by a radical DA" and "directing relevant committees to immediately investigate." (Exh. 2; *see also* Compl. (Exh. 1) ¶ 37.)

On March 20—still before the indictment had been returned— Chairman Jordan (along with two other committee chairs) sent a letter to District Attorney Bragg demanding that he "testify about what plainly appears to be a politically motivated prosecutorial decision": the reportedly imminent "indictment of a former President of the United States and current declared candidate for that office." (Exh. 3 at 1.) The

letter repeatedly questioned the basis for any such prosecution: it described the (yet to be articulated) "legal theory underlying [the] reported prosecution" as "tenuous and untested"; it asserted that a reported "star witness . . . has a serious credibility problem"; and it drew the "inference from the totality of these facts" that any prosecution would be impermissibly "motivated by political calculations." (Exh. 3 at 2.) The letter then explained that the District Attorney's "decision to pursue such a politically motivated prosecution" warranted inquiry "about how public safety funds appropriated by Congress are implemented by local law-enforcement agencies" and "about the delineation of prosecutorial authority between federal and local officials." (Exh. 3 at 3.)

On March 22, Chairman Jordan continued his inquiry into the pending criminal investigation by sending letters to Carey Dunne and defendant Mark Pomerantz, both former prosecutors in the Manhattan District Attorney's Office. (Exh. 4, 5.) Both letters explained that the Judiciary Committee was reaching out because of the reportedly forthcoming indictment of Mr. Trump, with the avowed purpose of conducting congressional "oversight of this politically motivated prosecutorial decision." And both letters justified their outreach to these

5

former employees by describing their "unique role[s] in this matter" while employed by the District Attorney's Office. The letters repeated Chairman Jordan's earlier criticisms of the pending investigation and explained that "Congress has a keen interest in these facts" about "this unprecedented and overzealous partisan investigation." (Exh. 4 at 4, 5 at 3.)

The District Attorney's Office responded on March 23. (Exh. 6.) The letter noted that the criminal investigation was still pending and that the Judiciary Committee was improperly seeking "non-public information . . . which is confidential under state law." (*Id.* at 2.) The letter objected that the Committee's "requests are an unlawful incursion into New York's sovereignty"—specifically, the traditional state authority to enforce criminal laws. (*Id.* at 4.) The letter offered, however, to fully describe the Office's use of federal funds, and requested that the parties "meet and confer" to amicably resolve any requests that appropriately fell within a legitimate legislative purpose. (*Id.* at 5-6.)

On March 25, the Judiciary Committee sent another letter to District Attorney Bragg. (Exh. 7.) The letter doubled down on what it described as "the central allegations at issue"—namely, the purported

deficiencies of any indictment of Mr. Trump. (*Id.* at 1.) It confirmed that the Committee sought to conduct "an examination of the facts" supporting any such prosecution. (*Id.* at 3.) It made clear that all of the purported federal interests underlying the Committee's requests were motivated by their concerns about this "potential criminal indictment of a former President of the United States by an elected local prosecutor of the opposing political party." (*Id.* at 1.) And while the letter expressed appreciation for the District Attorney's Office's offer to detail its use of federal funds, it made clear that the Committee's principal purpose was *not* limited to that inquiry: rather, the Committee sought to "insulate former and current Presidents from politically motivated prosecutions by state and local officials," and information about the "use of federal funds will not shed meaningful light on that question." (*Id.* at 8.)

> **2. After the indictment, the Judiciary Committee continues to demand information to undercut the pending criminal proceeding, including by issuing a subpoena to Mr. Pomerantz.**

On March 30, 2023, a New York grand jury returned an indictment charging Mr. Trump with 34 felony counts under New York law. (Exh. 8.) On March 31, the District Attorney's Office notified the Judiciary Committee about the indictment and reminded the Committee that Mr.

Trump, like any criminal defendant, was entitled to avail himself of the full protections of the New York judicial process. (Exh. 13 at 1.) By contrast, the Committee's "examination of the facts of a single criminal investigation, for the supposed purpose of determining whether any charges against Mr. Trump are warranted, is an improper and dangerous usurpation of the executive and judicial functions." (*Id.* at 3.) Consistent with the District Attorney's Office's prior offer, the letter then provided extensive details about the Office's use of federal funds, and reiterated the request to meet and confer to negotiate a resolution of any other appropriate requests for information by the Committee. (*Id.* at 4-7.)

On April 6, 2023, the Committee issued the subpoena to Mr. Pomerantz that is the subject of this litigation. (Exh. 15.) In the letter accompanying the subpoena, the Committee explained that it was "conducting oversight of the New York County District Attorney's unprecedented indictment of a former president." (*Id.* at 1.) The Committee sought to compel Mr. Pomerantz to provide "documents and testimony pertaining to [his] role as a special assistant district attorney leading the investigation into the former President's finances" (*id.*) and repeated that Mr. Pomerantz's information would be relevant because of

his "unique role" in that investigation, including his supposed knowledge about "internal deliberations" and the District Attorney's motivations (*id.* at 3-5).

The Committee also confirmed that the core federal interest underlying the subpoena was the "specific and manifestly important interest in preventing politically motivated prosecutions of current and former Presidents by elected state and local prosecutors." (*Id.* at 1-2.) Thus, the Committee explained that it was exploring potential legislation to "insulate current and former Presidents from . . . politically motivated state and local prosecutions" by: (a) authorizing removal of criminal cases, including the pending prosecution, to federal court; (b) addressing unidentified conflicts between federal and local law enforcement for Mr. Trump's appearances in New York court; and (c) prohibiting the use of federal funds to investigate or prosecute a current or former President. (*Id.* at 3.)

## B. Procedural Background

On April 11, 2023, the District Attorney brought suit against Chairman Jordan in his official capacity, the House Committee on the Judiciary, and Mr. Pomerantz seeking declaratory and injunctive relief

9

to enjoin the congressional defendants from enforcing the subpoena and Mr. Pomerantz from complying with it. The District Attorney filed a motion for a temporary restraining order and preliminary injunction on the same day.

The congressional defendants filed their opposition on April 17. Apart from a general interest in "expeditious and unimpeded Congressional investigations," the congressional defendants identified no basis for demanding immediate enforcement of the subpoena. Opp'n of Congressional Defs. at 25, *Bragg v. Jordan*, No. 23-3032 (S.D.N.Y. Apr. 17, 2023), ECF No. 27. Mr. Pomerantz also filed his response on April 17 and joined the District Attorney's request for relief. *See* Def. Mark F. Pomerantz's Resp. at 1, 7, *Bragg v. Jordan*, No. 23-3032 (S.D.N.Y. Apr. 17, 2023), ECF No. 30.

The district court held a hearing on the District Attorney's motion on April 19. Following that hearing, the district court issued an opinion and order denying a temporary restraining order. (Exh. 11.) The court concluded that the District Attorney was unlikely to succeed on the merits of his argument that the subpoena lacked a valid legislative purpose, and ordered Mr. Pomerantz to appear before the Committee for

a deposition tomorrow, April 20, 2023, at 10:00 am. Because the court had found no likelihood of success on the merits, it declined to address the other prongs of the temporary restraining order analysis, including irreparable injury and the balance of the equities. The district court also decided it would "retain jurisdiction over [the] dispute and any ancillary claims arising out of the inquiry by the Committee relating to the use of federal funds in a manner that may influence the 2024 presidential election." (Exh. 11 at 25.)

## ARGUMENT

## POINT I

## THE COURT HAS JURISDICTION OVER THIS APPEAL

The district court styled its order as a denial of the District Attorney's application for a temporary restraining order, without separately denying the motion for preliminary injunction. A temporary restraining order is ordinarily not appealable. *See Hoh v. Pepsico, Inc.*, 491 F.2d 556, 560 (2d Cir. 1974). But where the denial of a temporary restraining order "might have a 'serious, perhaps irreparable, consequence,' and . . . can be 'effectually challenged' only by immediate appeal," this Court may exercise appellate jurisdiction. *Carson v.*

*American Brands, Inc.*, 450 U.S. 79, 84 (1981). And the Second Circuit regularly reviews orders denying a temporary restraining order when the order amounts to a denial of a preliminary injunction, or otherwise effectively resolves the case. *See, e.g.*, *Riddick v. Maurer*, 730 F. App'x 34, 36-37 (2d Cir. 2018) (citing cases).

Those circumstances are present here. The district court's order, however styled, leaves the subpoena in place to compel Mr. Pomerantz to appear in Washington, D.C. tomorrow morning at 10 a.m. to testify in person before the Committee. Allowing the subpoena to be enforced in this matter effectively denies the District Attorney's application in its entirety. This Court accordingly has jurisdiction over the appeal from the district court's order.

## POINT II

### THE EQUITIES WEIGH HEAVILY IN FAVOR OF AN IMMEDIATE ADMINISTRATIVE STAY AND STAY PENDING APPEAL

The congressional defendants have never identified any reason for urgency in receiving information from Mr. Pomerantz; and in similar disputes over the validity of its legislative subpoenas, Congress has routinely agreed to adjourn the return date to give the courts time to carefully scrutinize the weighty legal issues and significant public

interests that are implicated. Despite these facts, the congressional defendants have refused in this case to consent to any adjournment of Mr. Pomerantz's scheduled deposition past the originally scheduled date and time of 10:00 a.m. tomorrow. Thus, absent an immediate administrative stay and stay pending appeal, the District Attorney will be irreparably injured when Mr. Pomerantz is compelled to appear for his deposition in just a few hours. The congressional defendants, by contrast, will suffer no injury from an interim stay to permit reasonably expedited briefing and consideration of this appeal. The equities thus decisively favor a stay.

1. The District Attorney will suffer immediate and irreparable injury absent a stay of the district court's order. *Nken v. Holder*, 556 U.S. 418, 426 (2009). The preservation of the status quo is the critical and historic function of a stay. But in light of the imminent return date, the denial of any stay will disrupt the status quo by "effectively award[ing] victory in the litigation" to the congressional defendants, without the benefit of this Court's review of the important issues presented here, *Romer v. Green Point Sav. Bank*, 27 F.3d 12, 15 (2d Cir. 1994); *see also Freedom Party of New York v. New York State Bd. of Elections*, 77 F.3d

13

660, 663 (2d Cir. 1996) (noting that "prompt application for a stay pending appeal" can prevent issue from "evad[ing] review" (quotation marks omitted)). Mr. Pomerantz's compelled deposition before Congress threatens several concrete harms to the pending criminal prosecution.

First, the subpoena will compromise the District Attorney's confidential communications concerning a criminal investigation and risk disclosing secret grand jury information. New York, like essentially every other jurisdiction, places significant restrictions on the disclosure of grand-jury information or internal deliberations by law enforcement specifically and lawyers in general. Thus, New York law prohibits disclosure of "the nature or substance of any grand jury testimony, evidence, or any decision, result or other matter attending a grand jury proceeding." N.Y. Crim. P. Law § 190.25(4)(a). The law-enforcement privilege shields information that would compromise the confidentiality of sources, endanger witnesses or law enforcement officers, reveal investigatory techniques, or "impair the ability of a law enforcement agency to conduct future investigations." *White v. City of Mt. Vernon*, 2022 WL 16578086, at *3 (S.D.N.Y. Nov. 1, 2022). Internal deliberations within the D.A.'s office are protected by the attorney-client privilege, the

work product doctrine, the public-interest privilege, and the deliberative-process privilege. *See United States v. Rowe*, 96 F.3d 1294 (9th Cir. 1996); *Hopkins v. U.S. Dep't of Housing & Urb. Dev.*, 929 F.2d 81, 84–85 (2d Cir. 1991); *Hertzog, Calamari & Gleason v. Prudential Ins. Co. of Am.*, 850 F. Supp. 255 (S.D.N.Y. 1994); *In re World Trade Ctr. Bombing Litig.*, 709 N.E.2d 452, 456 (N.Y. 1999). And New York City Charter § 2604(d)(5) prohibits former public servants from disclosing "any confidential information gained from public service which is not otherwise made available to the public." Charter 2606 makes violation of this provision a misdemeanor.

There is good reason for these protections. Confidentiality protects the integrity of the criminal process, protects witnesses and grand jurors from interference, and promotes frank and candid conversation among prosecutors. *See, e.g.*, *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (attorney-client privilege); *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681–82 & n.6 (1958) (grand jury secrecy); *People v. Di Napoli*, 265 N.E.2d 449, 452 (N.Y. 1970) (grand jury secrecy under New York law). A subpoena from Congress does not override those protections. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020). Yet Mr.

Pomerantz's testimony risks disclosing such confidential information, particularly when the congressional defendants have made explicit their interest in probing his knowledge of the "internal deliberations" of the District Attorney's Office and plainly do not consider adequate the disclosures he may already have made in his published book.

The district court thought that the risk of disclosing confidential information was speculative. But the Committee has demanded Mr. Pomerantz's testimony solely because of his role in a criminal investigation, which could include proceedings before a grand jury, and his knowledge of internal deliberations; the Committee has never identified any other general expertise for which Mr. Pomerantz's views would be helpful. The district court also believed that the risk of improper disclosures was premature because Mr. Pomerantz could assert privileges during his appearance before the Committee. But in their brief opposing relief below, the congressional defendants already staked out the position that "all" privileges were "waived" by virtue of Mr. Pomerantz's book. (Dkt. No. 27 at 22.[2]) And House regulations prevent

---

[2] "Dkt. No." refers to the relevant docket entry in the district court proceeding.

the District Attorney's Office from participating in the deposition and preserving privileges. (Dkt. No. 32-21, at 2-3.) No remedy short of staying the subpoena would suffice to protect the confidentiality mandated by New York law here.

The district court also took the view that the District Attorney had waived any privileges that might apply to Mr. Pomerantz's testimony by his asserted inaction in response to the publication of his book. But far from relinquishing any privileges, the District Attorney has diligently sought to protect them, reminding Mr. Pomerantz of his obligations not to disclose confidential or privileged information and requesting the opportunity for prepublication review (which Mr. Pomerantz and his publisher denied). (Compl. (Exh. 1) ¶ 102.) Mr. Pomerantz publicly assured the District Attorney that he had complied with his obligations. (*Id.* ¶ 90.) Mr. Pomerantz had no authority to waive privileges on behalf of the District Attorney—as Mr. Pomerantz now agrees (Dkt. No. 30 at 4). *See Merrill v. City of New York*, 2005 WL 2923520, at *1 n.2 (S.D.N.Y. Nov. 4, 2005) ("disclosure of such privileged information by a . . . former employee would not constitute a waiver of the privilege by the employer"); *Blumenthal v. Drudge*, 186 F.R.D. 236, 242 (D.D.C. 1999) (recognizing

that a former government employee was not authorized to waive the government's privilege).

Second, interrogating a former prosecutor about the District Attorney's decision-making process pertaining to a currently pending criminal prosecution and ongoing criminal investigation necessarily risks creating extra-judicial evidence and pre-judging legal issues—including objections based on selective prosecution or the sufficiency of the evidence—that will be raised and should be decided by a New York judge.[3] It potentially creates prejudicial pretrial publicity that could, among other obstacles, burden the jury-selection process or lead to the postponement of any trial. *See People v. Cahill*, 2 N.Y.3d 14, 40 (2003); *People v. Boss*, 261 A.D.2d 1 (1st Dep't 1999); *United States v. Simon*, 664 F. Supp. 780, 793 (S.D.N.Y. 1987). And it would permit discovery regarding Mr. Trump's criminal prosecution to take place along parallel tracks: one overseen by a New York judge under New York's criminal procedure law and subject to procedural and other protections, *see generally* N.Y. Crim. Proc. Law Article 245; the other in congressional

---

[3] The judge presiding over the pending criminal matter has entered a pretrial briefing schedule that will conclude in September and intends to issue a decision by December 2023.

hearings unconstrained by the rules of evidence and unburdened by any protective orders that the New York judge may impose on the public dissemination of discoverable materials, *cf.* N.Y. Crim. Proc. Law § 245.70.

Third, the subpoena risks chilling decisions by prosecutors and witness in the pending criminal prosecution that is the target of the subpoena, as well as future investigations and proceedings. The Supreme Court has acknowledged that "[a]buses of the investigative process" may chill the exercise of First Amendment rights. *Watkins v. United States*, 354 U.S. 178, 197 (1957). The subpoena here threatens to have a similar deterrent effect: prosecutors may hesitate to make certain decisions or engage in "internal deliberations" that they fear will be subject to immediate congressional scrutiny; witnesses may decline to cooperate with the District Attorney's Office or limit their public testimony to avoid the opprobrium of having their credibility and character publicly assailed; and even the state court judge, whose impartiality the Committee has repeatedly impugned (*see, e.g.*, Exh. 15 at 2; Exh. 7 at 3), may be unduly influenced by the threat of being exposed to "public stigma, scorn and obloquy," *Watkins*, 354 U.S. at 197.

The offensive nature of such a deterrent effect on public prosecutions is the reason that prosecutors (and judges) are absolutely immune from civil suit: to ensure that the "the efficient, and just, performance of the prosecutorial function" is not "chilled." *Harrison v. New York*, 2021 WL 1176146, at *4 (E.D.N.Y. Mar. 29, 2021) (quoting *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir. 1981). Prosecutorial decision making must be "insulat[ed]"—and the law strives to protect a prosecutor's ability to "exercise[e] the independence of judgment required by his public trust." *Flagler v. Trainor*, 663 F.3d 543, 546–47 (2d Cir. 2011) (cleaned up); *see also Imbler v. Pachtman*, 424 U.S. 409, 422-34 & n.20 (1976). The policy rationales underlying absolute immunity thus underscore the significance of the harm that the District Attorney will face without a stay.

All of these injuries are heightened by the fact that the Committee offers no assurances that Mr. Pomerantz's testimony will remain confidential. In fact, the Committee's rules leave disclosure to the Committee's discretion, all but ensuring anything Mr. Pomerantz says will soon make its way to the public. (Dkt. No. 32-21 at 3.) Indeed, the very point of the deposition is to make information public, so that, as one

Committee member put it, the Committee can "expose this so that in two years, the American people . . . can get this right." (Dkt. No. 12-21, 12-22.)

Finally, the Committee's subpoena will cause irreparable injury to New York's dignitary interests. A state official "is not a minion" of the federal government—rather, "he is an officer of the State . . . , carrying out the duties imposed upon him by this office." *Illinois ex rel. Harris v. Bd. of Govs. of the Fed. Reserve Sys.*, 751 F. Supp. 1323, 1331 (N.D. Ill. 1991). But the Committee's subpoena would subordinate New York's sovereign interests to the federal government's—despite the Constitution's strict policy of "no interference" with state officers "charged with the duty of prosecuting offenders against the laws of the State." *Younger v. Harris*, 401 U.S. 37, 45 (1971). That injury to New York's sovereign dignity is irreparable as a matter of law. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018).

Absent a stay, Mr. Pomerantz will be forced to attend a deposition tomorrow morning, causing the attendant harms to the District Attorney and the criminal justice process described here. Those harms cannot be

undone by an eventual victory on the merits. "[I]ssuance of a stay is warranted" to avoid imposing irreparable harm upon the stay applicant. *Garrison v. Hudson*, 468 U.S. 1301, 1302 (1984) (Burger, C.J., in chambers) (quoting *In re Bart*, 82 S. Ct. 675, 676 (1962) (Warren, C.J., in chambers)). In *Eastland v. United States Servicemen's Fund*, for example, the D.C. Circuit stayed a congressional subpoena to the plaintiff's bank and noted that "[t]he decisive element in our action to grant a stay is [that] unless a stay is granted this case will be mooted, and there is likelihood, that irreparable harm will be suffered" by the applicant. *U.S. Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1256 (D.C. Cir. 1973); *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 496-97 & nn. 9-10 (1975) (noting that the Court of Appeals twice stayed enforcement of the congressional subpoena pending further proceedings because "the threat of irreparable injury if the subpoena were honored, and the significant of the issues involved, necessitated . . . consideration and deliberation").

*2.* By contrast, the congressional defendants cannot show that a stay would "substantially injure" their interests. *Nken*, 556 U.S. at 426 (2009). The congressional defendants have identified no reason for

urgency in taking Mr. Pomerantz's deposition tomorrow, and no immediate need for his testimony. There is no emergency that accompanies Congress's stated interest in developing a record of the effectiveness of current laws for the purpose of considering new legislation—much less an emergency that requires Mr. Pomerantz's deposition to proceed tomorrow, without appellate review—particularly given the "time and difficulty of enacting new legislation." *Coal. for Responsible Regulation, Inc. v. EPA*, 2012 WL 6621785, at *22 (D.C. Cir. 2012) (Kavanaugh, J., dissenting from denial of rehearing en banc). And there is no plausible claim that the consideration of new legislation requires Mr. Pomerantz's deposition to proceed tomorrow for the separate reason that "legislative judgments normally depend more on the predicted consequences of proposed legislative actions . . . than on precise reconstruction of past events." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974) (en banc).

Even if congressional defendants were to articulate, for the first time in this litigation, a newly identified urgency for Mr. Pomerantz's testimony, any "interest" the congressional defendants may have "in

receiving this information immediately . . . poses no threat of irreparable harm." *John Doe Agency v. John Doe Corp.*, 488 U.S. 1306, 1309 (Marshall, J., in chambers). Rather, "[r]efusing a stay may visit an irreversible harm on" the District Attorney, "but granting it will apparently do no permanent injury to" the congressional defendants. *Philip Morris USA, Inc. v. Scott*, 561 U.S. 1301, 1305 (2010) (Scalia, J., in chambers).

Under comparable circumstances, Congress has routinely agreed to, or courts have provided, sufficient time to allow for appellate review of these weighty issues—including in the *Deutsche Bank* litigation in this Circuit,[4] and in the *Mazars* litigation in the D.C. Circuit.[5] Despite

---

[4] *See* Order Setting Briefing Schedule on Mot. for Preliminary Inj., *Trump v. Deutsche Bank AG*, No. 1:19-cv-3826 (S.D.N.Y. May 1, 2019), ECF No. 22 ("The House of Representatives has postponed the return date for the subpoenas to the Defendants under seven (7) days after the District Court rules on Plaintiffs' motion for a preliminary injunction."); *Mem. in Support of Joint Mot. to Expedite Appeal* at 2, *Trump v. Deutsche Bank AG*, No. 19-1540 (2d Cir. May 25, 2019), ECF No. 5-2 (requesting a schedule to brief the validity of Congress's subpoenas over approximately eight weeks, and representing that "[i]f the Court grants this joint motion to expedite, the Committees, through counsel for the House of Representatives, agree to suspend the time for production set by the subpoenas during the pendency of this appeal"); *Trump v. Deutsche Bank AG*, 140 S. Ct. 660 (2019) (granting stay pending further order of the Court).

[5] *See* Minute Order, *Trump v. Committee on Oversight & Reform*, No. 19-1136 (D.D.C. Apr. 23, 2019) ("Intervenor-Defendant Committee on Oversight
(Continued…)

consistently agreeing to this accommodation for years in litigation related to the validity of congressional subpoenas, in this case the congressional defendants—with no explanation—have refused the District Attorney's repeated requests for an adjournment of the subpoena's return date to permit expedited judicial review of the merits, including from this Court. Where Congress has identified no emergency requiring that Mr. Pomerantz's deposition occur tomorrow, and where Congress routinely acknowledges that orderly appellate review of its subpoena authority is appropriate, congressional defendants cannot show any injury to their interests—much less "substantial injury"—from a stay to permit this Court's review. *Nken*, 556 U.S. at 426.

*3.* The public interest also weighs in favor of a stay. As explained below in the discussion of the merits, the congressional defendants' subpoena likely exceeds Congress's authority and would upend bedrock

---

and Reform agrees to postpone the return date on its subpoena to Mazars USA, LLP until seven days after the court rules on Plaintiffs' Motion for Preliminary Injunction."); Joint Mot. to Expedite Appeal at 2, *Trump v. Mazars USA LLP*, No.19-5142 (D.C. Cir. May 22, 2019) ("If the Court grants this joint motion to expedite, the Committee, through counsel for the House of Representatives, agrees to suspend the time for production set by the subpoena during the pendency of this appeal."); *Trump v. Mazars USA LLP*, 140 S. Ct. 660 (2019) (granting stay pending further order of the Court).

principles of federalism that are an ineradicable part of our constitutional structure. Preventing a violation of this constitutional principle serves the public interest. *See United States v. California*, 921 F.3d 865, 893-94 (9th Cir. 2019); *see also League of Women Voters v. Newby*, 838 F.3d 1, 12 (2016) ("[t]here is generally no public interest in the perpetuation of unlawful" federal action). Because "a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front," *Printz v. United States*, 521 U.S. 898, 921 (1997), the public interest lies in granting a stay to review the constitutional questions presented by the District Attorney's appeal.

In addition, given the unprecedented nature of Congress's subpoena to a former prosecutor to explore his views and involvement in an investigation that is now the subject of an active state criminal prosecution, permitting Mr. Pomerantz's deposition to proceed with no appellate consideration of the merits would upend a nationwide status quo with no notice.

State prosecutors have for centuries carried out their law enforcement function on the understanding that charging decisions would be subject to judicial review in the course of any prosecution—*not*

subject to freewheeling congressional inquiry without the procedural and evidentiary protections afforded under state law. *See Younger*, 401 U.S. at 45; *Watkins*, 354 U.S. at 187. The district court's view of Congress's subpoena authority would upend that status quo and open the floodgates: any former or current prosecutors involved in any investigation or prosecution of any criminal matter would be at risk of being summoned to explain themselves before a congressional committee if they prosecute violations of state law in cases disfavored by Members of Congress. Nor would this incursion be limited to intruding on constitutional principles of federalism; the extraordinarily broad scope congressional defendants claim for their subpoena power would expose federal prosecutors no less to the risk of being summoned to a committee of Congress to explain investigative or charging decisions in any case Congress finds noteworthy, threatening federal separation-of-powers principles as well. A stay to permit careful appellate review of the district court's unprecedented decision is necessary to avoid immediate disruption of this status quo.

Finally, granting a stay would permit the parties an opportunity to determine whether there is an accommodation that could address

Congress's stated oversight interests while respecting the District Attorney's sovereign obligation and authority to conduct state criminal prosecutions and investigations without external interference. *Cf. Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2029-31 (2020) (noting that disputes involving congressional efforts to seek Executive Branch information are ordinarily resolved through interbranch accommodation). As noted above, the District Attorney previously offered to address Congress's stated interests by fully describing the Office's use of federal funds, and had asked for an opportunity to meet and confer with Committee staff to determine whether further responses could address any legitimate legislative purposes. (Exh. 6 at 5-6.) The Chairman ignored that offer and subpoenaed Mr. Pomerantz instead, forcing the District Attorney to bring this action to protect against significant intrusion into a pending criminal case. Staying the deposition subpoena and maintaining the status quo would permit the parties to negotiate in good faith to determine whether an accommodation can be reached. *See, e.g.*, Joint Mot. to Dismiss Appeal, *Comm. on the Judiciary of the U.S. House of Representatives v. McGahn*, No. 19-5331 (D.C. Cir.

28

June 10, 2021) (appending an agreement on accommodation with respect to the Committee's subpoena to former White House Counsel).

## POINT III

## THE DISTRICT ATTORNEY IS LIKELY TO SUCCEED ON THE MERITS

The subpoena to Mr. Pomerantz, like the broader investigation being conducted by the Judiciary Committee, was indisputably triggered by a single criminal case: the District Attorney's pending criminal prosecution against Mr. Trump. The stated object of the subpoena and investigation is to "prevent[]" this prosecution and "insulate" Mr. Trump from criminal liability. The subpoena seeks confidential information that New York law protects from public disclosure, or trial evidence whose disclosure is carefully regulated by New York discovery laws under a process overseen by the New York courts. And the congressional defendants have made clear that they intend to use any information to essentially litigate the merits of the pending criminal prosecution on Mr. Trump's behalf: by attacking the sufficiency of the evidence, questioning the credibility of key witnesses, previewing legal defenses to the charges,

and raising spurious concerns about the District Attorney's political motivations.[6]

The congressional defendants' intervention in an ongoing local criminal prosecution is unprecedented and unlawful. Congress has no authority to direct the progress of a pending judicial proceeding; no authority to regulate the enforcement of New York criminal law; and no authority to engage in state law enforcement by supplanting a New York judge and New York jury who will supervise the pretrial disclosure of evidence to Mr. Trump (including from former employees like Mr. Pomerantz), address any legal defenses that Mr. Trump may raise, and ultimately assess the credibility of witnesses and the strength of evidence at trial. Yet the subpoena here transparently seeks information from a former employee—solely because of his role in an earlier stage of this Office's investigation—to help accomplish these illegitimate ends. The

---

[6] Because the subpoena lacks any valid legislative purpose, the congressional defendants are not entitled to Speech or Debate immunity. Such immunity presupposes that Congress's "actions . . . fall within the sphere of legitimate legislative activity." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501 (1975). The district court did "not resolve" whether Speech or Debate immunity applies here. Dkt. 44, at 18.

District Attorney is thus likely to prevail on his claim that the subpoena is beyond Congress's authority.

### A. The Subpoena Lacks Any Valid Legislative Purpose and Therefore Exceeds Congress's Authority Under Article I.

Although Congress's subpoena power is broad, "it is not unlimited." *Watkins*, 354 U.S. at 187. "A congressional subpoena is valid only if it is related to, and in furtherance of, a legitimate task of Congress": that is, it must "concern a subject on which legislation could be had." *Mazars*, 140 S. Ct. at 2031. Here, the Judiciary Committee's subpoena is unlawful and unenforceable because Congress lacks any "valid legislative purpose" to regulate or oversee the District Attorney's pending criminal prosecution and ongoing investigation of Mr. Trump. *Id.* at 2031. Indeed, congressional intervention on this subject would contravene three closely related limitations on federal legislative power.

First, as the Supreme Court held more than 140 years ago, Congress may not deploy its subpoena power to "interfere with" a case "pending in a court of competent jurisdiction." *Kilbourn v. Thompson*, 103 U.S. 168, 194 (1881). In *Kilbourn*, a witness challenged a House subpoena for documents and testimony relating to a company in bankruptcy proceedings where the United States was a creditor. Because the

litigation was still pending in the Eastern District of Pennsylvania, the Court held that the House's inquiry into the circumstances of the bankruptcy "was in its nature clearly judicial," *id.* at 192, and "therefore one in respect to which no valid legislation could be enacted," *Watkins*, 354 U.S. at 194—even though the federal government plainly had a pecuniary interest in the litigation.

Here, as in *Kilbourn*, the subpoena unquestionably seeks information about a case that is "pending in a court of competent jurisdiction," 103 U.S. at 194. The first line of the April 6 letter to Mr. Pomerantz explains that the Judiciary Committee "is conducting oversight of the New York County District Attorney's unprecedented indictment of a former President"—then repeats the Committee's objective to conduct "oversight" of this prosecution no less than eight more times. (Exh. 15 at 1.) That explicit purpose is consistent with the Committee's earlier threat to conduct "an examination of the facts" involving this specific case (Exh. 7 at 3), including, as to Mr. Pomerantz, his knowledge about "internal deliberations" and the District Attorney's motivations leading up to the indictment (Exh. 15 at 5). And the co-signatories to Chairman Jordan's letters have been even more explicit:

for example, the Chairman of the House Committee on Oversight and Accountability announced that the House intended to force the District Attorney to "come explain to us exactly what he's investigat[ing]." (Compl. (Exh. 1) ¶ 60.) But the lesson of *Kilbourn* is that Congress does not sit to superintend the work of the courts.

*Kilbourn* involved a pending *federal* proceeding. The Court's concerns about congressional interference with judicial proceedings are even more pronounced when, as here, the pending proceeding is in front of a state court. "Federal interference with state proceedings, because it necessarily presumes that state court review will be inadequate, affronts the dignity of the state sovereign." *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 200 (2d Cir. 2002). And "[f]ederal intrusions into state criminal trials" more specifically "frustrate . . . the States' sovereign power to punish offenders." *Engle v. Isaac*, 456 U.S. 107, 128 (1982). Indeed, the "oversight" that the Committee has promised to pursue here, including through its subpoena to Mr. Pomerantz, is simply the congressional version of an "ongoing federal audit of state criminal proceedings" that the federal judiciary is barred from conducting. *O'Shea v. Littleton*, 414 U.S. 488, 500 (1974). By contrast, leaving state courts

free to adjudicate the matters before them without federal interference "reaffirms the competence of the state courts and acknowledg[es] the dignity of states as co-equal sovereigns in our federal system." *Spargo v. New York State Comm'n on Jud. Conduct*, 351 F.3d 65, 75 (2d Cir. 2003) (quotation marks omitted).

Second, Congress has no authority to regulate New York's enforcement of its own criminal law. "Under our federal system, the States possess primary authority for defining and enforcing the criminal law." *Lopez*, 514 U.S. at 561 n.3. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of . . . crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000).

The subpoena transgresses this limitation as well by seeking to raise questions about state criminal law that are outside of Congress's legislative authority. From the outset, Chairman Jordan's letters have assailed the "novel and untested legal theory" purportedly underlying the prosecution, questioned the District Attorney's choice to bring felony rather than misdemeanor charges, and raised potential affirmative

defenses under New York law on behalf of Mr. Trump, such as the statute of limitations. (Exh. 3 at 2; Exh. 7 at 1.) The Committee's letters to Mr. Pomerantz have sounded the same theme, asking for Mr. Pomerantz's views on the prosecution's "tenuous and untested legal theory" (Exh. 4 at 2) and his recounting of "internal deliberations" about the pending case (Exh. 15 at 3). But the "legal theory" underlying the pending prosecution of Mr. Trump implicates quintessential state-law issues that Congress simply has no power to countermand. Because the power to enforce state criminal law is "an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress," *New York v. United States*, 505 U.S. 144, 156 (1992); *see also Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (recognizing Congress cannot "readily interfere" where states "retain substantial sovereign powers").

Third, and relatedly, Congress may not issue a subpoena "for the purpose of 'law enforcement'"—such as to adjudicate whether someone has engaged in "'any crime or wrongdoing.'" *Mazars*, 140 S. Ct. at 2032 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 179 (1927)); *see also Kilbourn*, 103 U.S. at 182 ("An act of Congress which proposed to adjudge

a man guilty of a crime and inflict the punishment, would be conceded by all thinking men to be unauthorized by anything in the Constitution."). Yet the subpoena here avowedly seeks to prejudge and dictate the outcome of the state criminal proceeding. The letter to Mr. Pomerantz openly announces the Committee's objective of "preventing politically motivated prosecutions of current and former Presidents by elected state and local prosecutors" (Exh. 15 at 1-2), consistent with the Committee's earlier pronouncement of its intent to "insulate former and current Presidents" from such prosecutions (Exh. 7 at 8). Thus, as in *Kilbourn*, the subpoena is "clearly judicial" in nature because its purpose is to second guess the merits of New York's pending case against Mr. Trump and shield him from state criminal liability. 103 U.S. at 192.

The district court stated that it would not "passively accept" the District Attorney's argument that the subpoena would "undermine and obstruct New York's criminal case against Mr. Trump" or "presume" that the Committee had ulterior motives for calling Mr. Pomerantz to testify. (Exh. 11 at 13.) But the District Attorney never asked the district court to speculate about the Committee's "real motivations." (*Id.*) The Committee stated in the *letter enclosing the subpoena* it sought to depose

Mr. Pomerantz for the purpose of "conducting oversight of the New York County District Attorney's unprecedented indictment of a former president." Superintending an active state criminal prosecution is not a valid legislative purpose. *See Watkins*, 354 U.S. at 187, 198 ("Nor is the Congress a law enforcement or trial agency.").

The Committee's aim to be the judge of Mr. Trump's liability for the state-law criminal charges against him is made especially plain by the fact that the Committee's letters to the District Attorney's Office and to Mr. Pomerantz have repeatedly previewed factual and legal defenses that Mr. Trump may raise, inside information to support those defenses. For example, the Committee has repeatedly raised factual objections to the indictment, such as by impugning the "credibility" of the state's "star witness" (Exh. 3 at 2). And it has asserted that there are legal deficiencies to the charges and potential affirmative defenses, such as the repeated claim that the prosecution is "politically motivated" (Exh. 15 at 3), *cf. People ex rel. James v. Trump Org., Inc.*, 205 A.D.3d 625, 626 (1st Dep't 2022) (describing state-law defense of selective prosecution). To support these defenses, the letter enclosing the subpoena expressly asks Mr. Pomerantz to disclose "internal deliberations" about the strengths and

weaknesses of the pending prosecution and to reveal not only his own but also the District Attorney's supposed political motivations. (Exh. 15 at 3-4.) This open effort to support Mr. Trump's factual and legal defenses in an ongoing state criminal proceeding improperly intrudes on the sovereign prerogative of the New York judiciary and a New York jury and falls well outside Congress's legislative authority. *See Sinclair v. United States*, 279 U.S. 263, 295 (1929) ("Congress is without authority to compel disclosures for the purpose of aiding the prosecution of pending suits."), *overruled on other grounds by United States v. Gaudin*, 515 U.S. 506 (1995); *cf. Younger v. Harris*, 401 U.S. 37, 44 (1971) (abstention doctrine "prevent[s] erosion of the role of the jury and avoid[s] a duplication of legal proceedings and legal sanctions").

The district court's refusal to consider the Committee's own statements of purpose, made in official communications to the District Attorney's Office and in the letter enclosing Mr. Pomerantz's subpoena, is reason enough for granting an injunction pending appeal or a stay of the return date. Congress lacks authority to interfere with active judicial proceedings. Those limits on its subpoena power would be eviscerated if

federal courts were required to ignore the Committee's own professed reasons for compelling a witness's testimony.

### B. The Committee's Purported Legislative Interests Do Not Justify a Subpoena to a Former Employee regarding His Knowledge of a Pending Investigation.

The congressional defendants dispute that the purpose of the subpoena is to interfere with the pending state criminal prosecution. Instead, they point to several asserted legislative interests that supposedly justify their request for information from Mr. Pomerantz. Even assuming that these legislative interests are genuine, none of them support the current subpoena.

First, the Committee claims that it is considering legislation to "insulate current and former Presidents" from state criminal prosecutions for "personal acts" unrelated to their conduct in office. (Exh. 15, at 2.) But the States' exclusive sovereign authority to enact local criminal laws means that Congress lacks the power to exempt former presidents—that is, private citizens—from the reach of such laws. Moreover, former presidents have no inherent immunity from state law. "[E]very President takes office knowing that he will be subject to the same laws as all other citizens upon leaving office." *House Comm. on*

*Ways & Means v. U.S. Dep't of Treasury*, 45 F.4th 324, 338 (D.C. Cir. 2022). Mr. Trump himself has acknowledged that "state grand juries are free to investigate a sitting President with an eye toward charging him after the completion of his term." *Trump v. Vance*, 140 S. Ct. 2412, 2426–27 (2020). "This is a feature of our democratic republic, not a bug." *Ways & Means*, 45 F.4th at 338. Because Congress's "power to investigate" extends only as far as its "power to enact" appropriate legislation, *Eastland*, 421 U.S. at 504–06 & n.15, the congressional defendants cannot support the subpoena by referring to purported criminal legislation that Congress would be without power to enact.

Second, the Committee claims to be considering legislation "to enhance reporting requirements" about federal funds that local law enforcement officials use "to investigate a current or former President or presidential candidate." (Exh. 15, at 2.) But that purported legislative interest is simply not served by the subpoena here. *See McPhaul v. United States*, 364 U.S. 372, 381 (1960) (recognizing that a congressional subpoena cannot be "plainly incompetent or irrelevant to any lawful purpose").

40

For one thing, Mr. Pomerantz has sworn that he lacks "any personal knowledge of the District Attorney's Office's use of federal forfeiture funds, including the use of any such funds during [his] tenure at the Office." (Dkt. No. 31 ¶ 4.) Moreover, the District Attorney's general counsel has already provided the Committee with detailed information about the Office's limited use of federal funds, and offered to meet and confer about disclosing more of the same. The information already turned over has shown, as relevant here, that (a) the District Attorney's Office spent approximately $5,000 in federal forfeiture funds on matters related to Mr. Trump or the Trump Organization, the overwhelming majority of which went to the costs of litigating the U.S. Supreme Court case *Trump v. Vance*, 140 S. Ct. 2412; and that (b) "[n]o expenses incurred relating to this matter [i.e., the criminal prosecution] have been paid from funds that the Office receives through federal grant programs." (Exh. 159, at 4.) Mr. Pomerantz simply has no information germane to federal funding that he was wholly unaware of, that barely affected a criminal investigation that did not result in an indictment, and that did not affect the criminal investigation that did result in an indictment.

Third, the Committee purports to be considering legislation to remedy a "potential conflict" between "federal law-enforcement officials required by federal law to protect the former President" and "local law-enforcement officials required to enforce an indictment" and secure his presence during criminal proceedings. (Exh. 15 at 2.) There is no basis whatsoever to believe that Mr. Pomerantz has relevant knowledge about security arrangements by federal or state officials, let alone specific to the arrangements made during Mr. Trump's arraignment on April 4, 2023 (Compl. (Exh. 1) ¶¶ 92-93), which took place more than a year after Mr. Pomerantz had resigned. The subpoena to Mr. Pomerantz is thus "plainly incompetent or irrelevant" to this legislative purpose. *McPhaul*, 364 U.S. at 381.

Finally, the Committee purports to be interested in the "complicated question" of what "effect, if any, . . . potential criminal prosecutions may have on Presidents while serving office." (Dkt. No. 27 at 16; *see also* Exh. 15 at 2.) For example, the Committee asks if a President may "have an incentive to refrain from making decisions" while in office "as a way of guarding against future criminal liability." (Dkt. No. 27 at 16.) But it is difficult to understand how Mr. Pomerantz, who has

42

never been President or worked for one, could meaningfully inform the Committee about presidential decision-making. And there is no plausible connection between Mr. Pomerantz's knowledge of the "internal deliberations" of the District Attorney's Office (Exh. 15 at 3) and the completely separate and confidential deliberations that take place in the White House. *See United States v. Nixon*, 418 U.S. 683, 708 (1974). If the Committee is genuinely interested in legislating on this question, the appropriate witness would be Mr. Trump, not Mr. Pomerantz.

The congressional defendants' purported legislative interests thus do not support the subpoena here. But these asserted interests are also inadequate as a defense to the subpoena for a more fundamental reason: they simply do not account for much of the information that the Committee wishes to elicit from Mr. Pomerantz. The Committee has sought Mr. Pomerantz's testimony because of his "unique role as a special assistant district attorney leading the investigation into President Trump's finances" (Exh. 15 at 2)—not because of his expertise in criminal prosecution generally, corporate security, or presidential decision-making. And the Committee has asked Mr. Pomerantz about "internal deliberations" he may have witnessed regarding the evidence and legal

43

basis for the current criminal charges against Mr. Trump (Exh. 15 at 3)—deliberations that have nothing do with federal funding, and that have no bearing on any "current and former President[]" (*id.* at 2) aside from Mr. Trump. There is thus a serious mismatch between the Committee's purported interest in hypothetical general legislation and the actual interrogation they intend to conduct about Mr. Pomerantz's knowledge of and participation in a specific criminal case against a single individual.

Thus, the hypothetical legislation proposed by the Committee is, at best, a radically *incomplete* justification of their authority to compel Mr. Pomerantz specifically to appear and to testify about the particular subjects previewed in the Committee's letters. This mismatch underscores the importance of taking the Committee at its word that, as Chairman Jordan announced in his very first letter, the driving force behind this investigation is to halt a state criminal prosecution that the congressional defendants judged from the outset to be unfounded and "politically motivated" (Exh. 3 at 1)—not to solicit the views of subject-matter experts on general matters of congressional interest. Thus, notwithstanding the congressional defendants' litigation-driven arguments, this Court should not "blind" itself to "what all others can

see": the subpoena to Mr. Pomerantz is not "a run-of-the-mill legislative effort," *Mazars*, 140 S. Ct. at 2034, but rather an extraordinary intervention into a specific state criminal proceeding in support of a single defendant. The legitimacy of the subpoena should thus be assessed against this overt objective of the Committee's exercise of its oversight powers.

## C. The Subpoena Does Not Survive the Heightened Scrutiny Imposed by *Mazars*.

Even assuming that there were a valid legislative purpose for Mr. Pomerantz's testimony, the subpoena would still be invalid because the Committee has not come close to satisfying the heightened standard of review that *Trump v. Mazars* prescribes for congressional subpoenas implicating "a clash between rival branches of government." 140 S. Ct. at 2034. That standard requires Congress to tailor its demand to a valid legislative purpose and avoid unduly burdening other branches of government with requests for information that could be obtained from other sources. *Id.* at 2035–36. The Judiciary Committee's subpoena to Mr. Pomerantz fails this test.

As a threshold matter, the congressional defendants dispute whether *Mazars* applies here and essentially seek to limit that case to

45

disputes between Congress and the Executive Branch. (Dkt. No. 27 at 15; *see* Exh. 11 at 14.) There is no basis to read *Mazars* so narrowly. Although *Mazars* was motivated by the "significant separation of powers issues" raised by the inter-branch dispute at issue there, the federalism concerns raised by the subpoena here are at least as weighty, and thus require the same "careful analysis" into the congressional defendants' asserted interest and appropriate respect for the District Attorney's sovereign law enforcement powers. *Id.* at 2033, 2035; *see, e.g.*, *Bond v. United States*, 564 U.S. 211, 223-24 (2011) (recognizing importance of both separation of powers and federalism in protecting individual liberty); *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) ("Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front."). Even the district court recognized the "potential federalism concerns" implicated in this case. (Exh. 11 at 7.) *Mazars* should not apply any differently "merely because vertical [federalism] rather than

horizontal separation of powers is at issue." *LaRoque v. Holder*, 650 F.3d 777, 792 (D.C. Cir. 2011).

Indeed, given the strength of the federalism interests here, there would be a sound basis for this Court to apply the "more demanding standard" from *Nixon*, 418 U.S. 683—requiring Congress to establish a "demonstrated, specific need," *id.* at 713, or proof that the requested information is "demonstrably critical" to a legislative purpose, *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (en banc). The Supreme Court declined to apply this standard in *Mazars* because the financial information the House requested there involved "nonprivileged, private information, which by definition does not implicate sensitive Executive Branch deliberations." 140 S. Ct. at 2033. Here, by contrast, and as explained further below, the subpoena necessarily requests privileged information, including grand-jury matters that New York law requires to be kept secret, and confidential communications or materials that are protected by attorney-client, work-product, or other privileges. The analysis conducted in *Mazars* is thus, at most, a baseline standard that the Committee's subpoena here must satisfy (and does not). In applying the *Mazars*

framework, this Court can and should follow *Nixon* and give appropriate weight to the more significant public and sovereign interests implicated by the information requested by the Committee here.

*Mazar*'s "careful analysis" involves four factors. *Mazars*, 140 S. Ct. at 2035. Courts must (1) "carefully assess whether the asserted legislative purpose warrants the significant step of involving the President and his papers," including by asking whether "other sources could reasonably provide Congress the information it needs"; (2) "insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective"; (3) "be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose"; and (4) "assess the burdens imposed . . . by a subpoena." *Id.* at 2035–36. All four factors weigh against the subpoena here—so much so, in fact, the congressional defendants' opposition brief below did not even contest whether the subpoena meets the four factors.

The Judiciary Committee's subpoena fails the first *Mazars* factor because its "asserted legislative purpose" does not justify the "significant step" of deposing a former state prosecutor about a pending criminal case and ongoing criminal investigation, and information is available to the

Committee through other, less intrusive alternatives. 140 S. Ct. at 2035. For the reasons explained above, the Judiciary Committee has no valid legislative basis to obstruct, second-guess, or otherwise interfere with the state's criminal case, and no authority to immunize former presidents from state criminal liability. As also explained, the other legislative interests identified by the Committee have little to nothing to do with Mr. Pomerantz, and the Committee has many alternative sources of information about federal funding, courtroom security, presidential decision-making, and the like.

Even if the congressional defendants could demonstrate that Mr. Pomerantz's testimony may be relevant to some hypothetical legislative interest (and they cannot), Congress is not entitled to "every scrap of potentially relevant evidence" in crafting legislation. *Mazars*, 140 S. Ct. at 2036. Nor is Congress entitled to use a pending criminal prosecution as "a 'case study' for general legislation." *Id.* at 2036. Particularly in light of the inevitable burdens that will be imposed on the pending criminal prosecution by any ongoing congressional investigation into the motivations and justifications for that prosecution, the Committee has not established a need—let alone a "demonstrated, specific need," *Nixon*,

49

418 U.S. at 713—to have Mr. Pomerantz specifically testify about the inner workings of a criminal investigation.

The subpoena also fails the second *Mazars* factor because it is "broader than reasonably necessary to support Congress's legislative objective." 140 S. Ct. at 2036. The purported legislative interests identified by the Committee have essentially nothing to do with the most significant categories of information that the Committee has requested from Mr. Pomerantz: his knowledge of the "internal deliberations" within and "decision-making process" of the District Attorney's Office, his personal animosity toward Mr. Trump, and so on. Rather than identifying topics (or, for that matter, witnesses) more germane to its purported legislative interests, the Committee instead demands testimony from a former employee of the District Attorney's Office that bears most directly on the Committee's stated but forbidden purpose of halting the state criminal action against Mr. Trump.

The subpoena fails the third *Mazars* factor because the Committee has offered little to no "evidence" that its demand to Mr. Pomerantz "advances a valid legislative purpose." 140 S. Ct. at 2036. In cases like this one implicating substantial federalism or separation of powers

concerns, *Mazars* requires strong proof of a valid legislative objective—
"[t]he more detailed and substantial the evidence . . . the better." *Id.* Yet
the legislative record is bereft of any evidence that would support the
need for the legislation hypothesized by the Committee. For example,
although the Committee refers to "potential conflict" between federal and
local officials providing security to a former President (Ex. 1 at 2), there
was no evidence of any such conflict during Mr. Trump's arraignment
(Compl. ¶ 92). The Committee has also failed to establish how Mr.
Pomerantz's testimony might advance its legislative agenda, given his
ignorance over matters such as federal funding and presidential decision-
making. By contrast, the information that the Committee *has* requested
from Mr. Pomerantz about his knowledge of the internal deliberations in
and decision-making process of the District Attorney's Office could
meaningfully interfere with the pending criminal prosecution. The
Committee has thus failed to "adequately identif[y] its aims" or explain
why Mr. Pomerantz's "information will advance its consideration of . . .
possible legislation." *Mazars*, 140 S. Ct. at 2036.

Finally, the subpoena fails the fourth *Mazars* factor because it
would substantially burden both the New York criminal justice system

and the District Attorney's Office as it prepares for Mr. Trump's criminal trial. 140 S. Ct. at 2036. As explained above in the discussion of irreparable injury, the Committee's subpoena threatens to reveal confidential information; to interfere with ongoing pretrial procedures, including discovery; to chill actions by prosecutors and witnesses in this case and other ongoing and future investigations; and to create prejudicial pretrial publicity. These burdens would be inherent in any parallel congressional investigation of a pending state criminal action, but they are heightened here when the Committee's explicit and primary target is the state criminal proceeding itself, including the prosecutors, witnesses, and judge involved in it.

*Mazars* itself underscores the distinctive harm of such burdens from a congressional subpoena. As the Supreme Court noted in *Mazars*, the supposed federal interest identified by the Congressional defendants here—the protection of current and former Presidents from state criminal process—is not sufficiently weighty to override the states' sovereign interest in enforcement of its criminal laws. 140 S. Ct. at 2026. Indeed, on the same day that *Mazars* was decided, the Court allowed this Office to proceed with a criminal subpoena involving then-President

52

Trump, and rejected any "heightened need standard" for the District Attorney to obtain that information. *Vance*, 140 S. Ct. at 2429. But *Mazars* drew a sharp line between a request for "the President's information . . . sought . . . by prosecutors . . . in connection with a particular judicial proceeding," and a request by several House committees for the same information, and imposed a heightened standard of judicial scrutiny only on the latter. *Mazars*, 140 S. Ct. at 2026, 2035-36. In other words, *Mazars* (in conjunction with *Vance*) has already recognized the distinctive harms posed by House subpoenas that trigger inter-governmental conflicts, and contrasted those harms with the absence of any comparably significant burden from the enforcement of state criminal laws even against a sitting President. That finding further weighs in favor of a stay of the subpoena here.

# CONCLUSION

This Court should grant the District Attorney's application for an interim administrative stay and a stay pending appeal.

Dated: April 19, 2023

Respectfully Submitted,

ALVIN L. BRAGG, JR.
District Attorney
New York County

BY:  /s/ Steven C. Wu
    STEVEN C. WU
    *Chief, Appeals Division*
    (212) 335-0326
    wus@dany.nyc.gov

LESLIE B. DUBECK
    *General Counsel*
STEVEN C. WU
    *Chief, Appeals Division*
STEPHEN J. KRESS
CAROLINE S. WILLIAMSON
    *Assistant District Attorneys*
District Attorney's Office
New York County
One Hogan Place
New York, NY 10013
(212) 335-9000

*Of Counsel*

THEODORE J. BOUTROUS, JR.
Gibson Dunn & Crutcher LLP
33 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7804

MYLAN L. DENERSTEIN
LEE R. CRAIN
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
(212) 351-3850

KATHERINE MORAN MEEKS
Gibson Dunn & Crutcher LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8258

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 27 and 32 of the Federal Rules of Appellate Procedure, Steven C. Wu, an employee in the New York County District Attorney's Office, hereby certifies that according to the word count feature of the word processing program used to prepare this document, the document contains 10,412 words and complies with the typeface requirements and length limits of Rules 27(d) and 32(a)(5)-(6).


                                                       /s/ Steven C. Wu

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALVIN L. BRAGG, JR., in his official capacity as District Attorney for New York County, <br><br> *Plaintiff*, <br><br> v. <br><br> JIM JORDAN, in his official capacity as Chairman of the Committee on the Judiciary; COMMITTEE ON THE JUDICIARY OF THE UNITED STATES HOUSE OF REPRESENTATIVES; and MARK F. POMERANTZ, <br><br> *Defendants*. | **Case No.** 23-cv-3032 |

## INTRODUCTION

1.      Plaintiff District Attorney Alvin L. Bragg, Jr. brings this action in response to an unprecedently brazen and unconstitutional attack by members of Congress on an ongoing New York State criminal prosecution and investigation of former President Donald J. Trump. Beginning on March 20, 2023, Representative Jim Jordan, Chairman of the House Committee on the Judiciary (the "Committee"), began a transparent campaign to intimidate and attack District Attorney Bragg, making demands for confidential documents and testimony from the District Attorney himself as well as his current and former employees and officials. Two days after Mr. Trump was arraigned on 34 felony counts in New York State Supreme Court, Chairman Jordan and the Committee served a subpoena on Mark Pomerantz, a former Special Assistant District Attorney who participated in an investigation of Mr. Trump and his businesses. The subpoena seeks to compel Mr. Pomerantz to testify in a deposition on April 20, 2023. Chairman Jordan's demands, including his subpoena to Mr. Pomerantz, seek highly sensitive and confidential local prosecutorial information that belongs to the Office of the District Attorney and the People of New

1

York. Basic principles of federalism and common sense, as well as binding Supreme Court precedent, forbid Congress from demanding it.

2. Congress has no power to supervise state criminal prosecutions. Nor does Congress have the power to serve subpoenas "for the personal aggrandizement of the investigators or to punish those investigated." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) (quoting *Watkins v. United States*, 354 U.S. 178, 187 (1957)) (internal quotation marks omitted). Yet that is precisely what Chairman Jordan is trying to do. He and his allies have stated they want the District Attorney to come to Capitol Hill to "explain" himself and to provide "a good argument" to Congress in support of his decision to investigate and prosecute Mr. Trump. And they have threatened that the House of Representatives will "hold Alvin Bragg . . . to account" for indicting Mr. Trump. Now, Chairman Jordan has subpoenaed one of the District Attorney's former Special Assistants to interrogate him about his official prosecutorial activities. But subpoenaing a former line prosecutor to talk about an ongoing criminal prosecution and investigation is no less of an affront to state sovereignty than subpoenaing the District Attorney himself. Chairman Jordan claims he is seeking to conduct "oversight." But he has no power under the Constitution to oversee state and local criminal matters. By definition, then, he has no legitimate legislative purpose for issuing this subpoena. The subpoena threatens the sovereign powers of the States, confidence in the secrecy of grand jury proceedings, and the integrity of an ongoing criminal prosecution. This Court should enjoin its enforcement.

3. The Constitution "with[held] from Congress a plenary police power," *United States v. Lopez*, 514 U.S. 549, 566 (1995), which "is controlled by 50 different States instead of one national sovereign," *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012); *accord United States v. Morrison*, 529 U.S. 598, 618 (2000). "[P]rimary authority" "for defining and enforcing

the criminal law" is vested in the States. *Lopez*, 514 U.S. at 561 n.3. That division of authority requires that "[o]rdinarily" there should "be no interference with [state] officers," who are "charged with the duty of prosecuting offenders against the laws of the State and must decide when and how this is to be done." *Younger v. Harris*, 401 U.S. 37, 45 (1971). "Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982).

4.    The charges the District Attorney filed against Mr. Trump were approved by citizens of New York. They did their civic duty as members of a grand jury pursuant to the federal Constitution and laws of the State of New York. Like any other defendant, Mr. Trump is entitled to challenge these charges in court. He can avail himself of all the processes and protections that New York State's robust criminal procedure affords.

5.    But rather than allowing the criminal process to proceed in the ordinary course, Chairman Jordan and the Committee are participating in a campaign of intimidation, retaliation, and obstruction. Mr. Trump in particular has threatened New York officials with violent and racist vitriol. At a March 25, 2023 rally, for instance, Mr. Trump stated that "the thugs and criminals who are corrupting our justice system will be defeated, discredited, and totally disgraced."[1] On social media, he threatened "death & destruction" and to wage "war" if he was indicted. Mr. Trump also called District Attorney Bragg a "SOROS BACKED ANIMAL"—a dog whistle Chairman Jordan repeated on television on March 23, 2023, calling District Attorney Bragg "the Soros-backed, new DA, left-wing DA Alvin Bragg."[2] Mr. Trump even shared a social media post

---

[1]    Julia Shapero, *Trump vows to remove 'thugs and criminals' from justice system at rally, amid legal woes*, The Hill (Mar. 25, 2023), https://thehill.com/homenews/campaign/3918390-trump-vows-to-remove-thugs-and-criminals-from-justice-system-at-rally-amid-legal-woes/.

[2]    *The Art of Not Being Indicted with Rep. Jim Jordan*, The Charlie Kirk Show (Mar. 23, 2023), https://omny.fm/shows/the-charlie-kirk-show/the-art-of-not-being-indicted-with-rep-jim-jordan.

that appeared to be a picture of himself threateningly wielding a baseball bat to District Attorney

Bragg's head.



6.     These statements have had a powerful effect.  District Attorney Bragg has received

multiple death threats.  In one instance, he received a package containing suspicious white powder

with a note making a specific death threat against him.  Since Mr. Trump falsely predicted he

would be arrested on March 18, 2023, in fact, the District Attorney's Office has received more

than 1,000 calls and emails from Mr. Trump's supporters, many of which are threatening and

racially charged.  But rather than denounce efforts to vilify and denigrate the District Attorney and

the grand jury process, House Republicans are participating in those efforts.[3]

7.     Chairman Jordan, along with other congressmen, have made no secret that the

purpose of the Committee's inquiry is to "conduct oversight" and undertake an "examination of

the facts" supporting the indictment—the same facts already evaluated by an independent grand

---

[3]     Annie Grayer et al., *Inside the Backchannel Communications Keeping Donald Trump in the Loop on Republican Investigations*, CNN (Mar. 28, 2003), https://www.cnn.com/2023/03/28/politics/trump-gop-investigations-backchannel/index.html.

jury of New Yorkers—and to hold the District Attorney "to account."  Chairman Jordan and the Committee have, in essence, appointed Congress as a super grand jury that can flex its subpoena power to second guess the judgment of New York citizens and interfere with the state criminal justice process.   In his letters and public statements, however, Chairman Jordan and his congressional allies have changed their story multiple times, creating as it suits them a scattershot hodgepodge of new purported legislative interests and purposes that supposedly justify the Committee's unwarranted "incursion" into a state criminal case.  *Printz v. United States*, 521 U.S. 898, 920 (1997).  Each of these is a baseless pretext for hauling Mr. Pomerantz to Washington for a retaliatory political circus designed to undermine the rule of law and New York's police power.  And in cases like this one implicating "substantial" federalism or separation of powers concerns, the Supreme Court's decision in *Mazars* requires the federal courts to probe Congress's asserted purposes for pretext and evidence.  140 S. Ct. at 2036.  The Chairman has also admitted that subpoenaing Mr. Pomerantz is only the first step of his subpoena strategy.  As Chairman James Comer of the House Committee on Oversight and Accountability put it, Mr. Trump's allies in the House "fully expect to see Alvin Bragg answering questions in front of Congress as soon as [they] can make it happen."[4]

8.     Members of Congress are not free to invade New York's sovereign authority for their or Mr. Trump's political aims.  Congress has no authority to "conduct oversight" into District Attorney Bragg's exercise of his duties under New York law in a single case involving a single defendant.  Nor can Congress force a former prosecutor to make extrajudicial statements during a criminal prosecution about that prosecution or related criminal investigations—statements that the

---

[4]     Luke Broadwater and Jonathan Swan, *Republicans Vowed to Grill Bragg About Trump, but It's Not So Simple*, N.Y. Times (Apr. 5, 2023), https://www.nytimes.com/2023/04/05/us/politics/house-republicans-bragg-subpoena-trump.html#:~:text=%E2%80%9CWe%20do%20want%20Mr.%20Bragg,not%20going%20to%20back%20down.%E2%80%9D.

5

New York Rules of Professional Conduct forbid, in part, because they could prejudice Mr. Trump's right to a fair trial and prompt due process concerns. *See* N.Y.R. Prof. Cond. Rule 3.6; *see also Powers v. Coe,* 728 F.2d 97, 105 (2d Cir. 1984). Compelling Mr. Pomerantz to provide this type of testimony is unprecedented. As one former counsel for the House and legal scholar explained in testimony provided to Congress itself:

> [T]here hasn't been a subpoena enforcement against a state attorney general in 200 years . . . and there's an excellent reason. State Attorneys General have their own state sovereign authority. They are frequently elected. They have their own base, their own electoral base, their own mission, and their mission is to pursue things that Congress can't.[5]

9. Mr. Trump is free to avail himself of any and all criminal procedure processes available to him. Indeed, his motions in his criminal case are due in August. If he wishes to argue that his prosecution is "politically motivated," he is free to raise that concern to the New York state criminal court. Chairman Jordan is not, however, free to unconstitutionally deploy Congress's limited subpoena power for raw political retaliation, intimidation, or obstruction.

10. District Attorney Bragg therefore brings this action in response to the Committee's plainly unconstitutional subpoena. He brings two causes of action.

11. *First*, the subpoena served on Mr. Pomerantz is invalid, unenforceable, unconstitutional, and *ultra vires* because it has no legitimate legislative purpose, *Watkins*, 354 U.S. at 187, and manifestly fails each of the four factors the Supreme Court established in *Mazars* to evaluate the enforceability of a congressional subpoena directed to another branch of government. 140 S. Ct. at 2035–36. Namely, Congress has no power under Article I of the Constitution to oversee, let alone disrupt, ongoing state law criminal matters, and the shifting array of legislative

---

[5] *Affirming Congress' Constitutional Oversight Responsibilities: Subpoena Authority and Recourse for Failure to Comply with Lawfully Issued Subpoenas*: *Hearing Before H. Comm. On Science, Space, and Technology*, 114th Cong. (2016) (statement of Charles Tiefer, Former Acting General Counsel, U.S. House of Representatives).

purposes the Chairman has invoked in favor of his demands do not "warrant[] the significant step" of seeking information from the District Attorney. *Id.* at 2035. The subpoena also is vastly "broader than reasonably necessary to support" the Chairman's purported "legislative objective"— an objective the Chairman has provided not a whit of "evidence" to support. *Id.* at 2036. And finally, the subpoena is unduly burdensome, particularly in light of the ongoing criminal prosecution and investigation of Mr. Trump.

12.     *Second*, even if Chairman Jordan and the Committee were able to demonstrate a valid legislative purpose and withstand the *Mazars* test (they cannot), the subpoena still would not be enforceable because it could allow the Committee to seek secret grand jury material, confidential investigative material, and information clearly protected by the attorney-client, work product, deliberative process, law enforcement, informant's, and public interest privileges. These privileges exist to protect precisely the type of information Chairman Jordan and the Committee are seeking—confidential law enforcement and legal materials compiled during investigations and in the lead-up to a prosecution. The privileges are designed to prevent the type of obstruction and interference with ongoing criminal investigations and prosecutions that Chairman Jordan and the Committee's actions represent.

13.     In sum, Congress lacks any valid legislative purpose to engage in a free-ranging campaign of harassment in retaliation for the District Attorney's investigation and prosecution of Mr. Trump under the laws of New York. That campaign is a direct threat to federalism and the sovereign interests of the State of New York. This Court should enjoin the subpoena and put an end to this constitutionally destructive fishing expedition. It should protect New York's lawful pursuit of criminal justice and permit this State's criminal justice system to function under the

careful supervision of the New York Supreme Court free from unconstitutional congressional interference.  This Court should grant judgment to District Attorney Alvin L. Bragg, Jr.

## PARTIES

14.     Plaintiff Alvin L. Bragg, Jr. is the District Attorney for Manhattan.  District Attorney Bragg brings this suit in his official capacity.

15.     Defendant Jim Jordan is a Republican member of the U.S. House of Representatives and Chairman of the Committee on the Judiciary.  He is sued in his official capacity.

16.     Defendant Committee on the Judiciary is a standing committee of the United States House of Representatives.

17.     Defendant Mark F. Pomerantz was a Special Assistant District Attorney in the Manhattan District Attorney's Office from 2021 to 2022.  In that role, Mr. Pomerantz assisted with the Office's investigation into Mr. Trump's personal and business finances. On February 23, 2022, Mr. Pomerantz resigned his appointment.

18.     The District Attorney sues Mr. Pomerantz to protect the District Attorney's Office's interests and privileges and in light of the District Attorney's Office's instruction to Mr. Pomerantz not to provide any information or materials relating to his work in the District Attorney's Office in response to the subpoena.  As the Supreme Court has made clear, the important structural constitutional interests at stake "are no less palpable here simply because the subpoena[] w[as] issued to [a] third part[y]." *Mazars*, 140 S. Ct. at 2035.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this case arises under the Constitution and laws of the United States.

20.     This Court has authority to issue a declaratory judgment and order other relief that is just and proper pursuant to 28 U.S.C. §§ 2201 and 2202.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and (e)(1) because a substantial part of the events giving rise to this action occurred in the Southern District of New York.  Chairman Jordan served Mr. Pomerantz with a subpoena in New York, where he resides.  That subpoena seeks testimony relating to law enforcement investigations and an active prosecution the District Attorney is conducting in Manhattan and related grand jury proceedings.

22.     This Court has personal jurisdiction over Chairman Jordan and the Committee under CPLR § 302 because they "engage[d] in [a] persistent course of conduct" and "expect[ed] or should reasonably expect the act to have consequences in the state."  The Chairman and the Committee have reached into New York State to serve a subpoena on Mr. Pomerantz, a former Special Assistant in the Manhattan District Attorney's Office, as part of an ongoing effort to obstruct, impede, and delegitimize a local criminal prosecution in New York City.  They have also demanded documents and testimony from three other New Yorkers, including the District Attorney himself.  By his own reckoning, Chairman Jordan and the Committee are seeking to conduct "oversight" of an ongoing New York State criminal investigation and an ongoing New York State criminal prosecution pending in New York State court.  They are seeking highly sensitive and confidential prosecutorial information concerning an ongoing local prosecution and investigation the District Attorney's Office is properly conducting on behalf of the People of New York.  They have thereby purposefully availed themselves of this forum and subjected themselves to personal jurisdiction in the State of New York in connection with this controversy.

23.     The Chairman and the Judiciary Committee have also availed themselves of this forum by planning to hold a field hearing in New York City on April 17, 2023 regarding the District Attorney's prosecutorial policies.

24.     This Court has personal jurisdiction over Mr. Pomerantz because he is a resident of New York.

## FACTUAL ALLEGATIONS

**A.     District Attorney Bragg Takes Office And Reduces Crime In New York City.**

25.     The Manhattan District Attorney's Office investigates and prosecutes violations of New York State law.  New York State law confers on district attorneys the authority "to prosecute all crimes and offenses cognizable by the courts of the county for which he shall have been elected or appointed."  N.Y. County L. § 927; *see also id.* § 700.  Each case the Office brings is brought on behalf of "The People of the State of New York."

26.     Plaintiff Alvin L. Bragg, Jr. is the first Black person to serve as District Attorney of Manhattan.  District Attorney Bragg has spent two decades in public service, having previously served as Chief Deputy Attorney General in the New York Attorney General's office and as an Assistant United States Attorney in the Southern District of New York.  As a long-time white collar prosecutor, District Attorney Bragg believes in holding powerful people accountable for harming everyday New Yorkers.

27.     As of April 2, 2023, the year-to-date statistics for New York City, and Manhattan specifically, continue to trend downward:  homicides are down 14.3% and down further in Manhattan; shooting incidents are down 17.3%; rapes are down 33.3% and down further in Manhattan; robbery is down 7.6% and down further in Manhattan; and burglary is down 21% and down further in Manhattan.  Total index crimes are down 1.3% in Manhattan, despite being up slightly citywide.  The work of the District Attorney's Office in the last year is contributing to

these successes. Gun prosecutions by the Office were up approximately 18% in the District Attorney's first year in office. Last year, the District Attorney's Office secured indictments against gun traffickers, ghost gun manufacturers, and members of a violent criminal enterprise. The Office is also making use of available tools to reduce recidivism: with recent amendments to bail eligibility the Office has sought bail in 400 property crime cases that would not have been bail-eligible otherwise. And in just the past week, the Office has required landlords to initiate civil eviction proceedings against seven unlicensed cannabis shops that are operating unlawfully in Manhattan.

**B.      District Attorney Bragg Continues His Predecessor's Investigations Into Mr. Trump.**

28.      When he assumed office on January 1, 2022, District Attorney Bragg inherited years-long investigations into the financial activities of Donald J. Trump and the Trump Organization. District Attorney Bragg issued a public statement on April 7, 2022, confirming that his Office had continued the investigations through its staff of experienced career prosecutors.

29.      District Attorney Bragg also inherited an indictment of two Trump entities (Trump Corporation and Trump Payroll Corp.) and Allen Weisselberg, the former chief financial officer of the Trump Organization. The charges against the Trump entities went to trial with opening statements beginning on Monday, October 31, 2022. Donald Trump announced his candidacy for President the next month, while the trial and previously announced investigations by the District Attorney remained ongoing.

30.      District Attorney Bragg's Office secured the trial conviction of the two Trump entities and a guilty plea from Mr. Weisselberg for, among other crimes, defrauding New York State and New York City tax authorities. Following the trial verdict in December of 2022, a New York State court fined the Trump Corporation and the Trump Payroll Corp. $1.6 million for

running the decade-long tax fraud scheme and sentenced Mr. Weisselberg to five months incarceration followed by five years' probation.

31.     Other investigations remained ongoing.  The New York State Constitution Bill of Rights establishes that all "capital or otherwise infamous crime[s]" must be brought through a grand jury indictment.  N.Y. Const. Art. I § 6; *see also* U.S. Const., amend. V.  A grand jury in New York consists of 23 New Yorkers who must decide whether documents, witness testimony, and other evidence presented by prosecutors supports returning an indictment for violations of New York law.  Grand jurors are selected at random from the general population of New York County without regard to their personal political affiliation.

32.     In early 2023, the news media reported on a grand jury investigation into allegations against Mr. Trump and the possibility that Mr. Trump might be criminally charged.  In response, Mr. Trump and his supporters in Congress launched efforts to attack the District Attorney's integrity, intimidate his Office, and mount "an aggressive response" to preempt potential criminal charges.[6]  House Republicans regularly kept Mr. Trump updated on these developments.  For example, Representative Marjorie Taylor Greene "keep[s] him up[dated] on everything that [they're] doing," and House Republican Conference Chair Elise Stefanik has "walked [Mr. Trump] through the GOP's plans for an aggressive response to Bragg."[7]  It has been reported that Mr. Trump has himself been preparing plans to exact revenge on District Attorney Bragg if Mr. Trump returns to the White House in 2024.  Some of his advisors have reportedly recommended that he

---

[6]     Grayer, *supra* note 3.

[7]     *Id*.

"unleash" the Department of Justice's "Civil Rights Division" to prosecute District Attorney Bragg "for supposedly 'racist law enforcement practices.'"[8]

33.    The effort to obstruct the grand jury's investigation into Mr. Trump picked up steam on March 10, 2023. On that day, Mr. Trump's lawyer, Joseph Tacopina, sent Chairman Jordan a letter describing District Attorney Bragg as a "rogue local district attorney."[9] Mr. Tacopina urged Chairman Jordan to deploy the powers of his office to investigate what he described as District Attorney Bragg's "egregious abuse of power."[10]

34.    On March 18, 2023, Mr. Trump announced on Truth Social, his social media platform, that he believed he would be arrested the following Tuesday. Mr. Trump claimed to have sourced this information—which was false—from "ILLEGAL LEAKS" in the "CORRUPT & HIGHLY POLITICAL MANHATTAN DISTRICT ATTORNEYS OFFICE." Mr. Trump urged his supporters to "PROTEST, TAKE OUR NATION BACK!"



---

[8]    Asawin Suebsaeng, Adam Rawnsley, *Trump Already Has a Plan to Get Revenge on Alvin Bragg*, Rolling Stone (Mar. 23, 2023), https://www.rollingstone.com/politics/politics-features/trump-revenge-plan-alvin-bragg-1234702976/.

[9]    Annie Karni and Luke Broadwater, *House G.O.P., Defending Trump, Targets Bragg Ahead of Expected Indictment*, N.Y. Times (Mar. 20, 2023), https://www.nytimes.com/2023/03/20/us/politics/house-republicans-trump-indictment.html.

[10]    *Id.*

35.     Mr. Trump's post calling for "protest[s]" bears a striking resemblance to the December 19, 2020 tweet in which he urged his supporters to protest after he lost the 2020 Presidential election: "Big protest in D.C. on January 6th.  Be there, will be wild!"[11]  The House Select Committee to Investigate the January 6th Attack on the U.S. Capitol concluded that Mr. Trump's December 19, 2020 tweet served as "a call to arms" for "extremists and conspiracy theorists" that had the effect of "summoning a mob."[12]  "For the Proud Boys . . . President Trump's tweet set in motion a chain of events that led directly to the attack on the U.S. Capitol."[13]

36.     Mr. Trump was not arrested the following Tuesday, March 21, 2023, as he had predicted on social media.  Although his prediction was false, his call to "protest" and "take our nation back" prompted law enforcement agencies to deploy a significant security response, including around the New York State Supreme Court criminal courthouse in lower Manhattan and the District Attorney's Office.

37.     Meanwhile, on March 19, 2023, House Speaker Kevin McCarthy amplified Mr. Trump's incendiary rhetoric, accusing District Attorney Bragg of "abusing his office to target President Trump" and announced that Congress would "investigate any use of federal funds that are used to facilitate the perversion of justice by Soros-backed DA's across the country."  George Soros is a Jewish American businessman and philanthropist known for his support of liberal causes and candidates.  He is frequently cited as a boogeyman in rightwing, and often anti-Semitic, conspiracy theories and dog whistles.  District Attorney Bragg does not know Mr. Soros and has never communicated with him.

---

[11]   Maggie Haberman et al., *Trump Claims His Arrest Is Imminent and Calls for Protests, Echoing Jan. 6*, N.Y. Times (Mar. 18, 2023), https://www.nytimes.com/2023/03/18/us/politics/trump-indictment-arrest-protests.html.

[12]   Final Report of the House Select Committee to Investigate the January 6th Attack on the U.S. Capital, House Rep. 117-000, at Foreword & p. 6 (Dec. 22, 2022), available at https://tinyurl.com/mr364uyt.

[13]   *Id*.



38.     Other House Representatives have also expressed their support for Mr. Trump. House Republican Conference Chair Stefanik frequently speaks with Mr. Trump and has expressed that she believes District Attorney Bragg should testify before Congress to explain his decision to investigate the former president.  Representative Greene, a member of the Committee on Oversight and Accountability, also frequently speaks with Mr. Trump and has called for District Attorney Bragg's arrest.  On March 22, 2023, she falsely tweeted that District Attorney Bragg was "breaking the law" and "trying to incite civil unrest with his Soros funded political war."



**C.    Chairmen Of Three Congressional Committees Send A Letter Requesting Documents and Testimony from District Attorney Bragg, Mr. Pomerantz, and Carey Dunne.**

39.    After receiving the letter from Mr. Trump's counsel and in the wake of Speaker McCarthy's tweet vowing an investigation, on March 20, 2023, chairmen of three Congressional committees sent a letter to District Attorney Bragg purporting to launch an investigation into his "decision to pursue such a politically motivated prosecution."[14] The signatories included Chairman Jordan, Chairman Comer, and Chairman Bryan Steil of the Committee on House Administration (together the "Chairmen" and the "Committees," respectively).

40.    The letter blithely accused District Attorney Bragg of "an unprecedented abuse of prosecutorial authority:  the indictment of a former President of the United States and current declared candidate for that office."  And it demanded that District Attorney Bragg give testimony and produce the following three categories of documents for the period January 1, 2017 to the present:

> "1. All documents and communications between or among the New York County District Attorney's Office and the U.S. Department of Justice, its component entities, or other federal law enforcement agencies referring or relating to your office's investigation of President Donald Trump;
>
> 2. All documents and communications sent or received by former employees Carey Dunne and Mark Pomerantz referring or relating to President Donald Trump; and
>
> 3. All documents and communications referring or relating to the New York County District Attorney Office's receipt and use of federal funds."

---

[14]    Previously, Chairman Jordan requested from the U.S. Department of Justice documents relating to the special counsel investigation into President Biden's handling of classified material.  The Department of Justice responded by stating that it would withhold such documents because "[d]isclosures to Congress about active investigations risk jeopardizing those investigations and creating the appearance that Congress may be exerting improper political pressure or attempting to influence Department decisions in certain cases. Judgments about whether and how to pursue a matter are, and must remain, the exclusive responsibility of the Department."  Zachary Cohen, *DOJ tells House Judiciary chair it will not hand over most Biden special counsel probe documents until investigation complete*, CNN (Jan. 30, 2023), https://www.cnn.com/2023/01/30/politics/doj-response-special-counsel-documents/index.html.

41.     The Chairmen stated that their requests were based on Rule X of the Rules of the House of Representatives and the need for (1) "congressional scrutiny about how public safety funds appropriated by Congress are implemented by local law-enforcement agencies," (2) "oversight to inform potential legislative reforms about the delineation of prosecutorial authority between federal and local officials," and (3) "consider[ation] [of] legislative reforms to the authorities of special counsels and their relationships with other prosecuting entities."

42.     Rule X of the Rules of the House of Representatives identifies the jurisdictions and functions of the standing committees in the House, including the Committee on the Judiciary, the Committee on House Administration, and the Committee on Oversight and Accountability.

43.     On March 22, 2023, Chairman Jordan sent letters to Mr. Pomerantz and Carey Dunne.  Mr. Dunne was the General Counsel to former Manhattan District Attorney Cyrus Vance Jr. from 2017 to 2021 and Special Assistant District Attorney to District Attorney Bragg from January 1, 2022 to February 24, 2022.  In those roles, Mr. Dunne helped lead the District Attorney's investigation into Mr. Trump's tax records and the Trump Organization's tax-fraud scheme.

44.     The letters to Mr. Pomerantz and Mr. Dunne both requested their "cooperation with [the Chairmen's] oversight of this politically motivated prosecutorial decision" and "overzealous" investigation.  Specifically, the letters requested the following documents and information for January 1, 2017 to the present from Mr. Pomerantz and Mr. Dunne, both of whom have not worked at the District Attorney's Office in about a year:

> "1. All documents and communications between or among the New York County District Attorney's Office and the U.S. Department of Justice, its component entities, or other federal law enforcement agencies referring or relating to New York County District Attorney's investigation of President Donald Trump;

> 2. All documents and communications between or among you and the New York County District Attorney's Office referring or relating to President Donald Trump; and

> 3. All documents and communications between or among you and representatives of the New York County District Attorney's Office referring or relating to your appointment and role as Special Assistant District Attorney for New York County."

45. The letter to Mr. Pomerantz stated that he had previously "resign[ed] in protest" of a decision by District Attorney Bragg to "suspend[] the investigation" into Mr. Trump when District Attorney Bragg took office. The letter went on to state that Mr. Pomerantz's actions "both as a special prosecutor and since leaving the District Attorney's office, cast serious doubt on the administration of fair and impartial justice in this matter," and alleged that Mr. Pomerantz had "unfairly disparaged" Mr. Trump, "an innocent and uncharged man, as a felon to millions of [*New York Times*] readers." The letter further stated that Mr. Pomerantz's "book again unfairly disparaged President Trump, and now opens the door to examination about the District Attorney's office [sic] commitment to evenhanded justice."

**D.    District Attorney Bragg Responds.**

46. District Attorney Bragg's Office timely responded to the demand on March 23, 2023. Leslie Dubeck, General Counsel for the Manhattan District Attorney's Office, wrote in a letter to the Chairmen that the investigation into Mr. Trump "is one of thousands conducted by the Office of the District Attorney in its long history of pursuing justice and protecting New Yorkers" and "has been conducted consistently with the District Attorney's oath to faithfully execute the laws of the State of New York." In the letter, Ms. Dubeck states that the request by the Chairmen "is an unprecedented inquiry into a pending local prosecution," which came only "after Donald Trump created a false expectation he would be arrested the next day and his lawyers reportedly urged [the Chairmen] to intervene."

18

47.     The letter states that compliance with the Chairmen's request "would interfere with law enforcement."  Specifically, the Chairmen's request "seeks non-public information about a pending criminal investigation, which is confidential under state law" because "[g]rand jury proceedings are secret."

48.     The letter also states that the requests "are an unlawful incursion into New York's sovereignty" because a "Congressional committee may not 'inquire into matters which are . . . reserved to the States,'" and "[p]erhaps the clearest example of traditional state authority is the punishment of local criminal activity."  It explained that the District Attorney's investigation is a "quintessential police power[] belonging to the State" and because the Chairmen's inquiry "treads into territory very clearly reserved to the states," it is "indefensible."  The letter further explained that the requests would "usurp[] executive powers" because "Congress [is not] a law enforcement or trial agency."  Ms. Dubeck also made clear that the District Attorney's Office was not "pursuing a prosecution for political purposes."

49.     Notwithstanding these objections, Ms. Dubeck stated that the District Attorney's Office would submit a letter describing its use of federal funds.  Ms. Dubeck further stated that "this Office will always treat a fellow government entity with due respect" and requested the opportunity to meet and confer regarding the Chairmen's inquiry.

## E.      Former President Donald Trump Launches Attacks on Social Media and Puts District Attorney Bragg And Other New Yorkers at Risk.

50.     Following the parties' letter exchanges, Mr. Trump began to lob even more incendiary messages on Truth Social about District Attorney Bragg.  On March 23, 2023, he inveighed that "BRAGG REFUSES TO STOP DESPITE OVERWHELMING EVIDENCE TO THE CONTRARY" and described the District Attorney in dehumanizing terms, calling him a

"SOROS BACKED ANIMAL." These attacks by Mr. Trump and others have been widely condemned as both racist and antisemitic.



51. Minutes later, Mr. Trump accused District Attorney Bragg of "CARRYING OUT THE PLANS OF THE RADICAL LEFT LUNATICS." He also stated that "OUR COUNTRY IS BEING DESTROYED, AS THEY TELL US TO BE PEACEFUL!"



52. Also on that day, Mr. Trump shared a photograph on Truth Social of a side-by-side image of himself and District Attorney Bragg. Mr. Trump was holding a baseball bat in the photograph, and their side-by-side juxtaposition suggested that Mr. Trump was winding up the bat to strike the District Attorney.



53.    In the early hours of March 24, 2023, Mr. Trump threatened that an indictment would unleash "death & destruction" that would be "catastrophic for our Country." Mr. Trump queried: "What kind of person can charge another person, in this case a former President of the United States, . . . when it is known by all that NO Crime has been committed[?]" He then supplied his followers with an answer, alluding to District Attorney Bragg: "Only a degenerate psychopath that truely [sic] hates the USA."



54.    Later that day, a package containing suspicious white powder arrived at the District Attorney's Office along with a note making a specific death threat against the District Attorney.

21

The New York City Police Department and the Department of Environmental Protection responded and ultimately concluded the substance was not dangerous.

55.    In the aftermath, the District Attorney's Office received more than 1,000 calls and emails from individuals claiming to be Mr. Trump's supporters, many of which were threatening and racially charged.  District Attorney Bragg also received multiple death threats.

**F.    The Chairmen Continue to Insist on Document Production and Testimony.**

56.    On March 25, 2023, the Chairmen sent District Attorney Bragg's Office another letter.  They ignored Ms. Dubeck's request to meet and confer.

57.    The letter states that the Committees are "conducting oversight of [the Manhattan District Attorney's Office's] reported effort to indict a former President of the United States and current declared candidate for that office."  The Chairmen, for the first time, declared that they were considering whether Congress "should take legislative action to protect former and/or current Presidents from politically motivated prosecutions by state and local officials."

58.    The letter claimed that the inquiry is proper because (1) the Committees "are authorized to conduct such an inquiry," (2) "the inquiry is on a matter on which legislation could be had," and (3) "the requests are pertinent to the committees' inquiry."

59.    The letter further explains that the inquiry into the circumstances of a prosecutorial decision to indict a former President of the United States "on a novel and untested legal theory" falls within the scope of the Committee on the Judiciary's "oversight of criminal justice matters to inform potential legislation."  It also states that the inquiry could inform whether Congress drafts legislation to "insulate current and former presidents from such improper state and local prosecutions"—purported legislation the Chairmen did not even hint at in their March 20, 2023 letter.  The Chairmen speculated without any evidence that these prosecutions could create a

conflict "between the federal law-enforcement officials required to protect the former President and local law-enforcement officials required to enforce your indictment." Despite the District Attorney's Office's commitment to provide a letter detailing the use of the Office's federal funds, the Chairmen reiterated their request for such information and insisted that a letter from the District Attorney's Office would not be enough. The Chairmen requested a response by March 31, 2023.

60.     Subsequently, on an interview with CNN's Jake Tapper, Chairman Comer was asked about the Chairmen's letters to District Attorney Bragg.[15]  Chairman Comer candidly explained his view that the District Attorney should "come explain to us exactly what he's investigat[ing]." He further stated, "if Mr. Bragg wants to come in and explain to us what he is doing and he makes a good explanation, . . . then we'll back off." And when Mr. Tapper noted, "well, he's investigating as I understand it potential violations of state crimes," Chairman Comer responded: "even at that, . . . when you look at what we believe the role of the Manhattan DA should be is to fight crime. I mean that's one of the biggest issues in New York." He went on to state, "we believe our tax dollars would be better spent prosecuting local criminals—that's what a DA is supposed to do." Mr. Tapper also asked: "if [District Attorney Bragg] refuses to come in willingly, will you subpoena him?" Chairman Comer responded: "Well, that'll be up to Jim Jordan. He's the lead investigator in this particular situation." Mr. Tapper queried in response: "Jim Jordan who refused to comply with a congressional subpoena in the previous Congress?"

61.     Also on March 25, 2023, Ms. Dubeck sent a letter to Mr. Pomerantz and Mr. Dunne instructing them, as former employees of the District Attorney's Office, to not respond to Chairman Jordan's requests in light of the ongoing discussions and concerns over the inquiry. In

---

[15]     *State of the Union with Jake Tapper & Dana Bash*, interview by Jake Tapper of James Comer, CNN (Mar. 26, 2013), https://www.cnn.com/videos/politics/2023/03/26/sotu-rep-comer-full.cnn.

that letter, the District Attorney's Office explained that the Chairmen's requests "raise significant concerns about federalism, state sovereignty, the limits on congressional power, and the purpose and legality of the [Judiciary Committee's] inquiry.  In addition, the documents and information requested are protected from disclosure for many reasons, including because they relate to an ongoing criminal investigation, and are subject to the attorney client privilege, work product doctrine, and other legal protections."

62.     The letter specifically instructed Mr. Pomerantz to "as a former employee and attorney of the DA's Office, [] not provide any information or materials relating to your work in the DA's Office in response to [the Judiciary Committee's] request.  In addition, please direct [the Judiciary Committee] to communicate with the DA's Office regarding the request."  The letter made clear the District Attorney's Office was writing "[t]o protect the DA's Office's interests and privileges" and had asked the Committee "to provide additional information regarding their inquiries."

**G.      Donald Trump Persists in His Attacks on Social Media.**

63.     On March 28, 2023, Mr. Trump re-posted to his Truth Social account an article by Wayne Allyn Root titled "Democrats Want to Indict & Arrest President Trump.  They Want a War?  Let's Give it to Them."  That same day, a supporter of Mr. Trump who was protesting District Attorney Bragg's investigation pulled a knife on a family—including two small children— outside the Manhattan Criminal Court.  Court officers arrested the protester, who was holding a sign that read:  "I support Trump, do you?"

64.     On March 29, 2023, following news reports that the grand jury had recessed for several weeks, Mr. Trump continued his attacks on Truth Social.  He stated that he had "GAINED

SUCH RESPECT FOR THIS GRAND JURY" for not being a "RUBBER STAMP" and described

District Attorney Bragg as "HIGHLY PARTISAN" and "HATEFUL."



65.     A day later, on March 30, 2023, Mr. Trump described District Attorney Bragg as a

"Radical Left, Soros Backed Lunatic[]" in a post on Truth Social.  He also implied that a New

York Times columnist wrote that Mr. Trump "should be prosecuted" "because [he is] WHITE."

He concluded "we are now a Nation in Decline being stupidly led into World War III."



**H.      Mr. Pomerantz and Mr. Dunne Respond.**

66.      On March 27, 2023, Mr. Pomerantz responded to Chairman Jordan's March 22, 2023 correspondence.  In the letter, Mr. Pomerantz states that he will "act in a manner consistent with the instructions [he has] received from DANY" and requested that Chairman Jordan relay any communication to the District Attorney's Office.

67.      That same day, Mr. Dunne also responded to Chairman Jordan's March 22, 2023 correspondence.  Like Mr. Pomerantz, Mr. Dunne declined to respond to the inquiry and referred any communication to the District Attorney's Office.  In the letter, Mr. Dunne also stated that the District Attorney's Office is the legal holder of various privileges, including the attorney-client privilege, implicated by Chairman Jordan's inquiry.  The letter further states that "[a]s the legal holder of such privileges," the Office's position that the inquiry was "constitutionally infirm" was "[their] prerogative."

**I.      New York State Supreme Court Unseals The Fact That Mr. Trump Has Been Indicted And The Chairmen (And Other Members Of Congress) React.**

68.      On March 30, 2023, the New York State Supreme Court issued an order unsealing the fact that a Manhattan grand jury had returned an indictment charging Mr. Trump with a certain number of undefined crimes.  Mr. Trump is the first American president, current or former, to be indicted.

69.      It did not take long for Mr. Trump to start casting doubt on the integrity of the District Attorney's Office, and on the judicial system as a whole.  On March 30, 2023, he claimed that the charges against him were "Fake, Corrupt, and Disgraceful."  And on the morning of March 31, 2023, he asserted on Truth Social: "The Judge 'assigned' to my Witch Hunt Case [] HATES ME."  He further stated that the judge's name "is Juan Manuel Marchan [sic], [he] was handpicked

by Bragg & the Prosecutors, & is the same person who 'railroaded' my 75 year old former CFO,

Allen Weisselberg, to take a 'plea' deal."



70.     Later that day, Mr. Trump posted again on Truth Social, specifically referencing

Mr. Pomerantz:



71.     Mr. Trump's followers have followed suit.  Hours after the indictment, District

Attorney Bragg and his Office received numerous overtly racist and antisemitic emails and

messages.[16]   One email stated: "Hay George Soros a\*\* hole puppet If you want President Trump

---

[16]     Molly Crane-Newman, *Manhattan DA Alvin Bragg inundated with racist emails, death threats amid Trump
indictment; 'We are everywhere and we have guns,'* N.Y. Daily News (Mar. 31, 2023),

come and get me to. Remember we are everywhere and we have guns." Other messages called

the District Attorney "black trash [f----r]" and "Aids Infested."

72. Mr. Trump's supporters in Congress have also followed his lead, although none of

them articulated the legislative reform proposals the Chairman has invoked as the basis for this

congressional subpoena and his other demands. On March 30, 2023, Speaker McCarthy tweeted

using language that indicated his goal was retribution against District Attorney Bragg, not

legislation:



73. The Speaker's caucus followed suit. That same day, and after the news broke that

Mr. Trump would be indicted, Chairman Jordan tweeted: "Outrageous." Representative Ronny

Jackson tweeted "When Trump wins, THESE PEOPLE WILL PAY!!" Later, he stated that "it

will ultimately be Alvin Bragg that pays the price for this abuse of office!"

74. On March 31, 2023, Representative Dan Bishop, a member of defendant

Committee on the Judiciary, tweeted that "The subpoenas should now fly."

---

https://www.nydailynews.com/news/crime/ny-dany-bragg-trump-indictment-racist-emails-violent-threats-20230401-vimpdgvbrnfe5bq5d6wdw4g7ty-story.html.



**J.       District Attorney Bragg Responds to the Chairmen.**

75.       District Attorney Bragg's Office responded to the Chairmen on March 31, 2023. In that response, Ms. Dubeck reiterated the Office's position: Congress cannot interfere with a state criminal investigation or usurp judicial and executive functions, and the Chairmen's "examination of the facts of a single criminal investigation, for the supposed purpose of determining whether any charges against Mr. Trump are warranted, is an improper and dangerous usurpation of the executive and judicial functions" and "an unprecedented and illegitimate incursion on New York's sovereign interests."

76.       The letter states that the Chairmen's alleged legislative purpose for the inquiry— potential legislation to "insulate current and former presidents"—is "baseless pretext to interfere with [the] Office's work."  The letter queried whether "Congress would [even] have authority to place a single private citizen—including a former president or candidate for president—above the law."  It further stated that "based on [the Chairmen's] reportedly close collaboration with Mr. Trump in attacking this Office and the grand jury process, it appears [the Chairmen] are acting more like a criminal defense counsel trying to gather evidence for a client than a legislative body seeking to achieve a legitimate legislative objective."

77.       As Ms. Dubeck indicated she would in her March 23, 2023 correspondence, she provided in the March 31, 2023 letter further detail and information about the Office's use of

federal funds. Specifically, Ms. Dubeck clarified that "[n]o expenses incurred relating to this matter [including the investigation and prosecution of Mr. Trump] have been paid from funds that the Office received through federal grant programs." She identified three federal grant programs that the District Attorney's Office participates in: (1) Stop Violence Against Women Act Program; (2) Victim and Witness Assistance Grant Program; and (3) Justice Assistance Grant.

78. Ms. Dubeck also stated that the Office has "*contributed* to the federal fisc," in part by "help[ing] the Federal Government secure more than one billion dollars in asset forfeiture funds in the past 15 years." Of that forfeiture money, the Office spent approximately $5,000 "on expenses incurred [between October 2019 and August 2021] relating to the investigation of Donald J. Trump or the Trump Organization." The letter clarified that most of these expenses related to *Trump v. Vance*, 140 S. Ct. 2412 (2020), the Supreme Court case "in which the DA's Office prevailed and which led to the indictment and conviction of Trump Organization CFO Allen Weisselberg and two Trump organizations."

79. In light of the death threats the District Attorney had received, Ms. Dubeck also urged the Chairmen to "denounce the[] attacks" and "refrain from inflammatory accusations" instead of continuing to "vilify and denigrate the integrity of elected state prosecutors and trial judges." Ms. Dubeck further urged the Chairmen to "let the criminal justice process proceed without unlawful political interference."

80. Ms. Dubeck again requested to meet and confer with the Chairmen.

81. The Chairmen did not accept that request. Instead, in the days following the District Attorney's March 31, 2023 letter, Chairman Jordan and the Committee focused on the $5,000 of forfeiture funds the District Attorney's Office had used in investigating Mr. Trump or the Trump

Organization between October 2019 and August 2021. Specifically, defendant Committee on the Judiciary tweeted that the $5,000 of forfeiture funds "BOLSTER[S] GOP INVESTIGATION":



82.    And in an interview conducted on *Fox News* with Maria Bartiromo, Chairman Jordan stated, "they keep saying 'oh you're not supposed to be involved because, you know, this is a local prosecution decision,' and we're saying well look you used federal funds, you conceded that in your response to" the March 25, 2023 letter.[17]

83.    In other words, Chairman Jordan and the Committee argued the District Attorney's use of $5,000 from federal forfeiture funds prior to 2021 on matters relating to Mr. Trump *other* than his indictment was sufficient to confer authority on Congress to investigate the now-pending criminal prosecution. But they provided no explanation, and none exists, as to how mere federal

---

[17]    *Sunday Morning Futures*, interview by Maria Bartiromo with Jim Jordan (Fox News, Apr. 2, 2023), https://www.foxnews.com/video/6323835580112.

funds (even if they had been used in preparing for the pending prosecution of Mr. Trump) could justify invading state sovereignty to conduct federal "oversight" of a single ongoing state criminal investigation or prosecution to begin with.

### K. Donald Trump and His Supporters Continue to Interfere with an Ongoing State Criminal Proceeding.

84.     On April 3, 2023, Mr. Trump falsely accused District Attorney Bragg of "illegally LEAK[ING] . . . the pathetic Indictment against [him]" on Truth Social.  He stated that as a result of this "illegal" leak, District Attorney Bragg "MUST BE IMMEDIATELY INDICTED."



85.     Eleven minutes later, he once again falsely accused the District Attorney of "ILLEGALLY LEAK[ING] THE 33 points of Indictment" and called for the District Attorney's resignation.

86.     On April 4, 2023—the very day of his scheduled arraignment—Mr. Trump stated on Truth Social that New York County was a "VERY UNFAIR VENUE" and "THE HIGHLY PARTISAN JUDGE & HIS FAMILY ARE WELL KNOWN TRUMP HATERS."



87.     Later that day, Mr. Trump's son, Donald Trump Jr., shared an article on Twitter that identified Judge Juan Merchan's daughter and included a picture of her.  He called into question Judge Merchan's impartiality and alleged that his daughter had worked on the Biden-Harris campaign, which he claimed was another "relevant" "connection in this hand picked democrat show trial."  Representative Greene shared a similar article.

88.     Also on April 4, 2023, Chairman Jordan and Chairman Comer issued a statement expressing "concern" over "reports [that] the New York District Attorney may seek an unconstitutional gag order" because "[t]o put any restrictions on the ability of President Trump to discuss his mistreatment at the hands of this politically motivated prosecutor would only further demonstrate the weaponization of the New York justice system."[18]

89.     That same day, Speaker McCarthy once again evoked the specter of punishment, reiterating that District Attorney Bragg would be "held accountable by Congress" for "attempting to interfere in our democratic process by invoking federal law to bring politicized charges against President Trump [and] admittedly using federal funds."

---

[18]    Jim Jordan (@Jim_Jordan), Twitter (Apr. 4, 2023),
        https://twitter.com/Jim_Jordan/status/1643251228246147074?cxt=HHwWhICwhaWSgM4tAAAA.



> **Kevin McCarthy** ✓
> @SpeakerMcCarthy
>
> Alvin Bragg is attempting to interfere in our democratic process by invoking federal law to bring politicized charges against President Trump, admittedly using federal funds, while at the same time arguing that the peoples' representatives in Congress lack jurisdiction to investigate this farce.
>
> Not so. Bragg's weaponization of the federal justice process will be held accountable by Congress.
>
> 5:00 PM · Apr 4, 2023 · **6M** Views

90.     Later that night on April 4, Chairman Jordan and Mr. Comer did an interview on the *Fox News* program *Jesse Watters Primetime*.  During that interview, Chairman Jordan stated "Mr. Pomerantz . . . is someone we want to talk to as well.  He has left the DA's office.  He has written a book.  He's the guy who threw the fit and I think put the pressure on Mr. Bragg to go through with the ridiculous action that he took today."[19]  The book to which Chairman Jordan referred was Mr. Pomerantz's account of the District Attorney's Office's investigation into Mr. Trump and the Trump Organization, published on February 7, 2023.   Before the book was published, the District Attorney's Office wrote to Mr. Pomerantz and, referring to the existence of then-pending proceedings, expressly confirmed that Mr. Pomerantz did not have authority to make public any privileged or confidential information he acquired while serving as a Special Assistant. The Office requested to review a manuscript of the book before publication but was not provided that opportunity.  Mr. Pomerantz subsequently stated publicly that he was "confident that all of

---

[19]     *Jesse Watters Primetime*, interview by Jesse Watters with Jim Jordan and James Comer (Fox News, Apr. 4, 2023), https://www.foxnews.com/video/6323980648112.

my actions with respect to the Trump investigation, including the writing of my forthcoming book, are consistent with my legal and ethical obligations."[20]

91.    In response to Chairman Jordan's statement about the book, Mr. Watters stated: "Biden sent his goon into the DA's office, and that's what lit this fuse."  Chairman Comer shortly thereafter reiterated "we're serious about this . . .  I fully expect to see Alvin Bragg answering questions in front of Congress as soon as we can make it happen.  This is unacceptable, and we're not going to back down on this."  Chairman Comer therefore confirmed that the subpoena to Mr. Pomerantz was the first action of a subpoena strategy, with the ultimate goal of subpoenaing the District Attorney himself.

**L.    Mr. Trump Is Arraigned, And Chairman Jordan And The Committee Subpoena Mr. Pomerantz.**

92.    On April 4, 2023, Mr. Trump traveled from Florida to New York for his arraignment, arrest, and fingerprinting.  He was accompanied by the Secret Service, who had coordinated effectively with New York State Supreme Court security officers in advance of the arraignment.  On information and belief, Mr. Trump's transit to (and from) New York was safe. No security incidents or breaches were reported with respect to Mr. Trump's safety.

93.    Later that day, Mr. Trump was arraigned in New York State Supreme Court and his indictment and the District Attorney's statement of facts were unsealed.  The indictment accuses Mr. Trump of 34 felony counts of Falsifying Business Records in the First Degree in violation of New York Penal Law § 175.10.  Specifically, District Attorney Bragg alleged that Mr. Trump "repeatedly and fraudulently falsified New York business records to conceal criminal conduct that

---

[20]    Shayna Jacobs, *Ex-prosecutor's book could hurt Trump investigation, district attorney worries*, The Washington Post (Jan. 18, 2023), https://www.washingtonpost.com/national-security/2023/01/18/prosecutor-trump-book-manhattan/.

hid damaging information from the voting public during the 2016 presidential election."[21]  The criminal conduct involved, among other things, a scheme in which Mr. Trump and other participants "violated election laws," "made and caused false entries in the business records of various entities in New York," and "took steps that mischaracterized, for tax purposes, the true nature of the payments made in furtherance of the scheme."[22]

94.    Mr. Trump entered a plea of not guilty before Judge Merchan.

95.    The indictment vindicates a distinct state interest in the integrity of business records within New York State.  As District Attorney Bragg observed, "[t]rue and accurate business records are important everywhere," and "are all the more important in Manhattan, the financial center of the world."[23]  He further explained that "we have a history in the Manhattan DA's office of vigorously enforcing white collar law," and that the charge of falsifying business records is "the bread and butter of our white-collar work," which the Office has charged as a felony "hundreds" of times.[24]

96.    During the arraignment, prosecutors raised to the court Mr. Trump's recent "public statements threatening our city, our justice system, our courts, and our office."  They noted Mr. Trump had made "irresponsible social media posts that target various individuals involved in this matter, and even their families"; that he had "threatened potential death and destruction, and that is a quote, and world war three, another quote, if these charges were brought and he was indicted."  Prosecutors also informed the Court that Mr. Trump had posted "a picture that depicts Mr. Trump wielding a baseball bat at the head of the District Attorney."  Before handing the court copies of

---

[21]    Statement of Facts, *The People of the State of New York v. Donald J. Trump*, IND-714543-23 (Apr. 4, 2023).

[22]    *Id*.

[23]    CNBC Television, *Manhattan DA Alvin Bragg holds press conference following Trump's arraignment*, YouTube (Apr. 4, 2023), https://www.youtube.com/watch?v=C2XoDZjOMs8.

[24]    *Id.*

these posts, prosecutors noted that Mr. Trump's comments have "led to extensive public safety measures being put into place."  Prosecutors asked the court to impose an "appropriately restricted protective order" to ensure "the defendant does not disseminate any information provided as discovery through threatening online posts."

97.     Following the parties' discussion of the prosecutors' concerns, the court instructed the parties' counsel "speak to [their] client [or witnesses] and anybody else you need to, and remind them to please refrain [] from making statements that are likely to incite violence or civil unrest.  Please refrain from making comments or engaging in conduct that has the potential to incite violence, create civil unrest, or jeopardize the safety or well-being of individuals."  And the court concluded, "please do not engage in words or conduct which jeopardizes the rule of law, particularly as it applies to these proceedings in this courtroom."

98.     Hours later, Mr. Trump made a statement in Florida.  He told his supporters:  "[t]he criminal is the District Attorney because he illegally leaked massive amounts of grand jury information, for which he should be prosecuted or at a minimum, he should resign" and "I have a Trump hating judge, with a Trump hating wife and family, whose daughter worked for Kamala Harris and now receives money from the Biden-Harris campaign and a lot of it."[25]

99.     On April 6, 2023, two days after Mr. Trump was arraigned, Chairman Jordan and the House Judiciary Committee served a subpoena on Mr. Pomerantz directing him to appear and testify at a deposition before the Committee regarding the District Attorney's investigation.  The subpoena directs Mr. Pomerantz to appear before the Committee on April 20, 2023.

---

[25]   Kelly Garrity, *Trump decries charges against him as an 'insult to our country,'* Politico (Apr. 4, 2023), https://www.politico.com/news/2023/04/04/donald-trump-mar-a-lago-indictment-00090499.

100.    In the cover letter accompanying the subpoena, the Committee states that based on Mr. Pomerantz's "role as a special assistant district attorney leading the investigation into President Trump's finances," he is "uniquely situated to provide information that is relevant necessary to inform the Committee's oversight and potential legislative reforms" related to "insulat[ing] current and former Presidents from [] politically motivated state and local prosecutions." The Committee claims that such potential legislative reforms could include: (i) broadening "the existing statutory right of removal of certain criminal cases from state court to federal court"; (ii) investigating potential conflicts between "federal law-enforcement officials required by federal law to protect a former President and local law-enforcement officials required to enforce an indictment"; and (iii) enhancing "reporting requirements concerning the use of federal forfeiture funds or to prohibit the use of federal forfeiture funds to investigate a current or former President or presidential candidate."

101.    The letter states that Mr. Pomerantz has "no basis to decline to testify" regarding matters he wrote about (and later promoted in television interviews) in his February 2023 book, *People vs. Donald Trump: An Inside Account*.  The book details some of Mr. Pomerantz's views and his depiction of his personal experiences working on the District Attorney's investigation into Donald Trump.  The letter cites passages in Mr. Pomerantz's book, which the letter argues reveal that the District Attorney's Office's investigation of Donald Trump was politically motivated.  The letter says, for instance, that Mr. Pomerantz "frivolously compare[d] President Trump to mob boss John Gotti."  And it alleges that Mr. Pomerantz said there was "no doubt in [Mr. Pomerantz's] mind that [President] Trump deserved to be prosecuted," demonstrating that Mr. Pomerantz was personally "searching for any basis on which to bring criminal charges" against Mr. Trump.  The letter also points to Mr. Pomerantz's personal perceptions of Mr. Trump as a "malignant narcissist"

and "megalomaniac who posed a real danger to the country" whose behavior made Mr. Pomerantz "angry, sad, and [] disgusted." These views, the letter speculates, were evidence that Mr. Pomerantz "prejudg[ed] the results of the District Attorney's investigation" which contributed to the "political pressure" on District Attorney Bragg to "bring charges against former President Trump."

102. Contrary to the Chairman's contentions, however, Mr. Pomerantz's book did not and could not waive any privilege belonging to the District Attorney's Office. Prior to the book's publication, the District Attorney had instructed Mr. Pomerantz to make no disclosures relating to the "existence, nature, or content" of any communications or records or documents that relate in any manner to the investigation he participated in as a Special Assistant. The District Attorney's Office also did not have the opportunity to review any drafts or excerpts of Mr. Pomerantz's book prior to publication.

103. The letter also states that under Rule X of the House of Representatives, the Committee has jurisdiction "to conduct oversight of criminal justice matters to inform potential legislation." Rule X, however, makes no reference to *State* criminal justice—only stating that the Committee has jurisdiction over "[c]riminal law enforcement and criminalization" as well as "[t]he judiciary and judicial proceedings, civil and criminal." H.R. Rule X, clause 1 (*l*)(1), (7). Other sections of Rule X expressly make reference to the States, however, confirming that Rule X(*l*) on the Judiciary Committee's jurisdiction does not confer on the Judiciary Committee jurisdiction over State criminal (let alone civil) matters.

104. In the hours following his service of the subpoena, Chairman Jordan tweeted the following:



105.    He also retweeted a report by Breitbart News that "Rep @Jim_Jordan has issued his *first* subpoena for House Republicans' investigation of the Manhattan district attorney's indictment of former President Donald Trump," suggesting more subpoenas would follow. (emphasis added).

106.    Media reports after the subpoena was served indicated that the subpoena was part of an "all-out blitz" Mr. Trump was preparing to commence.[26]  That blitz will reportedly be directed towards "Manhattan District Attorney Alvin Bragg, Judge Juan Merchan, and anyone else in the judicial system who dares cross" Mr. Trump.[27]  "Meanwhile, powerful Republican lawmakers on Capitol Hill are preparing to use the levers of the legislative branch to run interference for Trump following his historic arrest and arraignment in Manhattan this week."[28]

---

[26]    Tim Dickenson, Asawin Suebsaeng, Adam Rawnsley, *Trump's Lawyers Are Begging Him for Restraint. His Political Allies Are Preparing to 'Fight Dirty'*, Rolling Stone (Apr. 6, 2023), https://www.rollingstone.com/politics/politics-features/trump-lawyers-alvin-bragg-indictment-debate-1234711049/.

[27]    *Id.*

[28]    *Id.*

**M. Chairman Jordan Demands Documents And Testimony From A Current Employee Of The District Attorney's Office.**

107. On April 7, 2023, Chairman Jordan sent a letter to Matthew Colangelo, Senior Counsel at the District Attorney's Office.

108. The letter requested documents and testimony in light of Mr. Colangelo's "history of working for law-enforcement entities that are pursuing President Trump and the public reporting surrounding [his] decision to work for the New York County District Attorney's Office." The Chairman argued Mr. Colangelo is "uniquely situated to provide information that is relevant and necessary to inform the Committee's oversight and potential legislative reforms." The Chairman requested Mr. Colangelo's cooperation in his "personal capacity." The Chairman's letter requested four categories of documents from Mr. Colangelo for the period June 22, 2021 to December 5, 2022:

- All documents and communications between or among you and anyone affiliated, in any way, with the New York County District Attorney's Office referring or relating to your potential or future employment with that Office, including, but not limited to (a) [t]he substance or type of work that you would potentially do for that Office; (b) [t]hat Office's motivation for or interest in hiring you; or (c) [y]our personal motivation for or interest in working for that Office;

- All documents and communications between or among you and anyone affiliated, in any way, with the New York County District Attorney's Office referring or relating to President Donald J. Trump; the Trump Organization; or any other entity owned, controlled by, or associated with President Donald J. Trump;

- All documents and communications between or among you and anyone not affiliated with the New York County District Attorney's Office referring or relating to both your potential or future employment with that Office and (a) President Donald J. Trump; (b) [t]he Trump Organization; or (c) [a]ny other entity owned, controlled by, or associated with President Donald J. Trump;

- Any other documents or communications referring or relating to both your potential or future employment with the New York County District Attorney's Office and (a) President Donald J. Trump; (b) [t]he Trump

41

Organization; or (c) [a]ny other entity owned, controlled by, or associated
with President Donald J. Trump.

The letter also asked that Mr. Colangelo testify before the Committee no later than April 21, 2023.

109.    The Chairman's letter said he sought information and documents relating to the "circumstances and chain of events that led to [Mr. Colangelo's] hiring by the New York County District Attorney's Office."  In other words, the Chairman now wanted to exercise "oversight" of the District Attorney's personnel decisions.  The Chairman argued this information would "shed substantial light on the underlying motives for that Office's investigation into and indictment of President Trump."  Specifically, the Chairman pointed to the fact that when Mr. Colangelo worked at the New York Attorney General's Office, he "ran investigations into President Trump, leading 'a wave of state litigation against Trump administration policies.'"  The Chairman opined that District Attorney Bragg hired Mr. Colangelo to "fill the void left by the departure of . . . Mark Pomerantz and Carey Dunne."

110.    The letter to Mr. Colangelo confirms the subpoena issued to Mr. Pomerantz is just the first of many the Chairman is planning to send to current and former District Attorney's Office employees and officials to wreak havoc on their prosecutorial activities pursuant to New York law. In fact, Representative Wesley Hunt, a member of the Judiciary Committee, confirmed just that when he gave an interview on *Fox News* on April 6, 2023.  During that interview, Mr. Hunt stated: "I can assure you that Jim Jordan, who's the head of the Judiciary Committee, we have a plan for all of these people to expose them for exactly who they are."[29]  He continued:  "They have an agenda to destroy our country.  They have an agenda to destroy the very fabric of America.  We've got to expose this so that in two years, the American people—we, the people—can get this right."

---

[29]   *See* Rep. Wesley Hunt Press Office (@RepWPH), Twitter (Apr. 7, 2023),
       https://twitter.com/RepWPH/status/1644341609440370688?cxt=HHwWgICzger-79EtAAAA.

Chairman Jordan retweeted a clip of Mr. Hunt's interview, signaling, on information and belief, that he approved of Mr. Hunt's statements. Mr. Trump subsequently posted the clip to his Truth Social account as well.

111. On April 10, 2023, the *New York Post* reported that the House Judiciary Committee would hold a "field hearing" in New York City at 9:00 am Monday, April 17 at the Jacob Javits Federal Building to examine "New York's rampant crime and victims of Alvin Bragg."[30] A source told the New York Post that purported "victims" of District Attorney Bragg's "policies" and "failure[s] to prosecute" would be witnesses at the hearing, although a witness list was not made immediately available for examination. A source also told the *New York Post* that the House Judiciary Committee and Congressman Jordan had not ruled out inviting the District Attorney to attend the hearing. Chairman Jordan and the Judiciary Committee specifically tweeted about the hearing:





**FIRST CAUSE OF ACTION**
**(Injunctive & Declaratory Relief)**
**The Subpoena Is *Ultra Vires* And**
**Exceeds the Committee's Constitutional Authority**

112.    Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

113.    The subpoena served on Mr. Pomerantz is invalid, unenforceable, unconstitutional, and *ultra vires* because it has no legitimate legislative purpose.  *See Watkins*, 354 U.S. at 187.

114.    The Chairman and the Committee have stated that their purpose in seeking information from current and former employees and officials of the District Attorney's Office is to "conduct oversight" into a local criminal prosecution and as part of an overall investigative plot

44

to demand unconstitutionally that District Attorney Bragg "explain himself" and provide a "good explanation" and a "good argument" to Congress. They have also made clear that the subpoena is designed to punish District Attorney Bragg for his prosecutorial decisions—*i.e.*, as Speaker McCarthy stated, to "hold Alvin Bragg and his unprecedented abuse of power to account." The subpoena Chairman Jordan and the Committee have served on Mr. Pomerantz is part and parcel of these unlawful aims.

115. But Congress lacks any enumerated power entitling it to "conduct oversight" into a single state prosecution in which a local grand jury has voted to bring criminal charges. The Supreme Court held more than 140 years ago that Congress may not deploy its subpoena power to "interfere with" a case "pending in a court of competent jurisdiction." *Kilbourn v. Thompson*, 103 U.S. 168, 194 (1880). Congress is not "a law enforcement or trial agency," for "[t]hese are functions of the executive and judicial departments of government." *Watkins*, 354 U.S. at 187. "No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress. Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.* And under the Tenth Amendment, the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend X. This framework reflects our principles of federalism and dual sovereignty, by which the states "remain independent and autonomous within their proper sphere of authority." *Printz*, 521 U.S. at 928. The Constitution "reposed [police power] in the States." *Morrison*, 529 U.S. at 618. It clearly conferred "primary authority for defining and enforcing the criminal law" on the States. *Lopez*, 514 U.S. at 561 n.3. There is no congressional power to interfere—as the Chairman and the

45

Committee seek to do here—with the states' "proper sphere of authority" to police. *Printz*, 521 U.S. at 928. In short, Congress has no legitimate legislative objective to pursue here.

116. As a result, in his letters and public statements, Chairman Jordan and his congressional allies have changed their story multiple times, creating new and constantly shifting purported legislative interests and purposes that supposedly justify the Committee's unwarranted "incursion" into a state criminal case. *Printz*, 521 U.S. at 920. These are just obvious pretexts for interfering with the District Attorney's Office's work enforcing the laws of the State of New York on behalf of the People.

117. The subpoena served on Mr. Pomerantz fails to satisfy the Supreme Court's test in *Mazars*. 140 S. Ct. at 2035. Namely, the purported legislative purposes Chairman Jordan has invoked to support the subpoena are unsupported, speculative, specious, and/or unconstitutional. The subpoena is more broad than reasonably necessary to support any claimed congressional objective. Chairman Jordan and the Judiciary Committee have offered no evidence in support of any legislative purpose they have attempted to invoke to justify their subpoena. And the subpoena is unduly burdensome because it would substantially burden both the New York criminal justice system and the District Attorney's Office as it prepares for Mr. Trump's criminal trial. The Committee's subpoena also burdens the District Attorney and the criminal justice system by politicizing Mr. Trump's trial and undermining the public's faith in the integrity of the criminal justice system. The Committee's subpoena to Mr. Pomerantz and its other intrusive serial requests for documents and testimony are plainly aimed at burdening the District Attorney's Office by harassing them, attempting to intimidate them, and trying to distract them from their preparation of Mr. Trump's criminal case.

118.     The subpoena is also *ultra vires* because the Judiciary Committee does not have jurisdiction over State criminal prosecutions under Rule X of the Rules of the House of Representatives.

119.     The demands for documents and testimony that Chairman Jordan has made on District Attorney Bragg and current and former District Attorney's Office employees or officials similarly lack any valid legislative purpose.  In the event Chairman Jordan or the Committee serves a subpoena on the District Attorney himself or any of his current or former employees or officials, such subpoenas will also be invalid, unenforceable, unconstitutional, and *ultra vires*.

120.     Plaintiff suffers and is continuing to suffer irreparable harm from the risk that Mr. Pomerantz may be forced to comply with the subpoena served on him, including but not limited to irreparable harm to New York's sovereign dignitary interests.  Plaintiff further lacks any adequate remedy at law.

### SECOND CAUSE OF ACTION
### (Injunctive & Declaratory Relief)
### Violation of Grand Jury Secrecy And Privilege

121.     Plaintiff repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

122.     Even if Chairman Jordan and the Committee were able to demonstrate a valid legislative purpose and withstand the *Mazars* test (they cannot), the subpoena still would not be enforceable because it could allow the Committee to seek secret grand jury material, confidential investigative material, and documents and communications that are clearly privileged under the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, the law enforcement privilege, the informant's privilege, and the public interest privilege.

123.     Grand jury materials are secret and privileged under New York State law.  *See* N.Y. Crim. Proc. Law § 190.25(4)(a); N.Y. Penal Law § 215.70.  "The attorney-client privilege protects

communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). The attorney work product doctrine protects documents prepared in anticipation of litigation by a party or its representative. Fed. R. Civ. P. 26(b)(3); *Hickman v. Taylor*, 329 U.S. 495, 511–12 (1947); *PepsiCo, Inc. v. SEC*, 563 F. Supp. 828, 830 (S.D.N.Y. 1983) (explaining that work product privileges are part of federal law). The deliberative process privilege protects deliberations regarding agency information, such as recommendations and analysis. The law enforcement privilege protects, among other things, law enforcement techniques and procedures, confidentiality of sources, and otherwise prevents interference with an investigation. The informant's privilege protects from retaliation members of the public who provide information to the government during an investigation. The public interest privilege applies to confidential communications between or to public officers in the performance of their duties where the public interest requires that those confidential communications or sources should not be revealed. The risk of disclosure is only heightened because the regulations governing House depositions permit only two "personal, nongovernmental" attorneys to accompany Mr. Pomerantz to his deposition and bar "government agency personnel" from the District Attorney's Office to attend and protect the Office's privilege. The regulations also empower a partisan decisionmaker—the Committee chairman—to overrule a privilege objection and order a witness to answer a question.

124. Privilege has not been waived by virtue of Mr. Pomerantz's book. Nor can grand jury secrecy be waived at all. Mr. Pomerantz did not receive written authorization to disclose any communications, records, or documents that relate in any manner to the investigation he participated in as a Special Assistant. He was expressly informed of the need to receive that written

authorization prior to the publication of his book and was expressly unauthorized to reveal any privileged or secret information. The District Attorney's Office did not have the opportunity to review any drafts or excerpts of Mr. Pomerantz's book prior to publication, despite asking to conduct such a pre-publication review. And Mr. Pomerantz publicly stated before the book was published that he was "confident that all of my actions with respect to the Trump investigation, including the writing of my forthcoming book, are consistent with my legal and ethical obligations."

125.    The demands for documents and testimony that Chairman Jordan has made on District Attorney Bragg and current and former District Attorney's Office employees or officials also improperly seek privileged and confidential material.

126.    Plaintiff will suffer imminent irreparable harm if the secret and privileged material is compelled to be disclosed, including but not limited to irreparable harm to New York's sovereign dignitary interests.

127.    Plaintiff lacks any adequate remedy at law.

**WHEREFORE**, Plaintiff asks this Court to enter judgment in his favor and to provide the following relief:

      a.    A declaratory judgment that the subpoena served on Mr. Pomerantz is invalid, unconstitutional, *ultra vires*, and/or unenforceable;

      b.    A permanent injunction, preliminary injunction, and temporary restraining order enjoining any enforcement of the subpoena served on Mr. Pomerantz and enjoining Mr. Pomerantz's compliance with the subpoena;

      c.    In the event Chairman Jordan or the Committee serves subpoenas on the District Attorney himself or any of his current or former employees or officials, a

declaratory judgment that those subpoenas are invalid, unconstitutional, *ultra vires*, and/or unenforceable as well as a permanent and preliminary injunction enjoining enforcement of any such subpoena;

d. Plaintiff's reasonable costs and expenses, including attorneys' fees; and

e. For such other and further relief as this Court determines proper.

Dated: April 11, 2023

GIBSON DUNN & CRUTCHER LLP

/s Theodore J. Boutrous, Jr. _____
Theodore J. Boutrous, Jr.
333 South Grand Ave.,
Los Angeles, California 90071
Tel: (213) 229-7804
tboutrous@gibsondunn.com

Mylan L. Denerstein
Lee R. Crain
200 Park Avenue
New York, New York 10166
Tel: (212) 351-3850
mdenerstein@gibsondunn.com
lcrain@gibsondunn.com

Katherine Moran Meeks (*phv forthcoming*)
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8258
kmeeks@gibsondunn.com

NEW YORK COUNTY DISTRICT
ATTORNEY'S OFFICE

Leslie B. Dubeck
General Counsel to the New York County
District Attorney
One Hogan Place
New York, New York 10013
Tel: (212) 335-9000
Dubeckl@dany.nyc.gov

*Counsel for Plaintiff Alvin L. Bragg, Jr.*

Exhibit 2



Tweet

**Kevin McCarthy** ✓
@SpeakerMcCarthy

Here we go again — an outrageous abuse of power by a radical DA who lets violent criminals walk as he pursues political vengeance against President Trump.

I'm directing relevant committees to immediately investigate if federal funds are being used to subvert our democracy by interfering in elections with politically motivated prosecutions.

11:07 AM · Mar 18, 2023 · **21.8M** Views

**30.9K** Retweets   **5,378** Quotes   **140.1K** Likes   **917** Bookmarks

**Luke Zaleski** ✓ @ZaleskiLuke · Mar 18
You are living through the largest longest coordinated rightwing propaganda campaign and hostile takeover attempt in the history of humanity. Because trump needs you to fight a civil war so he doesn't have to go to prison for his abuse of power and obstruction and attack on you.

💬 1,465    🔁 1,563    ♥ 10.5K    📊 191.2K

**Luke Zaleski** ✓ @ZaleskiLuke · Mar 18
The insurrection is coming from inside the House



From ShePyro🇺🇸🇺🇦✨

💬 77    🔁 55    ♥ 403    📊 8,663

Show replies

**NiKKi** ✓ @NikkiCush · Mar 18
We stand with Trump more than ever!!🇺🇸🇺🇸🇺🇸

💬 184    🔁 199    ♥ 2,006    📊 51.1K

**Andy Frye** ✓ @SportyFrye · Mar 18
You and your spiritual leader:



---

🐦

# Explore

⚙ Settings

🔍 Search Twitter

### New to Twitter?
Sign up now to get your own personalized timeline!

G Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

### Relevant people

**Kevin McCarthy** ✓
@SpeakerMcCarthy      **Follow**
Speaker of the House and Representative of California's 20th District in the House of Representatives.

### What's happening

NBA · Last night
**Warriors at Kings**

Trending in United States
**JUST ANNOUNCED**
28.1K Tweets

Television · Trending
**Boruto**
47.1K Tweets

Trending in United States
**#DominionvFox**

Trending in United States
**Zach Edey**

Show more

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···
© 2023 Twitter, Inc.



## Don't miss what's happening
People on Twitter are the first to know.

Log in     Sign up

▶ GIF  ALT

💬 45      ↻ 10      ♡ 203      📊 33.4K      ↑

**Rina Shah** ✓ @RinainDC · Mar 18                                    ···
Remember, Mister Speaker: the legislative branch is supposed to be a check
on the executive branch.

Doing the political bidding of a former President (aka: private citizen) from
your perch isn't just a bad look on you — it's an abdication of your
constitutional duty.

💬 1,726      ↻ 1,277      ♡ 9,048      📊 322.1K      ↑

**aka** ✓ @akafacehots · Mar 18                                       ···
Get back in the kitchen pumpkin.

💬 150      ↻ 117      ♡ 3,181      📊 38K      ↑

Show replies

**Christopher Webb** ✓ @cwebbonline · Mar 18                          ···
Kevin McCarthy calling for another clown show in the Republican controlled
House because they haven't been embarrassed enough by their current
hearings.



💬 615      ↻ 1,412      ♡ 7,145      📊 255.8K      ↑

**Ed Greenberger** ✓ @EdGreenberger · Mar 18                          ···
Allow me to explain what's happening here... Kevin McCarthy, like 98% of
the other Republicans on the Hill, are going to defend Trump publicly while
desperately praying he gets thrown in prison for the rest of his life.

💬 346      ↻ 517      ♡ 5,118      📊 150.3K      ↑

Show replies

**Wendell Husebø** ✓ @WendellHusebo · Mar 18                          ···
First, Democrats claimed Trump colluded with Russia. Then they tried to
impeach him — twice. They even sent the FBI to raid his residence. Now
they will indict Trump on bogus charges?

💬 1,913      ↻ 461      ♡ 3,932      📊 195.5K      ↑

**Don't miss what's happening**
People on Twitter are the first to know.                    Log in    Sign up

**Don't miss what's happening**
People on Twitter are the first to know.

Log in

Sign up

Exhibit 3

## Congress of the United States
### Washington, DC 20515

March 20, 2023

Mr. Alvin L. Bragg, Jr.
District Attorney
New York County
One Hogan Place
New York, NY 10013

Dear Mr. Bragg:

You are reportedly about to engage in an unprecedented abuse of prosecutorial authority: the indictment of a former President of the United States and current declared candidate for that office. This indictment comes after years of your office searching for a basis—any basis—on which to bring charges, ultimately settling on a novel legal theory untested anywhere in the country and one that federal authorities declined to pursue. If these reports are accurate, your actions will erode confidence in the evenhanded application of justice and unalterably interfere in the course of the 2024 presidential election. In light of the serious consequences of your actions, we expect that you will testify about what plainly appears to be a politically motivated prosecutorial decision.

The New York County District Attorney's Office has been investigating President Trump since at least 2018, looking for some legal theory on which to bring charges.[1] The facts surrounding the impending indictment have "been known for years."[2] Michael Cohen, President Trump's disgraced former lawyer, pleaded guilty over four years ago to charges based on the same facts at issue in the impending indictment.[3] By July 2019, however, federal prosecutors determined that no additional people would be charged alongside Cohen.[4] Now, in the words of one legal scholar, you are attempting to "shoehorn[]" the same case with identical facts into a new prosecution, resurrecting a so-called "zombie" case against President Trump.[5] Even the *Washington Post* quoted "legal experts" as calling your actions "unusual" because "prosecutors have repeatedly examined the long-established details but decided not to pursue charges."[6]

---

[1] Andrew Feinberg, *New York prosecutors warn Trump of possible indictment, report says*, THE INDEPENDENT (Mar. 10, 2023).

[2] Mark Berman et al., *The prosecutor, the ex-president and the 'zombie' case that came back to life*, WASH. POST (Mar. 17, 2023).

[3] Shawna Chen, *Timeline: The probe into Trump's alleged hush money payments to Stormy Daniels*, AXIOS (Mar. 18, 2023).

[4] *Id.*; *see* Barrett et al., *supra* note 2.

[5] Jonathan Turley, *Get ready for Manhattan DA's made-for-TV Trump prosecution: high on ratings, but short on the law*, THE HILL (Mar. 18, 2023); Berman et al., *supra* note 2.

[6] Berman et al., *supra* note 2.

Mr. Alvin L. Bragg, Jr.
March 20, 2023
Page 2

  The legal theory underlying your reported prosecution appears to be tenuous and untested.[7] Bringing charges for falsifying business records is ordinarily a misdemeanor subject to a two-year statute of limitations,[8] which would have expired long ago. State law, however, allows a district attorney to "elevate nominal misdemeanor conduct" to a felony charge if the "intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof."[9] Such a showing would extend the statute of limitations to five years[10]—which would likely expire soon and thus explains your rush to indictment. The only potential speculated crime that could be alleged here would be a violation of campaign finance law, according to one scholar, a charge that the Justice Department has already declined to bring.[11]

  In addition to the novel and untested legal theory, your star witness for this prosecution has a serious credibility problem—a problem that you have reportedly recognized.[12] This case relies heavily on the testimony of Michael Cohen, a convicted perjurer with a demonstrable prejudice against President Trump.[13] Cohen pleaded guilty to lying to Congress in 2018.[14] In 2019, when he testified before Democrats on the House Oversight Committee to aid their fruitless investigation into President Trump, Cohen lied again—six times.[15] Cohen has been vocal about his deeply personal animus toward President Trump.[16] Under these circumstances, there is no scenario in which Cohen could fairly be considered an unbiased and credible witness.

  The inference from the totality of these facts is that your impending indictment is motivated by political calculations. In January 2022, soon after you took office, you expressed doubts about President Trump's case and suspended the investigation.[17] This decision caused two of your top investigators, Carey Dunne and Mark Pomerantz, to resign in protest and publicly denounce your work.[18] Pomerantz, in particular, heavily criticized you for declining to bring charges at that time,[19] and "Dunne and others" are now "weighing ways" to bar President Trump from holding future office.[20] Pomerantz has published a book in the past month

---

[7] Turley, *supra* note 5.

[8] *Id.*

[9] N.Y. Penal Law § 175.10.

[10] Turley, *supra* note 5; Jeremy Saland, *First Degree Falsifying Business Records: NY Penal Law 175.10*, SALAND LAW PC (page last visited Mar. 19, 2023).

[11] *Id.*

[12] Berman et al., *supra* note 2.

[13] Christopher Lopez, *Progressive DA Alvin Bragg's case against Trump hinges on witnesses with 'credibility problems': Andy McCarthy*, FOX NEWS (Mar. 19, 2023); Marisa Schultz, *Jim Jordan, Mark Meadows ask Justice Department to probe Cohen for perjury*, N.Y. POST (Feb. 28, 2019).

[14] *Michael Cohen pleads guilty to lying to Congress*, ASSOC. PRESS (Nov. 29, 2018).

[15] Letter from Jim Jordan & Mark Meadows, H. Comm. on Oversight & Reform, to William P. Barr, Att'y Gen., Dep't of Justice (Feb. 28, 2019).

[16] *See, e.g.,* Nicholas Fandos & Maggie Haberman, *In Congressional Testimony, Cohen Plans to Call Trump a 'Con Man' and a 'Cheat',* N.Y. TIMES (Feb. 26, 2019).

[17] Shayna Jacobs et al., *Prosecutor who resigned over stalled Trump probe says ex-president committed felonies*, WASH. POST (Mar. 23, 2022).

[18] *Id.*

[19] *Read the Full Text of Mark Pomerantz's Resignation Letter*, N.Y. TIMES (Mar. 23, 2022).

[20] Shayna Jacobs, *Lawyers who investigated Trump form group to oppose anti-democratic policies*, WASH. POST (Jan. 11, 2023).

Mr. Alvin L. Bragg, Jr.
March 20, 2023
Page 3

excoriating you for not aggressively prosecuting President Trump.[21] The *Washington Post* reported that you were "deeply stung" by this criticism.[22]

The facts of this matter have not changed since 2018 and no new witnesses have emerged.[23] The Justice Department examined the facts in 2019 and opted not to pursue further prosecutions at that time. Even still, according to reporting, the investigation "gained some momentum this year," and your office "convened a new grand jury in January to evaluate the issue."[24] The only intervening factor, it appears, was President Trump's announcement that he would be a candidate for President in 2024.[25]

Your decision to pursue such a politically motivated prosecution—while adopting progressive criminal justice policies that allow career "criminals [to] run[ ] the streets" of Manhattan[26]—requires congressional scrutiny about how public safety funds appropriated by Congress are implemented by local law-enforcement agencies. In addition, your apparent decision to pursue criminal charges where federal authorities declined to do so requires oversight to inform potential legislative reforms about the delineation of prosecutorial authority between federal and local officials. Finally, because the circumstances of this matter stem, in part, from Special Counsel Mueller's investigation,[27] Congress may consider legislative reforms to the authorities of special counsels and their relationships with other prosecuting entities. Accordingly, to advance our oversight, please produce the following documents and information for the period January 1, 2017, to the present:

1. All documents and communications between or among the New York County District Attorney's Office and the U.S. Department of Justice, its component entities, or other federal law enforcement agencies referring or relating to your office's investigation of President Donald Trump;

2. All documents and communications sent or received by former employees Carey Dunne and Mark Pomerantz referring or relating to President Donald Trump; and

3. All documents and communications referring or relating to the New York County District Attorney Office's receipt and use of federal funds.

In addition, your testimony is necessary to advance our oversight and to inform potential legislative reforms. We therefore ask that you testify in a transcribed interview about these

---

[21] Mark Pomerantz, People vs. Donald Trump: An Inside Account (2023).

[22] Berman et al., *supra* note 2.

[23] *Id.*

[24] *Id.*

[25] Max Greenwood, *Trump announces 2024 run for president*, The Hill (Nov. 15, 2022).

[26] Alyssa Guzman, *Priorities, eh? Woke DA Alvin Bragg who's set to indict Trump is one of America's most controversial prosecutors after charging self-defense shopkeeper with murder and sending soft-on-crime memo*, Daily Mail (Mar. 18, 2023); Andrea Cavallier, *REVEALED: Woke Manhattan DA Alvin Bragg has downgraded over HALF of felony cases to misdemeanors as criminals are free to roam streets of the Big Apple*, Daily Mail (Nov. 27, 2022).

[27] Ben Protess et al., *How Michael Cohen turned against President Trump*, N.Y. Times (Apr. 21, 2019).

Mr. Alvin L. Bragg, Jr.
March 20, 2023
Page 4

matters as soon as possible. Please provide this information and contact Committee staff to schedule your transcribed interview as soon as possible but not later than 10:00 a.m. on March 23, 2023.

Pursuant to Rule X of the Rules of the House of Representatives, the Committee on the Judiciary has jurisdiction over criminal justice matters in the United States. The Committee on House Administration has jurisdiction over matters concerning federal elections. The Committee on Oversight and Accountability may examine "any matter" at any time.

If you have any questions about this request, please contact Committee staff at (202) 225-6906. Thank you for your prompt attention to this matter.

Sincerely,

Jim Jordan
Chairman
Committee on the Judiciary

Bryan Steil
Chairman
Committee on House Administration

James Comer
Chairman
Committee on Oversight and Accountability

cc:     The Honorable Jerrold Nadler, Ranking Member
        Committee on the Judiciary

        The Honorable Joseph Morelle, Ranking Member
        Committee on House Administration

        The Honorable Jamie Raskin, Ranking Member
        Committee on Oversight and Accountability

Exhibit 4

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

March 22, 2023

Mr. Mark F. Pomerantz
Former New York County Special Assistant District Attorney
Free & Fair Litigation Group
128 E. Broadway, Unit 793
New York, NY 10002

Dear Mr. Pomerantz:

New York County District Attorney Alvin Bragg is reportedly about to engage in an unprecedented abuse of prosecutorial authority: the indictment of a former President of the United States and current declared candidate for that office. This indictment comes after years of the District Attorney's office aggressively pursuing charges, including by appointing you as an unpaid "special assistant district attorney" to lead the investigation into every facet of President Trump's finances.[1] Last year, you resigned from the office over Bragg's initial reluctance to move forward with charges, shaming Bragg in your resignation letter—which was subsequently leaked—into bringing charges.[2] Based on your unique role in this matter, and your subsequent public statements prejudicing the impartiality of any prosecution, we request your cooperation with our oversight of this politically motivated prosecutorial decision.

The New York County District Attorney's Office has been investigating President Trump since at least 2018, looking for some legal theory on which to bring charges.[3] The facts surrounding the impending indictment have "been known for years."[4] Michael Cohen, President Trump's disgraced former lawyer, pleaded guilty over four years ago to charges based on the

---

[1] William K. Rashbaum et al., *A former federal prosecutor has joined the Manhattan D.A.'s team investigating the Trump family business*, N.Y. TIMES (Feb. 19, 2021); Ben Protess et al., *How the Manhattan DA's investigation into President Donald Trump unraveled*, N.Y. TIMES (March 5, 2022).
[2] *Read the Full Text of Mark Pomerantz's Resignation Letter*, N.Y. TIMES (Mar. 23, 2022) [hereinafter "Pomerantz Letter"].
[3] Andrew Feinberg, *New York prosecutors warn Trump of possible indictment, report says*, THE INDEPENDENT (Mar. 10, 2023).
[4] Mark Berman et al., *The prosecutor, the ex-president and the 'zombie' case that came back to life*, WASH. POST (Mar. 17, 2023).

Mr. Mark F. Pomerantz
March 22, 2023
Page 2

same facts at issue in the impending indictment.[5] By July 2019, however, federal prosecutors determined that no additional people would be charged alongside Cohen.[6]

In January 2022, soon after Bragg took office, he expressed doubts about President Trump's case and suspended the investigation.[7] This decision caused you and your colleague, Carey Dunne, to resign in protest.[8] You penned a scathing resignation letter in which you baselessly accused President Trump of "numerous felony violations," and asserted it would be "a grave failure of justice" if Bragg did not pursue charges.[9] You urged Bragg to hold President Trump "fully accountable for his crimes," asserting that Bragg's decision "will doom any future prospects" for prosecution.[10] Your resignation letter found its way into the *New York Times*, word-for-word, and your criticisms of Bragg's investigation were widely reported by news outlets.[11] Your unrelenting pursuit of President Trump followed you into the private sector as you and Dunne started a law firm dedicated to "weighing ways" to bar President Trump from holding future office.[12] Just this month, you published a book excoriating Bragg for not aggressively prosecuting President Trump, laying bare the office's internal deliberations about the investigation and your personal animus toward President Trump.[13]

It now appears that your efforts to shame Bragg have worked as he is reportedly resurrecting a so-called "zombie" case against President Trump using a tenuous and untested legal theory. [14] Even the *Washington Post* quoted "legal experts" as calling Bragg's actions "unusual" because "prosecutors have repeatedly examined the long-established details but decided not to pursue charges."[15] In addition, Bragg's star witness—Michael Cohen—has a serious credibility problem as a convicted perjurer and serial fabricator with demonstrable prejudice against President Trump.[16] Under these circumstances, there is no scenario in which Cohen could fairly be considered an unbiased and credible witness.

The inference from the totality of these facts is that Bragg's impending indictment is motivated by political calculations. The facts of this matter have not changed since 2018 and no new witnesses have emerged.[17] The Justice Department examined the facts in 2019 and opted not

---

[5] Shawna Chen, *Timeline: The probe into Trump's alleged hush money payments to Stormy Daniels*, AXIOS (Mar. 18, 2023).

[6] *Id.*; *see* Berman et al., *supra* note 4.

[7] Shayna Jacobs et al., *Prosecutor who resigned over stalled Trump probe says ex-president committed felonies*, WASH. POST (Mar. 23, 2022).

[8] *Id.*

[9] Pomerantz Letter, *supra* note 2.

[10] *Id.*

[11] *Id.*

[12] Shayna Jacobs, *Lawyers who investigated Trump form group to oppose anti-democratic policies*, WASH. POST (Jan. 11, 2023).

[13] MARK POMERANTZ, PEOPLE VS. DONALD TRUMP: AN INSIDE ACCOUNT (2023).

[14] Berman et al., *supra* note 4.

[15] *Id.*

[16] Christopher Lopez, *Progressive DA Alvin Bragg's case against Trump hinges on witnesses with 'credibility problems': Andy McCarthy*, FOX NEWS (Mar. 19, 2023); Marisa Schultz, *Jim Jordan, Mark Meadows ask Justice Department to probe Cohen for perjury*, N.Y. POST (Feb. 28, 2019); *Michael Cohen pleads guilty to lying to Congress*, ASSOC. PRESS (Nov. 29, 2018).

[17] Berman et al., *supra* note 4.

Mr. Mark F. Pomerantz
March 22, 2023
Page 3

to pursue further prosecutions at that time. Even still, according to reporting, the investigation "gained some momentum this year," and Bragg's office "convened a new grand jury in January to evaluate the issue."[18] The only intervening factor, it appears, was President Trump's announcement that he would be a candidate for President in 2024.[19]

Your actions, both as a special prosecutor and since leaving the District Attorney's office, cast serious doubt on the administration of fair and impartial justice in this matter. Your words in the *New York Times* have unfairly disparaged President Trump, an innocent and uncharged man, as a felon to millions of *Times* readers. Your book again unfairly disparaged President Trump, and now opens the door to examination about the District Attorney's office commitment to evenhanded justice. In light of this unprecedented and overzealous partisan investigation, Congress has a keen interest in these facts to inform potential legislation to improve the functioning and fairness of our criminal justice system, and to better delineate prosecutorial authority between federal and local officials. In addition, because the circumstances of this matter stem, in part, from Special Counsel Mueller's investigation,[20] Congress may consider legislative reforms to the authorities of special counsels and their relationships with other prosecuting entities.

Accordingly, to advance our oversight, please produce the following documents and information in your personal possession for the period January 1, 2017, to the present:

1. All documents and communications between or among the New York County District Attorney's Office and the U.S. Department of Justice, its component entities, or other federal law enforcement agencies referring or relating to New York County District Attorney's investigation of President Donald Trump;

2. All documents and communications between or among you and representatives of the New York County District Attorney's Office referring or relating to President Donald Trump; and

3. All documents and communications between or among you and representatives of the New York County District Attorney's Office referring or relating to your appointment and role as a Special Assistant District Attorney for New York County.

In addition, your testimony is necessary to advance our oversight and to inform potential legislative reforms. We therefore ask that you testify in a transcribed interview about these matters as soon as possible. Please provide this information and contact Committee staff to schedule your transcribed interview as soon as possible but not later than 10:00 a.m. on March 27, 2023.

Further, this letter serves as a formal request to preserve all existing and future records and materials relating to the topics addressed in this letter. You should construe this preservation

---

[18] *Id.*

[19] Max Greenwood, *Trump announces 2024 run for president*, THE HILL (Nov. 15, 2022).

[20] Ben Protess et al., *How Michael Cohen turned against President Trump*, N.Y. TIMES (Apr. 21, 2019).

Mr. Mark F. Pomerantz
March 22, 2023
Page 4

notice as an instruction to take all reasonable steps to prevent the destruction or alteration, whether intentionally or negligently, of all documents, communications, and other information, including electronic information and metadata, that are or may be responsive to this congressional inquiry. This instruction includes all electronic messages sent using your official and personal accounts or devices, including records created using text messages, phone-based message applications, or encryption software.

The Committee on the Judiciary has jurisdiction over criminal justice matters in the United States and matters involving threats to civil liberties pursuant to Rule X of the Rules of the House of Representatives.[21] If you have any questions about this request, please contact Committee staff at (202) 225-6906. Thank you for your prompt attention to this matter.

Sincerely,

Jim Jordan
Chairman

cc:    The Honorable Jerrold Nadler, Ranking Member

---

[21] Rules of the U.S. House of Representatives, R. X (2023).

# Exhibit 5

JIM JORDAN, Ohio
CHAIRMAN

JERROLD NADLER, New York
RANKING MEMBER

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States
## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

March 22, 2023

Mr. Carey R. Dunne
Former Manhattan Special Assistant District Attorney
The Law Office of Carey R. Dunne, PLLC
114 E. 95th St.
New York, NY 10128

Dear Mr. Dunne:

New York County District Attorney Alvin Bragg is reportedly about to engage in an unprecedented abuse of prosecutorial authority: the indictment of a former President of the United States and current declared candidate for that office. This indictment comes after years of the District Attorney's office aggressively pursuing charges, with you and other special prosecutors leading the investigation into every facet of President Trump's finances.[1] Last year, you resigned from the office over Bragg's initial reluctance to move forward with charges in 2022, Bragg is now attempting to "shoehorn[]" the same case with identical facts into a new prosecution.[2] Based on your unique role in this matter, we request your cooperation with our oversight of this politically motivated prosecutorial decision.

The New York County District Attorney's Office has been investigating President Trump since at least 2018, looking for some legal theory on which to bring charges.[3] The facts surrounding the impending indictment have "been known for years."[4] Michael Cohen, President Trump's disgraced former lawyer, pleaded guilty over four years ago to charges based on the same facts at issue in the impending indictment.[5] By July 2019, however, federal prosecutors determined that no additional people would be charged alongside Cohen.[6]

---

[1] Ben Protess et al., *How the Manhattan DA's investigation into President Donald Trump unraveled*, N.Y. TIMES (March 5, 2022); Shayna Jacobs et al., *Prosecutors in Trump probe quit after new DA seems to abandon plan to seek indictment of former president*, WASH. POST (Feb. 24, 2022).

[2] Jonathan Turley, *Get ready for Manhattan DA's made-for-TV Trump prosecution: high on ratings, but short on the law*, THE HILL (Mar. 18, 2023); Mark Berman et al., *The prosecutor, the ex-president and the 'zombie' case that came back to life*, WASH. POST (Mar. 17, 2023).

[3] Andrew Feinberg, *New York prosecutors warn Trump of possible indictment, report says*, THE INDEPENDENT (Mar. 10, 2023).

[4] Berman et al., *supra* note 2.

[5] Shawna Chen, *Timeline: The probe into Trump's alleged hush money payments to Stormy Daniels*, AXIOS (Mar. 18, 2023).

[6] *Id.*; *see* Berman et al., *supra* note 2.

Mr. Carey R. Dunne
March 22, 2023
Page 2

In January 2022, soon after Bragg took office, he expressed doubts about President Trump's case and suspended the investigation.[7] This decision caused you and your colleague, Mark Pomerantz, to resign in protest.[8] Your unrelenting pursuit of President Trump has followed you into the private sector. Following your resignation from Bragg's office, you and Pomerantz started a law firm dedicated to "weighing ways" to bar President Trump from holding future office.[9] Just this month, Pomerantz published a book excoriating Bragg for not aggressively prosecuting President Trump.[10] The *Washington Post* reported that Bragg was "deeply stung" by criticism from you and Pomerantz.[11]

It now appears that your efforts to shame Bragg have worked as he is reportedly resurrecting a so-called "zombie" case against President Trump using a tenuous and untested legal theory.[12] Even the *Washington Post* quoted "legal experts" as calling Bragg's actions "unusual" because "prosecutors have repeatedly examined the long-established details but decided not to pursue charges."[13] In addition, Bragg's star witness—Michael Cohen—has a serious credibility problem as a convicted perjurer and serial fabricator with demonstrable prejudice against President Trump.[14] Under these circumstances, there is no scenario in which Cohen could fairly be considered an unbiased and credible witness.

The inference from the totality of these facts is that Bragg's impending indictment is motivated by political calculations. The facts of this matter have not changed since 2018 and no new witnesses have emerged.[15] The Justice Department examined the facts in 2019 and opted not to pursue further prosecutions at that time. Even still, according to reporting, the investigation "gained some momentum this year," and Bragg's office "convened a new grand jury in January to evaluate the issue."[16] The only intervening factor, it appears, was President Trump's announcement that he would be a candidate for President in 2024.[17]

Your actions, both as a special prosecutor and since leaving the District Attorney's office, cast serious doubt on administration of fair and impartial justice in this matter. In light of this unprecedented and overzealous investigation, Congress has a keen interest in understanding the relevant facts to inform potential legislation to improve the functioning and fairness of our criminal justice system and to better delineate prosecutorial authority between federal and local

---

[7] Shayna Jacobs et al., *Prosecutor who resigned over stalled Trump probe says ex-president committed felonies*, WASH. POST (Mar. 23, 2022).

[8] *Id.*

[9] Shayna Jacobs, *Lawyers who investigated Trump form group to oppose anti-democratic policies*, WASH. POST (Jan. 11, 2023).

[10] MARK POMERANTZ, PEOPLE VS. DONALD TRUMP: AN INSIDE ACCOUNT (2023).

[11] Berman et al., *supra* note 2.

[12] Turley, *supra* note 5.

[13] Berman et al., *supra* note 2.

[14] Christopher Lopez, *Progressive DA Alvin Bragg's case against Trump hinges on witnesses with 'credibility problems': Andy McCarthy*, FOX NEWS (Mar. 19, 2023); Marisa Schultz, *Jim Jordan, Mark Meadows ask Justice Department to probe Cohen for perjury*, N.Y. POST (Feb. 28, 2019); *Michael Cohen pleads guilty to lying to Congress*, ASSOC. PRESS (Nov. 29, 2018).

[15] *Id.*

[16] *Id.*

[17] Max Greenwood, *Trump announces 2024 run for president*, THE HILL (Nov. 15, 2022).

Mr. Carey R. Dunne
March 22, 2023
Page 3

officials. In addition, because the circumstances of this matter stem, in part, from Special Counsel Mueller's investigation,[18] Congress may consider legislative reforms to the authorities of special counsels and their relationships with other prosecuting entities. Accordingly, to advance our oversight, please produce the following documents and information in your personal possession for the period January 1, 2017, to the present:

1. All documents and communications between or among the New York County District Attorney's Office and the U.S. Department of Justice, its component entities, or other federal law enforcement agencies referring or relating to New York County District Attorney's investigation of President Donald Trump;

2. All documents and communications between or among you and the New York County District Attorney's Office referring or relating to President Donald Trump; and

3. All documents and communications between or among you and representatives of the New York County District Attorney's Office referring or relating to your appointment and role as a Special Assistant District Attorney for New York County.

In addition, your testimony is necessary to advance our oversight and to inform potential legislative reforms. We therefore ask that you testify in a transcribed interview about these matters as soon as possible. Please provide this information and contact Committee staff to schedule your transcribed interview as soon as possible but not later than 10:00 a.m. on March 27, 2023.

Further, this letter serves as a formal request to preserve all existing and future records and materials relating to the topics addressed in this letter. You should construe this preservation notice as an instruction to take all reasonable steps to prevent the destruction or alteration, whether intentionally or negligently, of all documents, communications, and other information, including electronic information and metadata, that are or may be responsive to this congressional inquiry. This instruction includes all electronic messages sent using your official and personal accounts or devices, including records created using text messages, phone-based message applications, or encryption software.

The Committee on the Judiciary has jurisdiction over criminal justice matters in the United States and matters involving threats to civil liberties pursuant to Rule X of the Rules of the House of Representatives.[19] If you have any questions about this request, please contact Committee staff at (202) 225-6906. Thank you for your prompt attention to this matter.

Sincerely,

Jim Jordan
Chairman

---

[18] Ben Protess et al., *How Michael Cohen turned against President Trump*, N.Y. TIMES (Apr. 21, 2019).
[19] Rules of the U.S. House of Representatives, R. X (2023).

Mr. Carey R. Dunne
March 22, 2023
Page 4

cc:     The Honorable Jerrold Nadler, Ranking Member

Exhibit 6



**DISTRICT ATTORNEY**
**COUNTY OF NEW YORK**
ONE HOGAN PLACE
New York, N. Y. 10013
(212) 335-9000

ALVIN L. BRAGG, JR.
DISTRICT ATTORNEY

LESLIE B. DUBECK
GENERAL COUNSEL

March 23, 2023

By email

The Honorable Jim Jordan
Chairman, House Committee on the Judiciary

The Honorable Bryan Steil
Chairman, House Committee on House Administration

The Honorable James Comer
Chairman, House Committee on Oversight and Accountability

Dear Chairman Jordan, Chairman Steil, and Chairman Comer:

The District Attorney of New York County is investigating allegations that Donald Trump engaged in violations of New York State penal law. The investigation is one of thousands conducted by the Office of the District Attorney in its long history of pursuing justice and protecting New Yorkers. The investigation has been conducted consistently with the District Attorney's oath to faithfully execute the laws of the State of New York. The District Attorney pledged that the DA's Office would "publicly state the conclusion of our investigation—whether we conclude our work without bringing charges, or move forward with an indictment."[1] He stands by that pledge. And if charges are brought at the conclusion, it will be because the rule of law and faithful execution of the District Attorney's duty require it.

Your letter dated March 20, 2023 (the "Letter"), in contrast, is an unprecedent inquiry into a pending local prosecution. The Letter only came after Donald Trump created a false expectation that he would be arrested the next day[2] and his lawyers reportedly urged you to intervene.[3] Neither fact is a legitimate basis for congressional inquiry.

---

[1] Statement by Manhattan District Attorney Alvin Bragg on Ongoing Investigation Concerning the Trump Organization (April 7, 2022), available at: https://www.manhattanda.org/statement-by-manhattan-district-attorney-alvin-bragg-on-ongoing-investigation-concerning-the-trump-organization/.

[2] *Trump says 'illegal leaks' indicate he'll be arrested Tuesday*, FoxNews, March 18, 2023, available at: https://www.foxnews.com/politics/trump-says-illegal-leaks-indicate-arrested-tuesday.

[3] Shane Goldmacher, et al., *For the G.O.P., a Looming Trump Indictment Takes Center Stage*, N.Y. Times (March 20, 2023) (quoting a letter from Joseph Tacopina, a lawyer for Donald Trump, to Chairman Jordan, encouraging Congress to investigate the District Attorney).

The Honorable Jim Jordan, et al.
March 23, 2023
Page 2 of 5

In New York, the District Attorney is a constitutional officer charged with "the responsibility to conduct all prosecutions for crimes and offenses cognizable by the courts of the county in which he serves." *People v Di Falco*, 44 N.Y.2d 482, 486 (1978); *see also Matter of Haggerty v. Himelein*, 89 N.Y.2d 431, 436 (1997); *Matter of Schumer v. Holtzman*, 60 N.Y.2d 46, 52 (1983). These are quintessential police powers belonging to the State, and your letter treads into territory very clearly reserved to the states. It suggests that Congress's investigation is being "conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated," and is, therefore, "indefensible." *Watkins v. United States*, 354 U.S. 178, 187 (1957).

As articulated below, the District Attorney is obliged by the federal and state constitutions to protect the independence of state law enforcement functions from federal interference. The DA's Office therefore requests an opportunity to meet and confer with committee staff to better understand what information the DA's Office can provide that relates to a legitimate legislative interest and can be shared consistent with the District Attorney's constitutional obligations.

**Compliance with the Letter Would Interfere with Law Enforcement**

The Letter seeks non-public information about a pending criminal investigation, which is confidential under state law. CPL § 190.25(4)(a) ("Grand jury proceedings are secret"); Penal Law § 215.70 (prosecutor's disclosure of grand jury evidence is a felony unless "in the proper discharge of his official duties or upon written order of the court"); *Sanchez v. City of New York*, 201 A.D.2d 325, 326 (1st Dept. 1994) (witness statements to the District Attorney's Office protected by the public interest privilege); Public Officers Law § 87(2)(e) (shielding materials "compiled for law enforcement purposes" from public disclosure where disclosure would "interfere with law enforcement investigations" or "disclose confidential information relating to a criminal investigation").[4]

These confidentiality provisions exist to protect the interests of the various participants in the criminal process—the defendant, the witnesses, and members of the grand jury—as well as the integrity of the grand jury proceeding itself. Like the Department of Justice, as a prosecutor exercising sovereign executive powers, the District Attorney has a constitutional obligation to "protect the government's ability to prosecute fully and fairly," to "independently and impartially uphold the rule of law," to "protect witnesses and law enforcement," to "avoid flight by those implicated in our investigations," and to "prevent additional crimes."[5]

---

[4] That the investigation relates to a former President does not change this analysis. Even Donald Trump has conceded that he is not immune from local criminal prosecution. *See Trump v. Vance*, 591 U.S. ___, 140 S. Ct. 2412, 2426-27 (2020) (noting that the President "concedes—consistent with the position of the Department of Justice—that state grand juries are free to investigate a sitting President with an eye toward charging him after the completion of his term").

[5] Letter from Assistant Attorney General Carlos Uriarte to Chairman Jordan, dated January 20, 2023, at page 3-4. (Available at https://www.politico.com/f/?id=00000185-d087-dde8-a9af-d4afeba70000).

The Honorable Jim Jordan, et al.
March 23, 2023
Page 3 of 5

Consistent with these constitutional obligations, the DA's Office is cognizant of DOJ's "[l]ongstanding" policy of not providing Congress with non-public information about investigations.[6]

With regard to pending federal investigations, "Congress seems generally to have been respectful of the need to protect material contained in open criminal investigative files. There is almost no precedent for Congress attempting to subpoena such material, and even fewer examples of the DOJ actually producing such documents."[7]

## Requests Regarding the Exercise of State Police Powers Violate New York's Sovereignty

The Letter's requests are an unlawful incursion into New York's sovereignty. Congress's investigative jurisdiction is derived from and limited by its power to legislate concerning federal matters. *See, e.g., Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 503-05 (1975); *Barenblatt v. United States*, 360 U.S. 109, 111-12 (1959); *Kilbourn v. Thompson*, 103 U.S. 168, 195-96 (1880).

The Constitution limits Congress's powers to those specifically enumerated; and the Tenth Amendment ensures that any unenumerated powers are reserved to the States. *New York v. United States*, 505 U.S. 144, 155-56 (1992). It is therefore generally understood that a Congressional committee may not "inquire into matters which are . . . reserved to the States." Charles W. Johnson, *et al.*, House Practice: A Guide to the Rules, Precedents, and Procedures of the House at 254 (GPO 2017)[8]; *see also Watkins*, 354 U.S. at 187 ("The power of the Congress to conduct investigations . . . comprehends probes into departments of the *Federal* Government . . . .") (emphasis added).[9]

Among the powers reserved to the states, "[p]erhaps the clearest example of traditional state authority is the punishment of local criminal activity." *Bond v. United States*, 572 U.S. 844, 858 (2014). Thus, federal interference with state law enforcement "is peculiarly inconsistent with our federal framework." *Cameron v. Johnson*, 390 U.S. 611, 618 (1968); *see also Printz v. United*

---

[6] *Id.* at 3.

[7] Todd David Peterson, *Congressional Oversight of Open Criminal Investigations*, 77 Notre Dame L. Rev. 1373, 1410 (2002); *see also* Alissa M. Dolan & Todd Garvey, *CRS Report for Congress: Congressional Investigations of the Department of Justice, 1920-2012: History, Law, and Practice*, 2 (Nov. 5, 2012) (available at https://sgp.fas.org/crs/misc/R42811.pdf) ("Department [of Justice] rarely releases—and committees rarely subpoena—material relevant to open criminal investigations.").

[8] Available at https://www.govinfo.gov/content/pkg/GPO-HPRACTICE-115/pdf/GPO-HPRACTICE-115.pdf.

[9] Consistent with this general understanding, this type of inquiry appears to be unprecedented. The only precedent is one aimed at an ongoing state *civil* investigation that was never enforced. *See* Lemos, et al. Letter to House Committee on Science & Technology (Sept. 13, 2016) (scholarly review of subpoenas from the House Committee on Science & Technology to state Attorneys General regarding pending *civil* investigations, and stating: "To our knowledge, Congress has *never* before attempted to use its investigatory authority to interfere with an ongoing state investigation."), available at page 814 of https://docs.house.gov/meetings/SY/SY00/20160914/105259/HHRG-114-SY00-20160914-SD004.pdf.

The Honorable Jim Jordan, et al.
March 23, 2023
Page 4 of 5

*States*, 521 U.S. 898, 931 n.15 (1997) (Tenth Amendment limits federal power over local law enforcement). Invoking these principles of comity, equity, and federalism, the Supreme Court held, in *Younger v. Harris*, that federal courts may not interfere in pending state criminal prosecutions absent extraordinary circumstances. 401 U.S. 37 (1971). This holding reflects a "continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Id.* at 44.

Against this history, it is clear that Congress cannot have any legitimate legislative task relating to the oversight of local prosecutors enforcing state law. To preserve the Constitution's federalist principles, the District Attorney is duty bound by his constitutional oath to New York's sovereign interest in the exercise of police powers reserved to the States under the Tenth Amendment.

## Congressional Review of a Pending Criminal Investigation Usurps Executive Powers

Congress is not the appropriate branch to review pending criminal matters. As the Supreme Court noted in *Watkins*, "Congress [is not] a law enforcement or trial agency. These are functions of the executive and judicial departments of government." 354 U.S. at 187. "[T]he power [of Congress] to investigate must not be confused with any of the powers of law enforcement; those powers are assigned under our Constitution to the Executive and the Judiciary." *Quinn v. United States*, 349 U.S. 155, 161 (1955).

If a grand jury brings charges against Donald Trump, the DA's Office will have an obligation, as in every case, to provide a significant amount of discovery from its files to the defendant so that he may prepare a defense. The Letter's allegation that the DA's Office is pursuing a prosecution for political purposes is unfounded, and regardless, the proper forum for such a challenge is the Courts of New York, which are equipped to consider and review such objections. In addition, review by the U.S. Supreme Court would be available to the extent any criminal case raises federal issues. That is the mechanism afforded to every defendant in a criminal case. Congress has no role to play in that review, especially as to a pending *state* criminal proceeding. *See Younger*, 401 U.S. at 43-45.

## Federal Funding is an Insufficient Basis to Justify These Unconstitutional Requests

The Letter indicates that its requests may be related to a review of federal public safety funds. But the Letter does not suggest any way in which either the District Attorney's testimony about his prosecutorial decisions or the documents and communications of former Assistant District Attorneys on a pending criminal investigation would shed light on that review.

Nonetheless, to assist Congress in understanding the ways in which the DA's Office has used federal funds, we are preparing and will submit a letter describing its use of federal funds.

The Honorable Jim Jordan, et al.
March 23, 2023
Page 5 of 5

\*     \*     \*

We trust that you appreciate the importance of our federal system, state law enforcement activities, and the critical need to maintain the integrity and independence of state criminal law enforcement from federal interference. While the DA's Office will not allow a Congressional investigation to impede the exercise of New York's sovereign police power, this Office will always treat a fellow government entity with due respect. Therefore, again, we request a meet and confer to understand whether the Committee has any legitimate legislative purpose in the requested materials that could be accommodated without impeding those sovereign interests. We simply expect that our office also be treated "in a manner consistent with [New York's] status as a residuary sovereign[] and joint participant[] in the governance of the Nation." *Alden v. Maine*, 527 U.S. 706, 748 (1999) (Kennedy, J.).

Respectfully Submitted,

Leslie B. Dubeck
General Counsel

cc:    Honorable Jerrold Nadler, Ranking Member, Committee on the Judiciary

Honorable Joseph Morelle, Ranking Member, Committee on House Administration

Honorable Jamie Raskin, Ranking Member, Committee on Oversight and Accountability

Majority Staff, Committee on the Judiciary

Minority Staff, Committee on the Judiciary

Exhibit 7

**Congress of the United States**

Washington, DC 20515

March 25, 2023

Mr. Alvin L. Bragg, Jr.
District Attorney
New York County
One Hogan Place
New York, NY 10013

Dear Mr. Bragg:

Our Committees are conducting oversight of your reported effort to indict a former President of the United States and current declared candidate for that office. On March 20, 2023, we wrote to you requesting that you voluntarily cooperate with our oversight by providing relevant documents and testimony.[1] We received a reply letter sent on your behalf dated March 23, 2023, which set forth several purported reasons for why you could not cooperate with our investigation.[2]

Notably, your reply letter did not dispute the central allegations at issue—that you, under political pressure from left-wing activists and former prosecutors in your office, are reportedly planning to use an alleged federal campaign finance violation, previously declined by federal prosecutors, as a vehicle to extend the statute of limitations on an otherwise misdemeanor offense and indict for the first time in history a former President of the United States. Moreover, you are apparently attempting to *upgrade* a misdemeanor charge to a felony using an untested legal theory at the same time when you are simultaneously downgrading felony charges to misdemeanors in a majority of other cases in your jurisdiction.[3]

Contrary to the central argument set forth in your letter, this matter does not simply involve *local* or *state* interests. Rather, the potential criminal indictment of a former President of the United States by an elected local prosecutor of the opposing political party (and who will face the prospect of re-election) implicates substantial *federal* interests, particularly in a jurisdiction where trial-level judges also are popularly elected. If state or local prosecutors are able to engage in politically motivated prosecutions of Presidents of the United States (former or current) for personal acts, this could have a profound impact on how Presidents choose to

---

[1] Letter from Rep. Jim Jordan, H. Comm. on the Judiciary, et al., to Mr. Alvin L. Bragg, Jr., Manhattan District Attorney (Mar. 20, 2023).
[2] Letter from Leslie B. Dubeck, Gen. Counsel, N.Y. Co. District Att'y Off., to Rep. Jim Jordan, H. Comm. on the Judiciary, et al. (Mar. 23, 2023) [hereinafter "Letter from Dubeck"].
[3] *See, e.g.*, Melissa Klein, *NYC Convictions Plummet, Downgraded Charges Surge under Manhattan DA Bragg*, N.Y. Post (Nov. 26, 2022).

Mr. Alvin L. Bragg, Jr.
March 25, 2023
Page 2

exercise their powers while in office. For example, a President could choose to avoid taking action he believes to be in the national interest because it would negatively impact New York City for fear that he would be subject to a retaliatory prosecution in New York City.

Likewise, because the federal government has a compelling interest in protecting the physical safety of former or current Presidents, any decision to prosecute a former or current President raises difficult questions concerning how to vindicate that interest in the context of a state or local criminal justice system. For these reasons and others, we believe that we now must consider whether Congress should take legislative action to protect former and/or current Presidents from politically motivated prosecutions by state and local officials, and if so, how those protections should be structured. Critically, due to your own actions, you are now in possession of information critical to this inquiry.

I.      **The Arguments in Defense of Your Unprecedented Prosecutorial Conduct Are Conclusory and Unconvincing.**

The Supreme Court has recognized that Congress has a "broad and indispensable" power to conduct oversight, which "encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys in our social, economic or political system for the purpose of enabling Congress to remedy them."[4] In *Wilkinson v. United States*, the Supreme Court articulated a three-prong test to determine the legal sufficiency of a congressional subpoena: "(1) the Committee's investigation of the broad subject matter area must be authorized by Congress; (2) the investigation must be pursuant to 'a valid legislative purpose'; and (3) the specific inquiries involved must be pertinent to the broad subject matter areas which have been authorized by Congress."[5]

   A.  *The Committees Are Authorized to Conduct Such an Inquiry.*

Contrary to your assertion otherwise, the Committees' inquiry plainly satisfies this three-prong test. First, the Committee on the Judiciary is charged by the House of Representatives with upholding fundamental American civil liberties and with promoting fairness and consistency in our nation's criminal justice system. In fact, Rule X of the Rules of the House of Representatives authorizes the Committee on the Judiciary to conduct oversight of criminal justice matters to inform potential legislation.[6] In the Committees' view, the circumstances of any prosecutorial decision to indict a former President of the United States on a novel and untested legal theory based on facts known for years and conduct previously uncharged by federal prosecutors, shortly after your former high-ranking employee has publicly criticized you for *not* making such an indictment, require an examination of the facts and potential consequences of this unprecedented decision. The Committee on the Judiciary has an interest in the fair and evenhanded application of justice at both the state and federal level.

_____

[4] *See, e.g., Trump v. Mazars LLP*, No. 19-715 at 11 (U.S. slip op. July 9, 2020) (internal quotation marks and citations omitted).
[5] *Wilkinson v. United States*, 365 U.S. 399, 408-09 (1961); *see* Ashland Oil, Inc. v. FTC, 409 F. Supp. 297, 305 (D.D.C. 1976).
[6] Rules of the U.S. House of Representatives, R. X(l)(5) (2023).

Mr. Alvin L. Bragg, Jr.
March 25, 2023
Page 3

### B.  The Inquiry Is on a Matter on Which Legislation Could be Had.

Second, the Committees' inquiry has an obvious legitimate legislative purpose and is "a subject on which legislation could be had."[7] To begin with, as discussed above, Congress has a specific and manifestly important interest in preventing politically motivated prosecutions of current and former Presidents by elected state and local prosecutors, particularly those tried before elected state and local trial-level judges. Therefore, the Committee on the Judiciary, as a part of its broad authority to develop criminal justice legislation, must now consider whether to draft legislation that would, if enacted, insulate current and former presidents from such improper state and local prosecutions. These legislative reforms may include, for example, broadening the existing statutory right of removal of certain criminal cases from state court to federal court. Because your impending indictment of a former President is an issue of first impression, the Committees require information from your office to inform our oversight.

Moreover, as discussed above, your prosecutorial decision to indict a former President may cause a potential confrontation between federal and local law-enforcement authorities. Federal law requires the United States Secret Service to protect a former President.[8] Therefore, your unprecedented prosecutorial decision raises the potential for conflict between the federal law-enforcement officials required to protect the former President and local law-enforcement officials required to enforce your indictment and exercise control of him throughout his presence in the local criminal justice system. Such a novel and potentially fraught collision of federal and local law-enforcement officials with the safety of a former President at stake is certainly a matter of interest for the Committees. The Committees' oversight is necessary to inform potential legislation that would address or remedy any potential conflicts between federal and local authorities.

In addition, the federal campaign finance charges you are reportedly attempting to use to upgrade a misdemeanor charge to a felony have previously been considered—and rejected—by federal prosecutors.[9] In light of this fact, to bring uniformity to the law and prevent future attempts by state or local prosecutors to pursue politically motivated prosecutions related to campaign finance regulations applicable to federal elections, Congress may elect to consider legislation that broadens the preemption provision in the Federal Election Campaign Act. This reform could have the effect of better delineating the prosecutorial authorities of federal and local officials in this area and blocking the selective or politicized enforcement by state and local prosecutors of campaign finance restrictions pertaining to federal elections.

Furthermore, your reported decision to indict a former President requires congressional scrutiny about how federal public safety funds appropriated by Congress are implemented by

---

[7] *See, e.g., Mazars*, No. 19-715 at 12 (internal quotation marks and citations omitted).

[8] 18 U.S.C. § 3056.

[9] Jonathan Turley, *"America's Got Trump": Get Ready for a Truly Made-for-TV Prosecution*, Res Ipsa Loquitur – The Thing Itself Speaks (Mar. 20, 2023) ("Although it may be politically popular, the case is legally pathetic. Bragg is struggling to twist state laws to effectively prosecute a federal case long ago rejected by the Justice Department . . . .").

Mr. Alvin L. Bragg, Jr.
March 25, 2023
Page 4

local law-enforcement agencies and how limited resources are prioritized. Under your leadership, the New York County District Attorney's Office has adopted and defended your progressive criminal justice policies, which includes "downgrad[ing] 52 percent of felony cases to misdemeanors."[10] Even with downgrading more than half of your felony cases to misdemeanors, your office's conviction rate when prosecuting serious felony charges was reported to be just 51 percent.[11] Your conviction rate for misdemeanors also dropped sharply—from 53 percent to 28 percent.[12] Your policies have allowed career "criminals [to] run[ ] the streets" of Manhattan[13]—creating such a danger that a judge in your district has taken notice.[14]

To the extent that you are receiving federal funds and are choosing to prioritize apparent political prosecutions over commonsense public safety measures, the Committee on the Judiciary certainly may consider legislation to tie federal funds to improved public safety metrics. In fact, last year, a Judiciary Subcommittee heard testimony from the mother of an army veteran murdered in your district,[15] who criticized your office's handling of her son's murder by offering plea deals to the defendants despite the fact that "the murder and their roles were caught on video . . . ."[16] Her testimony crystallized the need for legislation to prevent dangerous criminals from running free. Additionally, if our oversight determines that improper partisan or political considerations are motivating your prosecutorial decisions, the Committee on the Judiciary may consider legislation to place conditions on federal funding for state and local law-enforcement jurisdictions to ensure that funds are not used to engage in discrimination on the basis of partisan affiliation or political beliefs.

Lastly, because the circumstances of this matter stem, in part, from Special Counsel Mueller's investigation,[17] Congress may consider legislative reforms to the authorities of special counsels and better delineate their relationships with other prosecuting entities.

---

[10] Andrea Cavallier, *REVEALED: Woke Manhattan DA Alvin Bragg has downgraded over HALF of felony cases to misdemeanors as criminals are free to roam streets of the Big Apple*, DAILY MAIL (Nov. 28, 2022); Georgett Roberts and Melissa Klein, *Manhattan DA Alvin Bragg surprised by 'push back' – defends policies*, N.Y. Post (Jan. 8, 2022).

[11] *Numbers show the grim consequences of Manhattan DA Alvin Bragg's pro-crime principles*, N.Y. Post (Nov. 27, 2022).

[12] *Id.*

[13] Alyssa Guzman, *Priorities, eh? Woke DA Alvin Bragg who's set to indict Trump is one of America's most controversial prosecutors after charging self-defense shopkeeper with murder and sending soft-on-crime memo*, DAILY MAIL (Mar. 18, 2023); Cavallier, *supra* note 10.

[14] Joe Marino and Bruce Golding, *Ex-con would have faced 'long time in jail' if not for new Manhattan DA: judge*, N.Y. Post (Jan. 12, 2022) (A career criminal "accused of threatening a drug store worker with a knife was told in court that he should "feel lucky" he got busted after new Manhattan District Attorney Alvin Bragg took office . . . . 'Based on your record, you would have faced a long period of time in jail if convicted," [Manhattan Criminal Court Judge Jay] Weiner said during the court proceeding . . . .")

[15] *Reimagining Public Safety in the COVID-19 Era, Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Sec. of the H. Comm. on the Judiciary*, 117th Cong. (Mar. 8, 2022) (testimony from Madeline Brame).

[16] Jack Morphet and Gabrielle Fonrouge, *Mother of slain Army vet Hason Correa rips Manhattan DA Alvin Bragg for giving plea deals in case*, N.Y. Post (June 10, 2022).

[17] Ben Protess et al., *How Michael Cohen turned against President Trump*, N.Y. Times (Apr. 21, 2019).

Mr. Alvin L. Bragg, Jr.
March 25, 2023
Page 5

### C. *The Requests Are Pertinent to the Committees' Inquiry.*

The Committees' inquiry satisfies *Wilkinson*'s third prong of pertinence to the oversight. Federal courts have interpreted this prong broadly, requiring "only that the specific inquiries be reasonably related to the subject matter under investigation."[18] The information sought by the Committees will allow us to assess the extent to which your reported effort to indict a former President and current declared candidate for that office is politically motivated and whether Congress should therefore draft legislative reforms to, among other things, protect former and current Presidents from politically motivated prosecutions.

## II. Your State Law-Based Defenses Are Insufficient.

Your conclusory claim that our constitutional oversight responsibilities will interfere with law enforcement is misplaced and unconvincing. As a threshold matter, whether your office is, in fact, fairly enforcing the law or abusing prosecutorial discretion to engage in a politically motivated indictment of a former President is a serious matter that, as discussed above, implicates significant federal interests. The Committees require information from the New York County District Attorney's Office to advance our oversight over the very matter that you claim is a basis to obstruct our investigation.

In support of your broad claim that compliance with the Committees' requests for documents and a transcribed interview would interfere with law enforcement, you note two New York State statutes that prohibit the disclosure of grand jury materials. The Committees' information requests, however, relate to numerous areas of inquiry that in no way implicate grand jury materials or seek information that would be confidential under New York law. For example, the request for your office's use of federal funds has no connection to any grand jury proceedings. Similarly, the vast majority of the questions that the Committees intend to ask you in an interview also would not implicate grand jury secrecy. Moreover, to the extent that questions are asked that you believe you are not permitted to answer, you would retain the ability to decline to answer or to assert an applicable privilege. Likewise, you remain free to decline to produce certain responsive documents on the basis of appropriate privileges or statutes that preclude production, provided you provide the Committees with a detailed privilege log that will enable us to review and evaluate your claims. The laws cited in your letter do not establish a basis for a complete refusal to cooperate. At best, they provide arguments that may be asserted on either a question-by-question or a document-by-document basis.

Furthermore, your invocation of certain New York laws as precluding you from complying with our oversight request is, at a minimum, overbroad. For example, New York's Freedom of Information Law (Public Officers Law § 87(2)) provides that agencies *may* decline to make certain records available for *public* inspection; it neither requires them to do so nor directly speaks to formal requests from congressional committees. Thus, that statutory provision does not preclude you from providing us with records that were "compiled for law enforcement

---

[18] Morton Rosenberg, When Congress Comes Calling: A Study on the Principles, Practices, and Pragmatics of Legislative Inquiry 18 (2017).

Mr. Alvin L. Bragg, Jr.
March 25, 2023
Page 6

purposes."[19] Indeed, the statute in question states that even when an agency receives a request from a member of the public, as opposed to congressional committees, a "denial of access shall not be based solely on the category or type of such record and shall be valid only when there is a particularized and specific justification for such denial."[20]

## III.     The Inquiry Does Not Intrude on Federalism Powers Because Congress Is Exercising Its Core Authority to Legislate.

Your letter raises unfounded and unpersuasive objections to our oversight based on federalism—arguing, in part, that our "requests are an unlawful incursion into New York's sovereignty."[21] You go on to note that "the District Attorney is duty bound by his constitutional oath to New York's sovereign interest in the exercise of police powers reserved to the States under the Tenth Amendment."[22] Contrary to your assertions, this inquiry does not infringe on New York's sovereignty.

To begin with, your argument hinges on your assertion that "Congress cannot have any legitimate legislative task relating to the oversight of local prosecutors enforcing state law." But this claim is simply wrong; as discussed at length above, this matter involves substantial federal interests. Moreover, the cases that you cite, *Younger v. Harris*, 401 U.S. 37 (1971), and *Cameron v. Johnson*, 390 U.S. 611 (1968), involve the question of when federal courts can enjoin prosecutions of state law. And needless to say, our oversight requests do no such thing; they would not block you from conducting any prosecution. Rather, we are simply seeking information to carry out constitutional duties.

Finally, our oversight requests do not implicate what is commonly referred to as the anti-commandeering principle.[23] In establishing the anti-commandeering principle in *New York v. United States*, the Supreme Court concluded that Congress cannot compel states to enact, enforce, or administer federal policies.[24] Unlike the matter before the Court in *New York*, our requests here simply do not compel the state "to enact, enforce, or administer federal policies."[25] Rather, the Committees are merely seeking information pertaining to a matter that is directly within the purview of our jurisdiction and is necessary to inform potential legislative reforms.

## IV.     The Inquiry Does Not Usurp Executive Powers

In your reply letter, you cited the Supreme Court of the United States in *Watkins v. United States* as saying, "Congress [is not] a law enforcement or trial agency."[26] We agree. The Committees do not seek to step into the shoes of the Executive Branch or usurp its powers.

---

[19] Public Officers Law § 87(2)(e).

[20] *Id.* at § 87(2).

[21] Letter from Dubeck, *supra* note 2.

[22] *Id.*

[23] The Committee's oversight does not involve the federal spending power. As such, the anti-coercion principle cannot be reasonably implicated.

[24] 505 U.S. 144, 188 (1992).

[25] *Id.*

[26] Letter from Dubeck, *supra* note 2 (citing *Watkins v. United States*, 354 U.S. 178, 187 (1957)).

Mr. Alvin L. Bragg, Jr.
March 25, 2023
Page 7

Rather, as explained, we are exercising the broad powers afforded Congress by the Constitution to conduct oversight to inform potential legislative reforms. This power

> encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste.[27]

Indeed, as the Supreme Court has recognized, Congress retains broad authority to conduct oversight of ongoing civil and criminal investigations. In *Sinclair v. United States*, the Supreme Court noted that the pendency of litigation does not stop Congress's ability to investigate, stating:

> It may be conceded that Congress is without authority to compel disclosures for the purpose of aiding the prosecution of pending suits; but the authority of that body, directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in such suits.[28]

The Court has further noted that "a congressional committee . . . engaged in legitimate legislative investigation need not grind to a halt whenever responses to its inquiries might potentially be harmful to a witness in some distinct proceeding . . . or when crime or wrongdoing is exposed."[29] Phrased another way, the Committees' oversight will in no way "stop [your] prosecution or set limits on the management of a particular case."[30] Accordingly, your refusal to cooperate with our oversight inquires on this basis is therefore unavailing.

## V.     Your Offer to Provide Information About Your Office's Use of Federal Funds Is Insufficient

While we appreciate your offer to submit a letter detailing the District Attorney's Office's use of federal funds, and we look forward to that submission, such a letter alone does not satisfy our oversight requests or preclude the Committees from proceeding with them. For example, as we have explained in detail, the Committee on the Judiciary is examining whether legislative reforms are necessary to insulate former and current Presidents from politically motivated prosecutions by state and local officials. And while your letter regarding your office's use of federal funds will not shed meaningful light on that question, we expect that your response to our other information requests will do so.

---

[27] *Id.*
[28] 279 U.S. 263, 295 (1929).
[29] *Hutcheson v. United States*, 369 U.S. 599, 617 (1962).
[30] *See* MORTON ROSENBERG, CONGRESSIONAL RESEARCH SERVICE, INVESTIGATIVE OVERSIGHT: AN INTRODUCTION TO THE LAW, PRACTICE AND PROCEDURE OF CONGRESSIONAL INQUIRY (1995).

Mr. Alvin L. Bragg, Jr.
March 25, 2023
Page 8

       Accordingly, we reiterate the requests in our March 20 letter and ask that you comply in full as soon as possible but no later than March 31, 2023. We trust the information in this letter satisfies your request to "understand whether the Committee has any legitimate legislative purpose . . . ."[31] Thank you for your attention to this matter.

                                  Sincerely,

Jim Jordan
Chairman
Committee on the Judiciary

Bryan Steil
Chairman
Committee on House Administration

James Comer
Chairman
Committee on Oversight and Accountability

cc:    The Honorable Jerrold Nadler, Ranking Member
       Committee on the Judiciary

       The Honorable Joseph Morelle, Ranking Member
       Committee on House Administration

       The Honorable Jamie Raskin, Ranking Member
       Committee on Oversight and Accountability

---

[31] Letter from Dubeck, *supra* note 2.

Exhibit 8

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE PEOPLE OF THE STATE OF NEW YORK

-against-

DONALD J. TRUMP,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE GRAND JURY OF THE COUNTY OF NEW YORK, by this indictment, accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about February 14, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated February 14, 2017, marked as a record of the Donald J. Trump Revocable Trust, and kept and maintained by the Trump Organization.

SECOND COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about February 14, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for the Donald J. Trump Revocable Trust, bearing voucher number 842457, and kept and maintained by the Trump Organization.

THIRD COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about February 14, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for the Donald J. Trump Revocable Trust, bearing voucher number 842460, and kept and maintained by the Trump Organization.

FOURTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about February 14, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump Revocable Trust Account check and check stub dated February 14, 2017, bearing check number 000138, and kept and maintained by the Trump Organization.

FIFTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about March 16, 2017, through March 17, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated February 16, 2017 and transmitted on or about March 16, 2017, marked as a record of the Donald J. Trump Revocable Trust, and kept and maintained by the Trump Organization.

SIXTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about March 17, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for the Donald J. Trump Revocable Trust, bearing voucher number 846907, and kept and maintained by the Trump Organization.

SEVENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about March 17, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump Revocable Trust Account check and check stub dated March 17, 2017, bearing check number 000147, and kept and maintained by the Trump Organization.

EIGHTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about April 13, 2017 through June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated April 13, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

NINTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 858770, and kept and maintained by the Trump Organization.

TENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated June 19, 2017, bearing check number 002740, and kept and maintained by the Trump Organization.


ELEVENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about May 22, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated May 22, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.


TWELFTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about May 22, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 855331, and kept and maintained by the Trump Organization.

THIRTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about May 23, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated May 23, 2017, bearing check number 002700, and kept and maintained by the Trump Organization.

FOURTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 16, 2017 through June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated June 16, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

FIFTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 858772, and kept and maintained by the Trump Organization.

SIXTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated June 19, 2017, bearing check number 002741, and kept and maintained by the Trump Organization.

SEVENTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about July 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated July 11, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

EIGHTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about July 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 861096, and kept and maintained by the Trump Organization.

NINETEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about July 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated July 11, 2017, bearing check number 002781, and kept and maintained by the Trump Organization.

TWENTIETH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about August 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated August 1, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

TWENTY-FIRST COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about August 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 863641, and kept and maintained by the Trump Organization.

TWENTY-SECOND COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about August 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated August 1, 2017, bearing check number 002821, and kept and maintained by the Trump Organization.

TWENTY-THIRD COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about September 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated September 11, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

TWENTY-FOURTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about September 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 868174, and kept and maintained by the Trump Organization.

TWENTY-FIFTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about September 12, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated September 12, 2017, bearing check number 002908, and kept and maintained by the Trump Organization.

TWENTY-SIXTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about October 18, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated October 18, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

TWENTY-SEVENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about October 18, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 872654, and kept and maintained by the Trump Organization.


TWENTY-EIGHTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about October 18, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated October 18, 2017, bearing check number 002944, and kept and maintained by the Trump Organization.


TWENTY-NINTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about November 20, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated November 20, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

**THIRTIETH COUNT:**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about November 20, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 876511, and kept and maintained by the Trump Organization.


**THIRTY-FIRST COUNT:**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about November 21, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated November 21, 2017, bearing check number 002980, and kept and maintained by the Trump Organization.


**THIRTY-SECOND COUNT:**

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about December 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated December 1, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

THIRTY-THIRD COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about December 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 877785, and kept and maintained by the Trump Organization.

THIRTY-FOURTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about December 5, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J.

Trump account check and check stub dated December 5, 2017, bearing check number 003006, and kept and maintained by the Trump Organization.

ALVIN L. BRAGG, JR.
District Attorney

GJ #8-5

Filed:                    NA

No.

THE PEOPLE OF THE STATE OF NEW YORK

-against-

DONALD J. TRUMP,

Defendant.

INDICTMENT

FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE, P.L. §175.10, 34 Cts

ALVIN L. BRAGG JR., District Attorney

A True Bill

Foreperson

ADJOURNED TO PART _____ ON _____

Exhibit 9

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALVIN L. BRAGG, JR., in his official capacity as District Attorney for New York County, | |
| *Plaintiff*, | Case No. 23-cv-3032 |
| v. | |
| JIM JORDAN, in his official capacity as Chairman of the Committee on the Judiciary, et al., | |
| *Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE DISTRICT ATTORNEY'S MOTION
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................ 1

BACKGROUND .............................................................. 3

ARGUMENT ................................................................. 6

I. The District Attorney Is Likely To Succeed on the Merits ........................................ 6

A. The Subpoena Lacks Any Valid Legislative Purpose and Therefore Exceeds Congress's Authority Under Article I. ..................................... 6

B. The Subpoena Does Not Survive the Heightened Scrutiny *Mazars* Requires for Congressional Inquiries Implicating Significant Separation of Powers or Federalism Concerns ........................................ 13

II. The District Attorney Will Be Irreparably Injured Absent Injunctive Relief. .......... 22

III. The Balance of Equities and the Public Interest Strongly Favor Injunctive Relief. ................................................................ 24

CONCLUSION ................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. Performance Supply, LLC*,
   458 F. Supp. 3d 181 (S.D.N.Y. 2020) ...................................................................................6

*Adler v. U.S. Dep't of Justice*,
   2018 WL 4571677 (S.D.N.Y. Sept. 24, 2018) .....................................................................22

*Bionpharma Inc. v. CoreRx, Inc.*,
   582 F. Supp. 3d 167 (S.D.N.Y. 2022) .................................................................................24

*Blumenthal v. Drudge*,
   186 F.R.D. 236 (D.D.C. 1999) ............................................................................................21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) .........................................................................................................18

*Eastland v. U.S. Servicemen's Fund*,
   421 U.S. 491 (1975) .......................................................................................................7, 10

*Engle v. Isaac*,
   456 U.S. 107 (1982) ...............................................................................................................9

*Georgia v. Pruitt*,
   326 F. Supp. 3d 1356 (S.D. Ga. 2018) ................................................................................24

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ...............................................................................................................9

*Illinois ex rel. Harris v. Bd. of Govs. of the Fed. Reserve Sys.*,
   751 F. Supp. 1323 (N.D. Ill. 1991) .....................................................................................24

*Hertzog, Calamari & Gleason v. Prudential Ins. Co. of Am.*,
   850 F. Supp. 255 (S.D.N.Y. 1994) ......................................................................................21

*Hickman v. Taylor*,
   329 U.S. 495 (1947) .............................................................................................................23

*Hopkins v. U.S. Dep't of Housing & Urb. Dev.*,
   929 F.2d 81 (2d Cir. 1991) ..................................................................................................22

*House Comm. on Judiciary v. McGahn*,
   968 F.3d 755 (D.C. Cir. 2020) ............................................................................................10

*House Comm. on Ways & Means v. U.S. Dep't of Treasury*,
    45 F.4th 324 (D.C. Cir. 2022) ................................................................10

*Jane Doe v. Yorkville Plaza Assocs.*,
    1996 WL 343059 (S.D.N.Y. June 21, 1996) ..........................................17

*Kilbourn v. Thompson*,
    103 U.S. 168 (1881) .....................................................................7, 8, 12

*LaRoque v. Holder*,
    650 F.3d 777 (D.C. Cir. 2011) ...............................................................14

*Mashpee Wampanoag Tribe v. Bernhardt*,
    2020 WL 3034854 (D.D.C. June 5, 2020) .............................................24

*McCoy v. City of New York*,
    2008 WL 3286270 (E.D.N.Y. Aug. 7, 2008) ..........................................20

*Merrill v. City of New York*,
    2005 WL 2923520 (S.D.N.Y. Nov. 4, 2005) ..........................................21

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ...............................................................................12

*New York v. United States*,
    505 U.S. 144 (1992) .................................................................................9

*Plaut v. Spendthrift Farm, Inc.*,
    514 U.S. 211 (1995) .................................................................................8

*Printz v. United States*,
    521 U. S. 898 (1997) ...........................................................................9, 25

*Rodgers v. Bryant*,
    942 F.3d 451 (8th Cir. 2019) ..................................................................25

*In re Sealed Case No. 98-3077*,
    151 F.3d 1059 (D.C. Cir. 1998) ..............................................................24

*In re Search Warrant Issued June 13, 2019*,
    942 F.3d 159 (4th Cir. 2019) ..................................................................23

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020) ...........................................................................14

*Tenney v. Brandhove*,
    341 U.S. 367 (1951) .................................................................................9

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995) ...................................................................................................23

*Trump v. Mazars USA, LLP*,
    140 S. Ct. 2019 (2020) ..................................2, 6, 11, 13, 14, 15, 16, 17, 18, 20, 21

*Trump v. Vance*,
    140 S. Ct. 2412 (2020) ...................................................................................10, 11, 20

*United States v. Lopez*,
    514 U.S. 549 (1995) ..........................................................................................2, 9

*United States v. Morrison*,
    529 U.S. 598 (2000) ............................................................................................9

*United States v. Rowe*,
    96 F.3d 1294 (9th Cir. 1996) ...............................................................................21

*Watkins v. United States*,
    354 U.S. 178 (1957) ...............................................................................2, 7, 12, 18

*White v. City of Mt. Vernon*,
    2022 WL 16578086 (S.D.N.Y. Nov. 1, 2022) .....................................................22

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ................................................................................................6

*In re World Trade Ctr. Bombing Litig.*,
    709 N.E.2d 452 (N.Y. 1999) ...............................................................................22

*Younger v. Harris*,
    401 U.S. 37 (1971) .................................................................................2, 14, 23

**Constitution**

U.S. Const. art. I..............................................................................................1, 6, 12, 20

U.S. Const. amend. X.................................................................................................9

**Statutes**

N.Y. Crim. P. Law § 190.25 ....................................................................................20

N.Y. Penal Law § 215.70..........................................................................................20

**Other Authorities**

118th Congress Regulations For Use of Deposition Authority and Remote
    Participation of Committee Witnesses, 169 Cong. Rec. H147 (Jan. 10, 2023) .....................23

William K. Rashbaum & Kate Christobek, *The Only Other Arrest of a U.S. President Involved a Speeding Horse*, N.Y. Times (Apr. 4, 2023) .........................................10

## INTRODUCTION

Chairman Jim Jordan and the House Committee on the Judiciary have issued a subpoena to former Manhattan prosecutor Mark Pomerantz for the purpose of interfering with New York's criminal prosecution of a single individual—former President Donald J. Trump. Ex. 1.[1] On March 30, 2023, an independent New York grand jury returned an indictment charging Mr. Trump with 34 felony counts under New York law. Ex. 36. Mr. Trump has leveraged his extensive social media network to undermine public confidence in the charges and threaten District Attorney Alvin Bragg Jr. ("District Attorney" or "D.A."). Compl. ¶¶ 34, 50–53, 63–65, 69–70, 84–86. At the urging of Mr. Trump's defense counsel, powerful allies in Congress have carried the refrain that the charges are "politically motivated" and have vowed to use the power of their office to hold the District Attorney "accountable." *Id.* ¶¶ 37–38, 72–74, 88–90; Ex. 2, at 1. Their latest salvo—the subpoena to Mr. Pomerantz—is an abuse of congressional process and a brazen incursion into New York's exercise of its sovereign prosecutorial powers.

The District Attorney hereby moves for a temporary restraining order and preliminary injunction to bar Chairman Jordan and his Committee from enforcing this unlawful and unconstitutional subpoena and to prohibit Mr. Pomerantz from complying with it. According to Chairman Jordan, the Committee seeks to question Mr. Pomerantz about the "internal deliberations" of the District Attorney's office and the "unique role" he played "as a special assistant district attorney leading the investigation into President Trump's finances." Ex. 1, at 2. This unprecedented federal intrusion into a state criminal prosecution exceeds Congress's authority under Article I of the Constitution and frustrates New York's prerogative to enforce its own criminal law. "Under our federal system, the States possess primary authority for defining

---

[1] Exhibits cited herein are exhibits to the Declaration of Theodore J. Boutrous Jr.

and enforcing the criminal law." *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995).  The Constitution requires the federal government to strictly observe a policy of "no interference" with the state officers who are "charged with the duty of prosecuting offenders against the laws of the State and must decide when and how this is to be done." *Younger v. Harris*, 401 U.S. 37, 45 (1971).  Congress is not "a law enforcement or trial agency," *Watkins v. United States*, 354 U.S. 178, 187 (1957), and the Judiciary Committee has no "valid legislative purpose" for hauling a former state prosecutor to Washington, D.C. to second guess the exercise of prosecutorial authority reserved to New York State.  *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020).

Mr. Jordan claims that the Judiciary Committee's unprecedented interference with a state criminal case is justified because, in his opinion, a "popularly elected" district attorney and state "trial-level judges" who "lack life tenure" cannot possibly be trusted to respect Mr. Trump's rights. Ex. 1, at 2.  But if Mr. Jordan believes the charges are "Outrageous," Ex. 17—a view not shared by the independent grand jury that indicted Mr. Trump—the proper forum for that objection is Mr. Trump's upcoming trial in New York Supreme Court.  Like every other criminal defendant, Mr. Trump will have the opportunity to confront the state's evidence and argue his innocence to the jury.  And the District Attorney will have the burden of proving his charges by the most rigorous standard known to the law—beyond a reasonable doubt.  A public trial, conducted with the robust procedural protections our Constitution and New York law afford, provides the ultimate safeguard against what Mr. Jordan derides as a "politically motivated" prosecution.  Exs. 1, 2.  That process alone, and not a congressional cross-examination of a former local prosecutor, will determine whether the charges will result in a conviction.

This Court should issue the preliminary injunction and temporary restraining order barring enforcement of the Committee's unconstitutional subpoena.

2

## BACKGROUND

The Judiciary Committee's subpoena is one of multiple efforts to undermine and disrupt the criminal proceedings in New York. Compl. ¶ 110. Twelve days before the indictment issued, Mr. Trump falsely announced that he would be arrested in three days and began stoking unrest on social media. *Id.* ¶ 34. In the same Truth Social post where he predicted his own arrest, Mr. Trump denigrated the District Attorney's office as "CORRUPT & HIGHLY POLITICAL" and pressed his followers to "TAKE OUR NATION BACK!" Ex. 6. His rhetoric only sharpened from there. Mr. Trump maligned the District Attorney as a "SOROS BACKED ANIMAL" and "a degenerate psychopath that truely [sic] hates the USA." Exs. 7, 8; Compl. ¶¶ 50, 53. He threatened that "the thugs and criminals who are corrupting our justice system will be defeated, discredited, and totally disgraced." Ex. 55; Compl. ¶ 5. Most ominously, he warned that his arrest or indictment would unleash "death & destruction," words reminiscent of the tweet that launched the insurrection at the U.S. Capitol on January 6, 2021. Exs. 8, 29, 34; Compl. ¶ 53.

As Mr. Trump fired up his supporters for a "war," his attorney reportedly worked behind the scenes to enlist help from representatives in Congress. Ex. 9; Compl. ¶¶ 5, 33. Mr. Trump's lawyer reportedly sent Chairman Jordan a letter urging Congress to investigate what he called an "egregious abuse of power" by a "rogue local district attorney." Ex. 25; Compl. ¶ 33. Mr. Jordan and U.S. Reps. James Comer and Bryan Steil marched in step to these orders, sending their own letter to the District Attorney demanding that he produce documents and appear before Congress to "testify about what plainly appears to be a politically motivated prosecutorial decision." Ex. 2, at 1. The trio then delivered a similar demand to Mr. Pomerantz and Carey Dunne, former prosecutors in the Manhattan D.A.'s office who at one time led the investigation into Mr. Trump and his businesses. Exs. 58, 59; Compl. ¶¶ 43–45.

The District Attorney's general counsel responded that the demand was "an unlawful incursion into New York's sovereignty" and requested the opportunity to meet and confer "to understand whether the Committee has any legitimate legislative purpose in the requested materials that could be accommodated without impeding those sovereign interests." Ex. 10, at 3, 5; *see also* Ex. 19. In a follow-up letter, Jordan, Comer, and Steil ignored the request to meet and confer, manufactured new supposed legislative objectives, and reiterated their intent to conduct "an examination of the facts" underlying the District Attorney's investigation. Ex. 11, at 2.

Meanwhile, the District Attorney's office directed Pomerantz and Dunne not to provide the documents or testimony the congressmen demanded in their letter. Mr. Pomerantz informed Chairman Jordan on March 27, 2023, that he would "act in a manner consistent with the instructions" he had received from the District Attorney. Ex. 12; Compl. ¶ 66. He also requested that Chairman Jordan direct any future requests for his testimony to the District Attorney's office. *Id.* Mr. Dunne did the same. Ex. 13; Compl. ¶ 67.

As the parties exchanged letters, the indictment issued on March 30, 2023, charging Mr. Trump with 34 felony counts of falsifying business records in the first degree. Exs. 36, 36-A; Compl. ¶¶ 68, 93. Mr. Trump pleaded not guilty to the charges. Compl. ¶ 94. Other aspects of the District Attorney's investigation have not resulted in grand jury action. As he awaits trial in the New York Supreme Court, Mr. Trump and others have waged an aggressive campaign to threaten and intimidate the District Attorney and presiding Judge Juan Merchan. *Id.* ¶s¶ 34, 36–38, 50–53, 63–65, 69–74, 84–91; *see also, e.g.*, Exs. 3–9, 23–26, 30–33, 35, 38–46, 49. On his Truth Social account, Mr. Trump posted a photograph of himself that made it appear he was swinging a baseball bat toward the District Attorney's head. Ex. 14; Compl. ¶¶ 5, 52. Then, after Mr. Trump primed his social media followers to believe that Judge Merchan "HATES ME," his

son, Donald Trump Jr., reposted a photograph of the judge's adult daughter.  Ex. 4; Compl. ¶ 69.

Mr. Trump and his allies in Congress have also leveled baseless and inflammatory accusations that

the state's case is "politically motivated."  Exs. 2, 5-A, 11, 24, 25, 47; Compl. ¶¶ 39, 44, 57, 88,

100–01.  Mr. Trump derided the state's charges as "Fake, Corrupt, and Disgraceful," among other,

more noxious descriptions.  Ex. 16; Compl. ¶ 69.  Mr. Jordan tweeted:  "Outrageous."  Ex. 17;

Compl. ¶ 73.  And House Speaker Kevin McCarthy vowed to use the power of his office to "hold

Alvin Bragg and his unprecedented abuse of power to account."  Ex. 18; Compl. ¶ 114; *see also*

Ex. 3; Compl. ¶ 89 (pledging that the District Attorney would be "held accountable by Congress").

On April 6, 2023, two days after Mr. Trump's arraignment, the Judiciary Committee issued

its subpoena to Mr. Pomerantz, ordering him to appear for a deposition on April 20, 2023.  Ex. 1.

According to The New York Times, House Republicans were eager to subpoena the District

Attorney but wanted to avoid "accusations of personal hypocrisy" after Speaker McCarthy and

Chairman Jordan both defied subpoenas from the House Select Committee investigating the

January 6, 2021, insurrection at the U.S. Capitol.  Ex. 15; Compl. ¶ 37 n.9.  Instead, they decided

to start by pursuing what they believed to be an easier initial target—Mr. Pomerantz.  Compl.

¶¶ 99, 110.  In a letter accompanying the subpoena, Chairman Jordan asserted that Mr. Pomerantz

had "no basis to decline to testify" because he published a book about the Trump investigation

after he resigned from the District Attorney's office in February 2022.  Ex. 1, at 2.  Chairman

Jordan asserted that the Committee had "a specific and manifestly important interest in preventing

politically motivated prosecutions of current and former Presidents by elected state and local

prosecutors."  *Id.* at 1–2.  And he contended that Mr. Pomerantz was "uniquely situated" to provide

information because of his "unique role as a special assistant district attorney" who participated in

the office's investigation of Mr. Trump.  *Id.* at 2.  This action followed.

**ARGUMENT**

The Judiciary Committee's extraordinary request to a former state prosecutor requires extraordinary relief.  A party seeking a temporary restraining order or preliminary injunction must demonstrate that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable injury absent preliminary relief; (3) the balance of the equities tips in his favor; and (4) an injunction serves the public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 191 (S.D.N.Y. 2020) (recognizing the "same legal standard" governs the issuance of preliminary injunctions and TROs).

The Judiciary Committee's subpoena to Mr. Pomerantz marks the first time in our nation's history that Congress has used its compulsory process to interfere with an ongoing state criminal case.  The District Attorney is likely to succeed on the merits because the subpoena exceeds Congress's authority and obstructs New York's sovereign right to enforce its criminal law.  The subpoena would also irreparably injure the District Attorney by, among other things, interfering with an ongoing criminal case, compromising grand jury secrecy and the attorney-client privilege, and disrupting his preparation for trial.  Finally, the balance of the equities and the public interest favor the District Attorney because the subpoena undercuts federalism principles and the fair administration of justice by injecting politics into a state criminal case.

**I.    The District Attorney Is Likely To Succeed on the Merits.**

**A.    The Subpoena Lacks Any Valid Legislative Purpose and Therefore Exceeds Congress's Authority Under Article I.**

The Judiciary Committee's subpoena is unlawful and unenforceable because it lacks any "valid legislative purpose."  *Mazars*, 140 S. Ct. at 2031.  "A congressional subpoena is valid only if it is related to, and in furtherance of, a legitimate task of Congress."  *Id.*  A subpoena, in other words, must "concern a subject on which legislation could be had."  *Id.* (brackets omitted).  The

Committee's subpoena flunks this basic requirement because its purpose is to undermine and obstruct New York's criminal case against Mr. Trump and retaliate against the District Attorney for what Chairman Jordan falsely described as a "politically motivated" prosecution. Ex. 1, at 1. Neither of these falls within "the sphere of legitimate legislative activity," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 506 (1975), because Congress has no authority to meddle in an ongoing criminal case prosecuted in New York state court under New York law.

Although Congress's subpoena power is broad, "it is not unlimited." *Watkins*, 354 U.S. at 187. "Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.* "Nor is Congress a law enforcement or trial agency." *Id.* "These are functions of the executive and judicial departments of government." *Id.* The Supreme Court thus held more than 140 years ago that Congress may not deploy its subpoena power to "interfere with" a case "pending in a court of competent jurisdiction." *Kilbourn v. Thompson*, 103 U.S. 168, 194 (1881). In *Kilbourn*, a witness challenged a House subpoena for documents and testimony relating to a company in bankruptcy proceedings where the United States was a creditor. Because the company's bankruptcy case remained open in the Eastern District of Pennsylvania, the Court held that the House's inquiry into the circumstances of the bankruptcy "was in its nature clearly judicial," *id.* at 192, and "therefore one in respect to which no valid legislation could be enacted," *Watkins*, 354 U.S. at 194. As a result, the House "had no lawful authority" to require the witness to testify "beyond what he voluntarily chose to tell." *Kilbourn*, 103 U.S. at 196.

Here, as in *Kilbourn*, the Judiciary Committee's subpoena is "clearly judicial" in nature because its purpose is to second guess the merits of New York's pending criminal case against Mr. Trump. 103 U.S. at 192. Chairman Jordan has made no secret that the Committee intends to

conduct "an examination of the facts" with the aim of exposing the charges against Mr. Trump as "an unprecedented abuse of prosecutorial authority."  Ex. 11, at 2; Ex. 2, at 1; *see also* Ex. 50, at 1.[2]  Before the indictment even issued, Chairman Jordan attacked the state's legal theory as "tenuous and untested" and impugned the "credibility" of the state's "star witness"—and then asserted that these supposed defects in the state's case required federal "oversight."  Ex. 2, at 2.  Chairman Jordan then reiterated the "oversight" theme in his letter to Mr. Pomerantz, hammering this word no less than nine times.  *See, e.g.*, Ex. 1, at 1 ("The Committee . . . is conducting oversight of the . . . District Attorney's unprecedented indictment of a former President.").  But the lesson of *Kilbourn* is that Congress does not sit to superintend the work of the courts:  it has "no lawful authority" to "interfere with" a case "pending in a court of competent jurisdiction."  103 U.S. at 194, 196; *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219, 224 (1995) (recognizing that the Framers abjured "a system of intermingled legislative and judicial powers").  If Mr. Trump and his allies on the Committee believe he is the victim of a "Witch Hunt," Ex. 4; Compl. ¶ 69, his recourse is the same one available to every other criminal defendant—a trial before a New York jury and a right to appeal if convicted.  Congress cannot appoint itself a super grand jury empowered to review the state's charges or a preemptive petit jury ready to acquit on every count.

Here, the Judiciary Committee has strayed even farther beyond its "jurisdiction" than the House did in *Kilbourn*, 103 U.S. at 196, because it is attempting to interfere in a criminal case pending in the courts of a separate sovereign—New York State.  Congress has no authority to

---

[2] Mr. Comer, chairman of the House Committee on Oversight and Accountability and one of the signatories to Chairman Jordan's letters, confirmed that the purpose of Congress's investigation is to probe the merits of the state's case.  He told the press that the committees wanted to force the District Attorney to "come explain to us exactly what he's investigat[ing]."  Ex. 52, at 4:46–5:44.  "If Mr. Bragg wants to come in and explain to us what he is doing and he makes a good explanation, . . . then we'll back off."  *Id.* at 6:26–8:18.

conduct an inquiry into the charges against Mr. Trump because it has no authority to regulate New York's enforcement of its own criminal law. "Under our federal system, the States possess primary authority for defining and enforcing the criminal law." *Lopez*, 514 U.S. at 561 n.3. "Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of . . . crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). Because the power to enforce state criminal law is "an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York v. United States*, 505 U.S. 144, 156 (1992); *see also Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (recognizing Congress cannot "readily interfere" where states "retain substantial sovereign powers").

The structural separation of powers between the state and federal governments is no mere formality. Our system of dual sovereignty is designed to "prevent the accumulation of excessive power" in any one part of the government and thereby "reduce the risk of tyranny and abuse from either front." *Printz v. United States*, 521 U. S. 898, 921 (1997). But here the Judiciary Committee has arrogated to itself the power to conduct "oversight" of a state criminal prosecution, Ex. 1, at 1, bigfooting the District Attorney's authority to enforce New York law and Judge Merchan's authority to manage the cases on his docket. This "obvious . . . usurpation of functions exclusively vested" in state governments, *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951), disrupts the constitutional balance and "frustrate[s]" New York's "sovereign power to punish offenders," *Engle v. Isaac*, 456 U.S. 107, 108 (1982).

Chairman Jordan points to alleged legislative interests that supposedly justify the Judiciary Committee's unwarranted "incursion" into a state criminal case, *Printz*, 521 U. S. at 920, but each of these is a baseless pretext for hauling Mr. Pomerantz to Washington for a political spectacle.

9

According to Mr. Jordan, the Committee could consider legislation—which of course remains entirely hypothetical—to "insulate current and former Presidents" from state criminal prosecutions for "personal acts" unrelated to their conduct in office. Ex. 1, at 2. But Congress's "power to investigate" extends only as far as its "power to enact and appropriate under the Constitution." *Eastland*, 421 U.S. at 504–06 & n.15; *see also House Comm. on Judiciary v. McGahn*, 968 F.3d 755, 765 (D.C. Cir. 2020) (recognizing the subpoena power effectuates "the *constitutional*" powers of Congress (emphasis added)). The Judiciary Committee cannot compel Mr. Pomerantz's testimony because Congress lacks authority to exempt former presidents—that is, private citizens—from the reach of state criminal laws. Any such legislation would invade the states' prerogative to punish state offenses, *see* pp. 8–9, *supra*, and make a mockery of equal protection principles. "[E]very President takes office knowing that he will be subject to the same laws as all other citizens upon leaving office." *House Comm. on Ways & Means v. U.S. Dep't of Treasury*, 45 F.4th 324, 338 (D.C. Cir. 2022); *see also* William K. Rashbaum & Kate Christobek, *The Only Other Arrest of a U.S. President Involved a Speeding Horse*, N.Y. Times (Apr. 4, 2023) (noting that President Grant told the officer who arrested him for speeding that he "admired a man who did his duty"). Mr. Trump himself has acknowledged that "state grand juries are free to investigate a sitting President with an eye toward charging him after the completion of his term." *Trump v. Vance*, 140 S. Ct. 2412, 2426–27 (2020). Only the Judiciary Committee appears unaware that "[t]his is a feature of our democratic republic, not a bug." *Ways & Means*, 45 F.4th at 338.

Chairman Jordan also asserts that the Judiciary Committee could consider legislation "to enhance reporting requirements" about federal funds that local law enforcement officials use "to investigate a current or former President or presidential candidate." Ex. 1, at 2. But this purely hypothetical legislation is merely a fig leaf for the Committee's impermissible federal intrusion

into a state prosecution. In response to Chairman Jordan's letter inquiry, the District Attorney's general counsel already provided the Committee with detailed information about its use of federal funds. She explained that the office has "*contributed* to the federal fisc" by helping the federal government "secure more than one billion dollars in assert forfeiture funds in the past 15 years." Ex. 19, at 3. Of that billion dollars in forfeiture money, the District Attorney spent approximately $5,000 on matters related to Mr. Trump or the Trump Organization, most of it litigating the U.S. Supreme Court case *Trump v. Vance*, 140 S. Ct. 2412. Ex. 19, at 4. That is the sum total of federal monies spent by the District Attorney's office on the Trump investigation or prosecution: "*No expenses* incurred relating to this matter have been paid from funds that the Office receives through federal grant programs." *Id.* (emphasis added). Were the Committee truly interested in "legislation to enhance reporting requirements concerning the use of federal forfeiture funds," Ex. 1, at 2, it could have accepted the District Attorney's offer to meet and confer about what additional information his office could provide, Ex. 10, at 2, 5; Ex. 19, at 6. The Committee also could have reviewed the substantial disclosures that the law requires and the office already makes in the ordinary course regarding its use of forfeiture funds. Instead, the Committee fired off a subpoena to Mr. Pomerantz—a former line attorney unlikely to have any information (much less up-to-date information) about the office's use of federal funds.

The Court need not credit the charade, nor "blind" itself to "what all others can see": the subpoena to Mr. Pomerantz is not "a run-of-the-mill legislative effort but rather a clash between rival" sovereigns "over records of intense political interest." *Mazars*, 140 S. Ct. at 2034. The purpose of the Committee's subpoena is not to legislate, but to disrupt New York's criminal prosecution of Mr. Trump and punish the prosecutor who had the temerity to submit potential charges to a grand jury. As Mr. Trump escalated his invective against the District Attorney, his

allies in Congress—working at the behest of Mr. Trump's lawyer—stepped in to abet the campaign of obstruction and intimidation. Exs. 24–26; Compl. ¶¶ 33–38. Speaker McCarthy pledged to hold the District Attorney "accountable," Ex. 3; Compl. ¶ 89, while Chairman Jordan and the Committee wielded the subpoena power to "run interference" for Mr. Trump, Ex. 26; Compl. ¶ 106. U.S. Rep. Wesley Hunt, a Judiciary Committee member, confirmed to Fox & Friends that the Committee's "plan" was political payback: "I can assure you that Jim Jordan, who's the head of the Judiciary Committee, we have a plan for all of these people to expose them for exactly who they are. . . . We've got to expose this so that in two years, the American people . . . can get this right." Ex. 20-A; Compl. ¶ 110. Far from denying this agenda, Mr. Jordan retweeted the interview. Ex. 20; Compl. ¶ 110.

In its scramble to insulate a single powerful individual from the rule of law, the Judiciary Committee has strayed far beyond its Article I powers and into a constitutional wilderness. The Committee has no warrant to conduct "oversight" of a state's "indictment" of a single criminal defendant. Ex. 1, at 1; *Kilbourn*, 103 U.S. at 192–96. Nor may the Committee abuse the subpoena power to "punish" the District Attorney or "aggrandize[]" itself or Mr. Trump. *Watkins*, 354 U.S. at 187. These uses of Congress's compulsory process lack any valid legislative purpose and are constitutionally "indefensible." *Id.* Tellingly, the District Attorney could identify *no* prior case in which Congress has attempted to subpoena a state prosecutor for the purpose of extracting information about an ongoing state prosecution. *Cf.* Ex. 27, at 116; Compl. ¶ 8 ("there hasn't been a subpoena enforcement against a state attorney general in 200 years"). Although "[l]egislative novelty is not always fatal, . . . sometimes the most telling indication of a severe constitutional problem is the lack of historical precedent for Congress's action." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) (Roberts, C.J.). The subpoena to Mr. Pomerantz subverts two

12

centuries of constitutional norms and impermissibly interferes with New York's power to prosecute and punish those who violate its laws. The Court should enjoin this unlawful overreach.

### B. The Subpoena Does Not Survive the Heightened Scrutiny *Mazars* Requires for Congressional Inquiries Implicating Significant Separation of Powers or Federalism Concerns.

Even assuming that the Judiciary Committee could concoct a valid legislative purpose for Mr. Pomerantz's testimony, the Court should still enjoin compliance with the subpoena because the Committee has not come close to satisfying the heightened standard of review that *Trump v. Mazars USA, LLP* prescribes for congressional subpoenas implicating significant separation-of-powers concerns. 140 S. Ct. 2019, 2032–34. That standard requires Congress to tailor its demand to a valid legislative purpose and avoid burdening other branches of government with requests for information that could be obtained from other sources. *Id.* at 2035–36. It also permits the courts to scrutinize Congress's asserted legislative purposes for pretext. *Id.* at 2034–36. The Judiciary Committee's subpoena to Mr. Pomerantz satisfies none of these factors.

Like this case, *Mazars* involved subpoenas that would have given Congress leverage over another branch of government—there the executive, here a state. Three House committees issued subpoenas to the accounting firm Mazars USA for the financial records of then-President Trump, his children, and his businesses. 140 S. Ct. at 2026. President Trump sued Mazars to enjoin the company from complying, and the three committees intervened to enforce their subpoenas. *Id.* Until then, the Supreme Court had never confronted the scope of Congress's power to subpoena presidential documents because the branches had historically "hashed out" such disputes "in the hurly-burly . . . of the political process." *Id.* at 2029. Faced with this unprecedented clash between rival branches, the Court placed constraints on Congress's power to investigate the President's information. "Without limits," the Court concluded, "Congress could 'exert an imperious controul' over the Executive Branch and aggrandize itself at the President's expense." *Id.* at 2034

13

(quoting The Federalist No. 71 (A. Hamilton)).  The Court held that, in assessing whether a congressional subpoena for the President's personal information was "related to, and in furtherance of, a legitimate task of Congress, courts must perform a careful analysis that takes adequate account of the separation of powers principles at stake."  *Id.* at 2035.

That "careful analysis" involves four factors.  *Mazars*, 140 S. Ct. at 2035.  Federal courts must (1) "carefully assess whether the asserted legislative purpose warrants the significant step of involving the President and his papers," including by asking whether "other sources could reasonably provide Congress the information it needs," (2) "insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective," (3) "be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose," and (4) "assess the burdens imposed . . . by a subpoena."  *Id.* at 2035–36.

The Judiciary Committee's flagrant intrusion on New York's sovereign power to conduct a criminal prosecution warrants application of the *Mazars* test here.  If the courts must rigorously scrutinize a congressional subpoena that threatens the balance of power between Congress and the executive, *Mazars*, 140 S. Ct. at 2034, then so too must they rigorously analyze a subpoena that poses a triple threat—to a state executive officer, a state judicial proceeding, and our federal system itself, *see Younger*, 401 U.S. at 44.  The separation of powers and federalism doctrines are each "foundational," *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2205 (2020), and they function in parallel to check the exercise of federal power and secure the rights and freedoms enumerated in the Constitution.  *See LaRoque v. Holder*, 650 F.3d 777, 792 (D.C. Cir. 2011) (describing federalism as a "vertical . . . separation of powers").  Like the subpoenas in *Mazars* that threatened to "aggrandize" Congress "at the President's expense," the Judiciary Committee's subpoena in this case imperils our federal system and gives rise to the same "weighty concerns" that justified the

14

Supreme Court's four-factor analysis. *Mazars*, 140 S. Ct. at 2034–36. The subpoena does not withstand that heightened scrutiny.

        **1.**        **The Judiciary Committee's Asserted Purposes Do Not Justify the "Significant Step" of a Serving a Subpoena on a State Prosecutor for Information Related to an Active Criminal Case.**

The Judiciary Committee's subpoena fails the first *Mazars* factor because its "asserted legislative purpose" does not justify the "significant step" of deposing a former state prosecutor about a pending criminal case, and information is available to the Committee through other, less intrusive alternatives. 140 S. Ct. at 2035. For the reasons explained above, the Judiciary Committee has no valid legislative purpose; its subpoena to Mr. Pomerantz is a thinly veiled ruse to obstruct the state's criminal case and retaliate against the District Attorney. But even taking the Committee's asserted legislative purposes at face value, none warrants the Committee's significant interference with New York's ongoing criminal case.

Chairman Jordan suggests that the Judiciary Committee could consider legislation to "insulate current and former Presidents" from "state and local prosecutions," including by creating a statutory right for former presidents to remove state criminal charges to federal court. Ex. 1, at 2. Even if such legislation were constitutional, which the District Attorney doubts, the Committee's demand for testimony from Mr. Pomerantz is unnecessary and unjustified. The Committee has many sources from which it could seek information about the wisdom of such legislation, including from former prosecutors not personally involved in the Trump investigation who might *voluntarily* give testimony. Congress may not politicize an ongoing state prosecution by using it as "a 'case study' for general legislation." *Mazars*, 140 S. Ct. at 2036.

Chairman Jordan also suggests that the Committee could consider "reforms" that would ameliorate the potential for conflict between federal law enforcement officials required to protect a former president and state law enforcement officials required to jail him if he is found guilty.

15

Ex. 1, at 2.  Mr. Trump's recent trip from Florida to New York for his arraignment, where he was accompanied by the Secret Service and arrested and fingerprinted by state officials at the Manhattan Criminal Court, indicates that the potential for conflict among these professionals is illusory at best.  Compl. ¶ 92.  But even assuming Congress might consider "reforms" to address this nonexistent problem, Mr. Pomerantz has no obvious value to the Committee as a witness:  he is an attorney whose expertise lies in enforcing the law rather than managing the physical security of defendants.  The tenuous connection between his testimony and the Committee's asserted legislative ends requires the Committee to look to "other sources" that could "reasonably provide" information without intruding into an active state criminal case.  *Mazars*, 140 S. Ct. at 2035–36.

Finally, Mr. Jordan asserts that the Committee could "enhance reporting requirements" by state law enforcement officials who use federal forfeiture funds to investigate a current or former president.  Ex. 1, at 2.  Once again, the Committee has obvious alternative sources of information.  The District Attorney's general counsel already sent the Committee detailed disclosures about the office's use of $5,000 in federal forfeiture funds in the Trump investigation and offered to meet and confer about what other documentation was needed.  Ex. 19, at 4, 6.  If the Committee's objective were truly to consider reporting requirements, then it could easily have pursued additional voluntary disclosures or reviewed the information the District Attorney's office already provides pursuant to existing reporting requirements.  Instead, its subpoena to Mr. Pomerantz is a non sequitur.  Deposing Mr. Pomerantz about the office's "internal deliberations" about the Trump investigation and his alleged personal animus toward Mr. Trump would not illuminate the need for a reporting requirement on the use of federal forfeiture funds.  Ex. 1, at 2.

None of the Committee's asserted legislative purposes warrants the "significant step," *Mazars*, 140 S. Ct. at 2035, of placing a former prosecutor on the witness stand to testify about his

"unique role" in New York's pending criminal case against Mr. Trump, Ex. 1, at 2. The first *Mazars* factor strongly favors injunctive relief.

### 2. The Subpoena Is Broader Than Necessary To Support Any Purported Legislative Objective.

The subpoena also fails the second *Mazars* factor because it is "broader than reasonably necessary to support Congress's legislative objective." 140 S. Ct. at 2036. The Committee served an unbounded demand for Mr. Pomerantz's testimony and indicated its intent to question him about topics ranging from the "internal deliberations" of the D.A.'s office to his alleged personal animosity toward Mr. Trump. Ex. 1, at 2–4. Far from tailoring its deposition request to its asserted legislative purposes, the Committee has engaged in an overbroad fishing expedition for any information that could conceivably bolster Mr. Trump's defense and undermine the prosecutors. *See, e.g.*, *Jane Doe v. Yorkville Plaza Assocs.*, 1996 WL 343059, at *4 (S.D.N.Y. June 21, 1996) (denying "overbroad" request to New York County District Attorney to produce entire criminal file). This "broader than . . . necessary" demand for Mr. Pomerantz's testimony does not survive scrutiny under the second *Mazars* factor. 140 S. Ct. at 2036.

### 3. Chairman Jordan and the Judiciary Committee Lack Evidence that the Subpoena Advances a Valid Legislative Purpose.

The subpoena fails the third *Mazars* factor because the Committee has offered only flimsy "evidence" that its demand to Mr. Pomerantz "advances a valid legislative purpose." 140 S. Ct. at 2036. In cases like this one implicating substantial federalism or separation of powers concerns, however, *Mazars* requires strong proof of a valid legislative objective—"[t]he more detailed and substantial the evidence . . . , the better." *Id.*

Although the Committee has paid lip service to potential legislative reforms, Speaker McCarthy and Chairman Jordan's own words disclose that the objective is to cross-examine Mr. Pomerantz to bolster the narrative that the case against Mr. Trump is "politically motivated." Ex.

1, at 1. Speaker McCarthy vowed to hold the District Attorney "accountable." Ex. 3; Compl. ¶ 89. Rep. Hunt "assure[d]" Fox News that "we have a plan . . . to expose" "these people." Ex. 20-A; Compl. ¶ 110. And Chairman Jordan has asserted that his inquiry will thwart the District Attorney from engaging in alleged "election interference." Ex. 54, at 0:35–0:39; *see also* Exs. 2, 11, 53. But subpoenas issued "to 'punish' those investigated are indefensible." *Watkins*, 354 U.S. at 187.

Meanwhile, the legislative record is bereft of any evidence that the Judiciary Committee actually intends to pursue the agenda that supposedly justifies its demand for testimony. Mr. Jordan's initial letter to the District Attorney nowhere suggested that the Committee was considering legislation to insulate former Presidents from state prosecutions or avoid clashes between Secret Service agents and state jailors. Ex. 2. Mr. Jordan invented these alleged reforms after the D.A.'s office questioned whether the Committee "has any legitimate legislative purpose in the requested materials." Ex. 10, at 5. Such "*post hoc* rationalizations" hardly "serve as a sufficient predicate" for congressional intrusion into a state criminal case. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). Underscoring that the Committee's supposed legislative agenda is baseless pretext, the Congressional Record does not reveal a *single* reference to the legislative reforms for which the Committee supposedly requires testimony.

### 4. The Subpoena Unreasonably Burdens the District Attorney's Office and the State Criminal Justice System.

The subpoena fails the fourth *Mazars* factor because it would substantially burden both the New York criminal justice system itself and the District Attorney's Office as it prepares for Mr. Trump's criminal trial. 140 S. Ct. at 2036. The Committee's subpoena would force discovery to take place along parallel tracks: one overseen by a New York judge under New York's criminal procedure law, the other in freewheeling congressional hearings unconstrained by the rules of evidence. But partial disclosures of the state's evidence, filtered to the public through partisan

hearings, would substantially prejudice the right to a fair trial and interfere with New York's ongoing investigation. The Committee should not be permitted to preempt the ordinary processes of a New York courtroom or conduct a partisan show trial for the television cameras before the District Attorney's office has the opportunity to present its case to a jury.

The Committee's subpoena also burdens the District Attorney and the criminal justice system by politicizing Mr. Trump's trial and undermining the public's faith in the integrity of the criminal justice system. Under Mr. Jordan's leadership, the Judiciary Committee has served the Justice Department with three subpoenas and 11 letters containing 183 requests for information in the first three months of 2023 alone. Ex. 21, at 4. In rebuffing the Committee's demands for information relating to "active investigations," the Justice Department explained that disclosures to Congress would "risk jeopardizing those investigations and creating the appearance that Congress may be exerting improper political pressure or attempting to influence Department decisions in certain cases." Ex. 22; Compl. ¶ 39 n.10. That is equally true here. Chairman Jordan's pledge that he will investigate the investigators for supposed political bias against Mr. Trump undermines public faith in the proceedings and injects partisan passions into a forum where they do not belong—a criminal courtroom.

Finally, the Committee's subpoena and its other intrusive discovery requests are plainly aimed at harassing and intimidating Manhattan prosecutors as they prepare Mr. Trump's criminal case for trial. Beyond litigating this action for emergency relief, the District Attorney's office has prepared two detailed letters responding to Chairman Jordan's demands for information about the Trump investigation. Exs. 10, 19. And these demands were only the beginning: one day after serving Mr. Pomerantz with a subpoena, Chairman Jordan demanded that Matthew Colangelo, senior counsel in the District Attorney's office, produce all documents and communications related

to Mr. Trump, along with information concerning his decision to join the District Attorney's office. Ex. 28; *see also* Ex. 37. These serial requests, made by Chairman Jordan with great public fanfare, are plainly intended to harass and intimidate New York's prosecutors and distract from their preparation of Mr. Trump's criminal case. *See* Exs. 48, 51, 56, 57.

In sum, each of the *Mazars* factors confirms that the subpoena to Mr. Pomerantz is an unlawful and unenforceable attempt to interfere with New York's sovereign right to enforce the criminal law and exceeds Congress's powers under Article I of the Constitution. This Court should enjoin the subpoena's enforcement.

### C. The Subpoena Impermissibly Seeks Secret Grand Jury Communications, Privileged Communications, and Attorney Work Product.

Even if Chairman Jordan and the Committee could show a valid legislative purpose and satisfy the *Mazars* test, the District Attorney is still likely to succeed on the merits because the subpoena seeks grand jury material whose secrecy is protected by New York law as well as documents and communications protected by the attorney-client privilege and work product doctrine. Injunctive relief is warranted to protect these sensitive materials.

***Grand Jury Material—New York Law***. New York law prohibits disclosure of "the nature or substance of any grand jury testimony, evidence, or any decision, result or other matter attending a grand jury proceeding." N.Y. Crim. P. Law § 190.25(4)(a). "Those who make unauthorized disclosures regarding a grand jury subpoena do so at their peril." *Vance*, 140 S. Ct. at 2427 (citing N.Y. Penal Law § 215.70). The secrecy of the grand jury under New York law is recognized as a privilege. *See McCoy v. City of New York*, 2008 WL 3286270, at *1 (E.D.N.Y. Aug. 7, 2008).

Although Chairman Jordan represents that he does not seek information protected by New York's grand jury secrecy laws, that assurance rings hollow. The Committee seeks Mr. Pomerantz's testimony because of his "role as a special assistant district attorney leading the

investigation into the former President's finances," Ex. 1, at 1, but such an inquiry could include questions about grand jury matters. Questioning Mr. Pomerantz about his investigation into Mr. Trump, particularly while Mr. Trump is being prosecuted, would seriously risk disclosure of grand jury material protected under New York law.

*Attorney-Client Privilege and Work Product*. The Committee also improperly seeks Mr. Pomerantz's testimony concerning "internal deliberations" within the District Attorney's office about the investigation of Mr. Trump. Ex. 1, at 3. Like communications within a law firm, internal deliberations within the D.A.'s office are protected by the attorney-client privilege and the work product doctrine. *See United States v. Rowe*, 96 F.3d 1294 (9th Cir. 1996); *Hertzog, Calamari & Gleason v. Prudential Ins. Co. of Am.*, 850 F. Supp. 255 (S.D.N.Y. 1994). A subpoena from Congress does not override those protections. *See Mazars*, 140 S. Ct. at 2032.

The Committee seeks to depose Mr. Pomerantz about an investigation he undertook at the District Attorney's office. Much of the information that would be responsive to the Committee's questions will be covered by the attorney-client privilege or work product doctrine. Chairman Jordan suggested that Mr. Pomerantz waived these protections by publishing his book about the Trump investigation. Ex. 1, at 2. But the privilege belongs to the District Attorney and was not Mr. Pomerantz's to waive. *See Merrill v. City of New York*, 2005 WL 2923520, at *1 n.2 (S.D.N.Y. Nov. 4, 2005) ("disclosure of such privileged information by a . . . former employee would not constitute a waiver of the privilege by the employer"); *Blumenthal v. Drudge*, 186 F.R.D. 236, 242 (D.D.C. 1999) (recognizing that a former government employee was not authorized to waive the government's privilege). Far from relinquishing any privileges, the District Attorney diligently sought to protect them, reminding Mr. Pomerantz of his obligations not to disclose confidential or privileged information and requesting the opportunity for prepublication review (which Mr.

Pomerantz and his publisher denied). Compl. ¶ 90. The District Attorney thus has every right to assert those privileges here. To the extent Mr. Pomerantz's book contains relevant, nonprivileged material, his testimony is redundant—the Committee already has his book.

*Law Enforcement and Informant's Privileges*. The testimony the Judiciary Committee seeks concerning an "ongoing criminal matter[]" also falls squarely within the scope of the law enforcement privilege. *Adler v. U.S. Dep't of Justice*, 2018 WL 4571677, at *4 (S.D.N.Y. Sept. 24, 2018). Along with its close cousin, the informant's privilege, the law enforcement privilege shields information that would compromise the confidentiality of sources, endanger witnesses or law enforcement officers, reveal investigatory techniques, or "impair the ability of a law enforcement agency to conduct future investigations." *White v. City of Mt. Vernon*, 2022 WL 16578086, at *3 (S.D.N.Y. Nov. 1, 2022). As with the attorney-client privilege, the Judiciary Committee's questions would have virtually complete overlap with the law enforcement privilege, providing yet another reason to enjoin the Committee's intrusive and improper demand.

*Public Interest and Deliberative Process Privileges*. The subpoena also risks disclosure of material protected by the public interest privilege, which applies to communications involving public officers where the public interest requires secrecy, *In re World Trade Ctr. Bombing Litig.*, 709 N.E.2d 452, 456 (N.Y. 1999), and by the deliberative process privilege, which protects pre-decisional communications of executive officials and their staff, *Hopkins v. U.S. Dep't of Housing & Urb. Dev.*, 929 F.2d 81, 84–85 (2d Cir. 1991). The exposure of such communications would chill the office's deliberations and undermine the secrecy of grand jury investigations.

## II.    The District Attorney Will Be Irreparably Injured Absent Injunctive Relief.

Absent a temporary restraining order and preliminary injunction, the District Attorney will face at least three forms of immediate and irreparable harm—that is, harm which is "not remote or

22

speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995).

*First*, the subpoena to Mr. Pomerantz is part of a collusive scheme to harass and intimidate the District Attorney and sabotage the criminal trial. "In performing his various duties, . . . it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties." *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947). "Proper preparation of a . . . case demands that he . . . plan his strategy without undue and needless interference." *Id.* Allowing the Judiciary Committee to open up an extrajudicial pathway for discovery and expose the "when and how" of an ongoing criminal case, *Younger*, 401 U.S. at 45, would sow chaos in the trial preparation process and irreparably injure not only the District Attorney, but the integrity of the state criminal proceeding itself.

*Second*, the subpoena will compromise the District Attorney's confidential communications and risk disclosing secret grand jury information. The regulations governing House depositions permit only two "personal, nongovernmental" attorneys to accompany Mr. Pomerantz to his deposition and bar "government agency personnel" from the District Attorney's office to attend and protect the privilege. *See* 118th Congress Regulations For Use of Deposition Authority and Remote Participation of Committee Witnesses, 169 Cong. Rec. H147 (Jan. 10, 2023). Not only does the D.A. lack a seat in the room, but the House regulations empower a partisan decisionmaker—the Committee Chairman—to overrule privilege objections and order a witness to answer a question. *Id.* Mr. Pomerantz could therefore face the dilemma of potentially being held in contempt if he refused to divulge privileged or confidential information over the Chairman's orders. Public disclosure of privileged or protected materials is a quintessential irreparable injury. *See In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019)

(holding that adverse party's review of attorney-client privileged materials irreparably harms the privilege holder); *cf. In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1065 (D.C. Cir. 1998) (granting mandamus petition where independent counsel argued he would be "irreparably harmed" by disclosure of grand jury material).

*Finally*, the Judiciary Committee's subpoena will cause irreparable injury to New York's dignitary interests. A state official "is not a minion" of the federal government, "scurrying here and there" to do the federal government's bidding—rather, "he is an officer of the State . . . , carrying out the duties imposed upon him by this office." *Illinois ex rel. Harris v. Bd. of Govs. of the Fed. Reserve Sys.*, 751 F. Supp. 1323, 1331 (N.D. Ill. 1991). But the Committee's subpoena would subordinate New York's sovereign interests to the federal government's—even though our Constitution reserves the power of criminal prosecution to the states. That injury to New York's sovereign dignity is irreparable as a matter of law. *Cf. Mashpee Wampanoag Tribe v. Bernhardt*, 2020 WL 3034854, at *3 (D.D.C. June 5, 2020); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) ("Loss of sovereignty is an irreparable harm.").

## III. The Balance of Equities and the Public Interest Strongly Favor Injunctive Relief.

The balance of equities and public interest strongly favor interim relief. "In determining whether the balance of the equities tips in the plaintiff's favor and whether granting the preliminary injunction would be in the public interest, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." *Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 178 (S.D.N.Y. 2022).

The balance of equities tips powerfully in the District Attorney's favor. The Judiciary Committee will suffer no injury if this Court enjoins compliance with its subpoena because the Committee has no jurisdiction to "conduct[] oversight," Ex. 1, at 1, of state prosecutions in the

first place. If Committee members believe the charges against Mr. Trump are unjust, they will have the opportunity to follow the progress of Mr. Trump's trial and communicate their views to constituents. But they have no warrant to put the state's case on trial before the District Attorney has presented it to a jury—a scenario that would undermine the interests of justice and irreparably injure New York's sovereign authority to prosecute violations of its criminal law.

The public's interest also favors injunctive relief. "[I]t is always in the public interest to protect constitutional rights." *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019). The District Attorney is pursuing this criminal prosecution on behalf of the people of New York pursuant to state laws intended to protect the public. The Judiciary Committee, by way of its subpoena, is seeking to undermine the District Attorney as he carries out his public duties and is violating fundamental principles of constitutional federalism by attempting to usurp New York's right to prosecute this criminal case free from federal interference. Because "a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front," *Printz*, 521 U.S. at 921, the public interest lies in deflecting the Committee's incursions on the rights of the people of the State of New York.

## CONCLUSION

This Court should grant a temporary restraining order and preliminary injunction barring enforcement of, or compliance with, the subpoena.

Dated: April 11, 2023                    Respectfully submitted,

                                         GIBSON DUNN & CRUTCHER LLP

                                         /s/ *Theodore J. Boutrous, Jr.*
                                         Theodore J. Boutrous, Jr.
                                         333 South Grand Ave.,
                                         Los Angeles, California 90071
                                         Tel:  (213) 229-7804
                                         tboutrous@gibsondunn.com

                                         Mylan L. Denerstein
                                         Lee R. Crain
                                         200 Park Avenue
                                         New York, New York 10166
                                         Tel:  (212) 351-3850
                                         mdenerstein@gibsondunn.com
                                         lcrain@gibsondunn.com

                                         Katherine Moran Meeks (*pro hac pending*)
                                         1050 Connecticut Avenue, N.W.
                                         Washington, D.C. 20036
                                         Tel:  (202) 955-8258
                                         kmeeks@gibsondunn.com

                                         NEW YORK COUNTY DISTRICT
                                         ATTORNEY'S OFFICE

                                         Leslie Dubeck
                                         General Counsel to the New York County
                                         District Attorney
                                         One Hogan Place
                                         New York, New York 10013
                                         (212) 335-9000
                                         Dubeckl@dany.nyc.gov

                                         *Counsel for Plaintiff Alvin L. Bragg, Jr.*

26

Exhibit 10

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

ALVIN L. BRAGG, JR., in his official capacity as District Attorney for New York County,

Plaintiff,

v.

JIM JORDAN, in his official capacity as Chairman of the Committee on the Judiciary, COMMITTEE ON THE JUDICIARY OF THE UNITED STATES HOUSE OF REPRESENTATIVES, and MARK F. POMERANTZ,

Defendants.

**1:23-CV-03032-MKV**

**DEFENDANT MARK F. POMERANTZ'S RESPONSE TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Defendant Mark F. Pomerantz joins the District Attorney's prayer for interim relief, and writes separately to stress a potential constitutional injury unique to Mr. Pomerantz.

Although Mr. Pomerantz is nominally designated a defendant in this action, he agrees with the District Attorney that the subpoena at issue seeks to impede and interfere with the pending prosecution of Donald Trump, and impermissibly intrudes on New York State's sovereign law enforcement authority, federalism, and the doctrine of separation of powers. These are matters for the District Attorney of New York County to argue. As the only person who has been summoned to testify, however, Mr. Pomerantz has individual standing to object to the subpoena, and his own arguments to make. He does object to the subpoena, and he therefore asks this Court to grant the District Attorney's motion.

The facts pertinent to this submission are set forth in the accompanying declaration. Mr. Pomerantz was sworn in as a special assistant district attorney in New York County on February 2, 2021. Pomerantz Decl. ¶ 3. He resigned from that position on February

23, 2022.  *Id*.  Mr. Pomerantz' resignation had nothing to do with the charges now pending against Donald Trump.

The current indictment, which relates to false business records used to conceal the reimbursement of Michael Cohen after Mr. Cohen made a payment of so-called "hush money" on Mr. Trump's behalf, was not returned until March 30, 2023, more than a year after Mr. Pomerantz's departure.  Following his resignation in February 2022, Mr. Pomerantz played no role whatsoever in the decision to seek Mr. Trump's indictment, and he did not discuss the decision to prosecute Mr. Trump with the District Attorney or any member of the prosecution team.  *Id.* ¶ 4.  Mr. Pomerantz is not a witness to the District Attorney's motives in seeking the indictment, and he does not have any personal knowledge about how the decision to seek the indictment—a decision reportedly made many months after his resignation—was reached. Mr. Pomerantz also has no personal knowledge about the use of federal forfeiture funds in connection with the Trump investigation or prosecution.  *Id*.

These facts—that Mr. Pomerantz was not involved in the District Attorney's decision to seek the indictment now pending against Donald Trump—are of great import because the pending indictment is what prompted the Committee's subpoena, and animates the purported "legislative purpose" underlying it.  In a letter to Mr. Pomerantz accompanying the subpoena, Rep. Jordan, as Chair of the House Judiciary Committee, says that the Committee is "conducting oversight" of the indictment of Mr. Trump.  *Id.* ¶ 2, Ex. 1 at 1–2.  The letter also speaks of Congress's purported interest in "preventing politically motivated prosecutions of current and former presidents."  *Id.*  Finally, the letter also

discusses Congress's interest in regulating the District Attorney's Office's use of federal forfeiture funds. *Id.*

Mr. Pomerantz cannot provide any meaningful information that advances the legislative purposes referenced in Rep. Jordan's letter. More troubling, the Committee apparently wishes to question Mr. Pomerantz about matters plainly outside the scope of Congress's authority under Section 1 of the United States Constitution. Rep. Jordan's letter indicates that the Committee intends to question Mr. Pomerantz about his political views, "the depth of [his] personal animosity" toward Donald Trump, his motives for writing his book (entitled *People vs. Donald Trump*), and his opinions on matters addressed in that book. *Id.*, Ex. 1 at 4. None of these topics cited in the letter are pertinent to the propriety of Mr. Trump's indictment, which is what the Committee supposedly seeks to "oversee." The subpoena is therefore constitutionally defective.

*Watkins v. United States*, 354 U.S 178 (1957), is directly on point. In *Watkins*, the U.S. Supreme Court wrote that "[t]here is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress." *Id.* at 187. The Court held that Congress is not "a law enforcement or trial agency," and ruled that "[i]investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.* The Court cautioned that the "mere semblance of legislative purpose" will not justify an intrusion on a person's First Amendment rights and held that a court "cannot simply assume" that "every congressional investigation is justified by a public need that overbalances any private rights affected." *Id.* at 198. To do so, the Court reasoned, "would be to abdicate the responsibility placed by the Constitution upon the judiciary to insure that the Congress does not unjustifiably

encroach upon an individual's right to privacy nor abridge his liberty of speech, press, religion, or assembly." *Id.* at 198–99.

The *Watkins* Court held that, as a matter of due process, a witness under Congressional subpoena can be questioned only if the questioning is "pertinent" to a legitimate legislative purpose. *Id.* at 208–09. Here, there is no connection between the questions raised in Rep. Jordan's letter about Mr. Pomerantz's personal views, motives, and opinions and the stated "legislative purpose" of probing an indictment that Mr. Pomerantz had no role in seeking.

The result is to place Mr. Pomerantz in a legally untenable position. The District Attorney has instructed Mr. Pomerantz, in writing, to provide no information to the Judiciary Committee in response to the subpoena. Pomerantz Decl. ¶ 5, Ex. 2. If Mr. Pomerantz does not follow the District Attorney's instructions, he faces potential legal or ethical consequences, including criminal exposure under New York's grand jury secrecy laws. *Id.* ¶ 5. Additionally, the District Attorney has asserted various claims of privilege. Pl.'s Mem. of Law 20–22, ECF No. 8. He asserts that Mr. Pomerantz cannot waive privileges that belong to the District Attorney, and that Mr. Pomerantz' prior public statements do not constitute a privilege waiver by Mr. Bragg or his Office. While Mr. Pomerantz agrees with this position, the Committee appears not to recognize the validity of the District Attorney's privilege claims, and Rep. Jordan's letter claims that Mr. Pomerantz must answer questions even about matters as to which the District Attorney claims privilege. As we understand the rules governing Mr. Pomerantz' appearance, he will not be allowed to assert the privileges that the District Attorney has instructed him to assert, and he risks being held in contempt if he tries to do so. *Id.* at 23. In short, Mr.

Pomerantz may be faced with potential criminal and disciplinary exposure if he answers the Committee's questions and possible criminal and disciplinary exposure if he does not. Placing Mr. Pomerantz in this dilemma is particularly unfair—and particularly unnecessary—because he cannot provide any pertinent testimony relevant to the return of the indictment filed against Mr. Trump, which is what the Judiciary Committee seeks to "oversee."

Under the Supreme Court's decision in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020), a subpoena that directly implicates the constitutional separation of powers requires special scrutiny and a careful balancing of the competing interests at stake. 140 S. Ct. at 2035–36. We defer to the papers filed by the District Attorney on this motion to articulate why the subpoena threatens New York's sovereign power to bring criminal prosecutions and the historic deference to a state's exercise of police powers. We agree with the District Attorney that, in these circumstances, the *Mazars* balancing approach is required. In that regard, the subpoena to Mr. Pomerantz plainly does not pass muster, for several reasons:

First, as we have indicated, Mr. Pomerantz has little if anything to say that will advance the purported legislative purpose that justifies the subpoena. He was not involved in the decision to bring the pending indictment against Mr. Trump. Pomerantz Decl. ¶¶ 3–4.

Second, under *Mazars*, a reviewing court can, indeed must, examine the evidence regarding Congress's purported legislative purpose. *Id.* at 2036. Here, Mr. Pomerantz's lack of involvement in the decision to bring the existing indictment, which is what the Committee purportedly wishes to "oversee," suggests that its stated purposes are

pretextual.  The close coordination between the Committee's Chairman and the former President, together with the other circumstances referenced in the District Attorney's moving papers, indicate that the Committee's real purpose is to obstruct the pending prosecution, assist Mr. Trump in his defense, impede any continuing investigation, and punish Mr. Pomerantz for writing a book that Mr. Trump and many of his supporters dislike.

Third, whether or not the Committee's stated purpose is pretextual, the potential for the misuse and abuse of the Committee's subpoena power is obvious.  The Committee will likely use the opportunity to question Mr. Pomerantz for improper purposes.  Rep. Jordan's letter indicates that the Committee wishes to gather information about how various prosecutors viewed the credibility of Michael Cohen, and to flesh out any discussions of the evidence that will be introduced at Mr. Trump's trial.  Pomerantz Decl., Ex. 1 at 3.  The Committee also plans to probe the political views of Mr. Pomerantz and, presumably, other prosecutors, notwithstanding the complete lack of evidence to suggest that those views tainted any actions that the District Attorney's Office took during Mr. Pomerantz' tenure or thereafter.  *Id.* at 4.  Issues surrounding the District Attorney's Office's motivation in filing its charges against Mr. Trump will almost certainly be litigated in his criminal case.  We believe that the goal of the subpoena is to try to gather information that might be helpful to Mr. Trump in litigating the charges against him, either in the courtroom or in the court of public opinion.  The potential for mischief is apparent, and we urge the Court to be particularly sensitive to avoid any interference with the pending criminal case.

Finally, in connection with the careful balancing of interests that *Mazars* requires, the legal jeopardy that the subpoena creates for Mr. Pomerantz is entitled to substantial

7

weight. It is simply unfair to place him in a circumstance where he faces legal and disciplinary peril in trying to navigate the conflicting demands of the Judiciary Committee's subpoena, the District Attorney's Office's directive, and applicable New York laws.

Accordingly, Mr. Pomerantz joins in the District Attorney's motion for interim relief.

Dated: New York, New York
April 17, 2023

**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**

By: /s/ Theodore V. Wells Jr.

Theodore V. Wells Jr.
Roberto Finzi
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
twells@paulweiss.com
rfinzi@paulweiss.com

*Counsel for Defendant Mark F. Pomerantz*

Exhibit 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALVIN L. BRAGG, JR., *in his official capacity as District Attorney for New York County*,

Plaintiff,

-against-

JIM JORDAN, *in his official capacity as Chairman of the Committee on the Judiciary*, COMMITTEE ON THE JUDICIARY OF THE UNITED STATES HOUSE OF REPRESENTATIVES, and MARK F. POMERANTZ,

Defendants.

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _4/19/2023_

1:23-cv-3032 (MKV)

**OPINION AND ORDER DENYING TEMPORARY RESTRAINING ORDER**

MARY KAY VYSKOCIL, United States District Judge:

The request by Manhattan District Attorney Alvin L. Bragg Jr. for a temporary restraining order, enjoining enforcement of the subpoena issued to Mark F. Pomerantz by the Committee on the Judiciary of the United States House of Representatives, chaired by Congressman Jim Jordan, is DENIED. The subpoena was issued with a "valid legislative purpose" in connection with the "broad" and "indispensable" congressional power to "conduct investigations." It is not the role of the federal judiciary to dictate what legislation Congress may consider or how it should conduct its deliberations in that connection. Mr. Pomerantz must appear for the congressional deposition. No one is above the law.

**BACKGROUND**

On April 6, 2023, the Committee on the Judiciary of the United States House of Representatives (the "Committee") issued a subpoena, directing Mark F. Pomerantz ("Pomerantz"), a former *pro bono* employee of the Office of the District Attorney for New York County ("DANY"), to appear on April 20, 2023 "to testify at a deposition touching matters of

1

inquiry committed to [the Committee]." Exhibit 1 ("Ex. 1") to the Declaration of Theodore J. Boutrous, Jr. ("Boutrous Dec.") [ECF No. 12-1]. The subpoena does *not* request that Pomerantz produce any documents. *See* Ex. 1.

The subpoena was accompanied by a letter from the Chairman of the Committee, Jim Jordan ("Jordan"). *See* Ex. 1. The letter requests Pomerantz's appearance due to his "unique role as a special assistant district attorney leading the investigation into President Trump's finances." Ex. 1 at 2. It further explains that Pomerantz has "already discussed many of the topics relevant to [the Committee's] oversight in a book [that Pomerantz] wrote and published in February 2023, as well as in several public interviews to promote [his] book."[1] Ex. 1 at 2 (citations omitted). Jordan notes that DANY has "acknowledged that it used federal forfeiture funds in its investigations of President Trump,"[2] and that the Committee was considering "potential legislative reforms," such as "broadening the existing statutory right of removal of certain criminal cases from state court to federal court." Ex. 1 at 2.

The book referenced in Jordan's letter is *People vs. Donald Trump: An Inside Account*, written by Pomerantz and published in early 2023. *See* M. Pomerantz, *People vs. Donald Trump: An Inside Account* (2023) ("*Inside Account*"). As its subtitle indicates, the book recounts Pomerantz's *insider* insights, mental impressions, and his front row seat to the investigation and deliberative process leading up to the DANY case against former President and current presidential candidate Donald Trump. Among Pomerantz's observations:

- Within DANY, the case against Trump arising out of payment of so-called "hush money" to Stephanie Clifford was referred to as the "zombie" case. *Id.* at 200.

- The facts surrounding the payments "did not amount to much in legal terms. Paying hush money is not a crime under New York State law, even if the payment

---

[1] *See* Exhibits E–O to the Declaration of Todd B. Tatelman [ECF Nos. 32-5 to 32-15].

[2] *See* Exhibit 19 to the Boutrous Dec. [ECF No. 12-20].

was made to help an electoral candidate." *Id.* at 40.

- "[C]reating false business records is only a misdemeanor under New York law." *Id.* at 40.

- "[T]here appeared to be no [felony] state crime in play." *Id.* at 40–41.

- "[T]o charge Trump with something other than a misdemeanor, DANY would have to argue that the intent to commit or conceal a federal crime had converted the falsification of the records into a felony. No appellate court in New York had ever upheld (or rejected) this interpretation of the law." *Id.* at 41.

- The statutory language (under which Trump was charged) is "ambiguous." *Id.* at 40.

- "[T]here was a big risk that felony charges would be dismissed before a jury could even consider them." *Id.* at 41.

- "[T]he Trump investigation should have been handled by the U.S. Department of Justice, rather than by the Manhattan district attorney's office." *Id.* at 240.

- "[F]ederal prosecutors would not have to torture or massage [statutory] language to charge Trump with a violation," as DANY would have to do. *Id.* at 240.

- *Federal prosecutors previously looked into the Clifford "hush money payment" and did not move forward with the prosecution. Id.* at 242 (emphasis added); *see also id.* at 39.

- There is a statute of limitations issue with the DANY case against Trump. *Id.* at 240–41.

- Numerous DANY prosecutors were skeptical about the prosecution of Trump and were referred to internally at DANY as "conscientious objectors." *Id.* at 194.

- The invoices and requests for payment from Michael Cohen in connection with the Clifford payments, in a supposed effort to "camouflage" reimbursements, were made "throughout 2017 (*after* Trump's inauguration as president)." *Id.* at 39 (emphasis added) (parenthetical in original).

- The DANY prosecution team discussed "Michael Cohen's credibility" as being one of "the difficulties in the case." *Id.* at 203.

- *At one point, Bragg "commented that he 'could not see a world' in which [DANY] would indict Trump and call Michael Cohen as a prosecution witness." Id.* at 227 (emphasis added).

- While Pomerantz acknowledged Bragg's right to make prosecutorial decisions, Pomerantz viewed himself as more experienced and qualified than Bragg. *Id.* at 218–19. Pomerantz makes a point that he was "finishing law school when Alvin was a toddler." *Id.* at 208.

- Pomerantz resigned from his *pro bono* position at DANY when it became clear to him that President Trump would not be indicted. *Id.* at 248–51; *see also* Exhibit C ("Ex. C") to the Declaration of Todd B. Tatelman ("Tatelman Dec.") [ECF No. 32-3]. Pomerantz "told the DA that he was responsible for a 'grave failure of justice' because he would not authorize Trump's indictment." *Inside Account* at 1.

- Ultimately in March 2023, Bragg did, of course, indict President Trump, "bring[ing] the 'zombie' theory back from the dead once again." *Id.* at 209.

Jordan and the Committee first tried to acquire information from Pomerantz and DANY voluntarily. *See, e.g.*, Exhibit 2 ("Ex. 2") to the Boutrous Dec. [ECF No. 12-2]; Exhibit 11 ("Ex. 11") to the Boutrous Dec. [ECF No. 12-12]; Exhibit 58 ("Ex. 58") to the Boutrous Dec. [ECF No. 12-61]. While the DANY General Counsel offered to "meet and confer" with the Committee "to understand whether [it] ha[d] any legitimate legislative purpose in the requested materials," DANY declined to provide information and instructed Pomerantz not to comply with the Committee's requests. Exhibit 10 ("Ex. 10") to the Boutrous Dec. at 5 [ECF No. 12-11]; Exhibit 12 ("Ex. 12") to the Boutrous Dec. [ECF No. 12-13]; *see also* Exhibit 19 ("Ex. 19") to the Boutrous Dec. [ECF No. 12-20].

On April 11, 2023, Manhattan District Attorney Alvin L. Bragg, Jr. ("Plaintiff" or "Bragg")—one of five local district attorneys for the five boroughs in the City of New York— filed a 50-page Complaint in this Court, naming Jordan, the Committee, and Pomerantz as defendants. *See* Complaint [ECF No. 1] ("Compl."). Bragg simultaneously filed a motion, brought on by an *ex parte* proposed order to show cause, seeking a temporary restraining order and a preliminary injunction (1) enjoining Jordan and the Committee from enforcing the subpoena served on Pomerantz and (2) enjoining Pomerantz from complying with the subpoena, *see*

Proposed Order to Show Cause With Emergency Relief [ECF No. 7]; *see also* Memorandum of Law in Support [ECF No. 8] ("Pl. Mem."). Plaintiff later filed the Declaration of Theodore J. Boutrous, Jr., accompanied by over 60 exhibits. *See* Boutrous Dec.

The first 35 pages of the Complaint have little to do with the subpoena at issue and are nothing short of a public relations tirade against former President and current presidential candidate Donald Trump. The same is true of the vast majority of the exhibits accompanying the Boutrous Declaration. Of note, the Complaint acknowledges that DANY used federal forfeiture funds in investigating President Trump and/or the Trump Organization. Compl. ¶ 78. Moreover, Bragg concedes that DANY was aware that Pomerantz was writing a book about the Trump investigation and asked to review the manuscript pre-publication. Compl. ¶ 90. Pomerantz declined. Compl. ¶ 90; Pl. Mem. 21–22. At heart, the Complaint simply includes two requests for declaratory and injunctive relief directed at the congressional inquiry. The reality is that, as framed, this action is merely a motion to quash a subpoena dressed up as a lawsuit.

The motion for a temporary restraining order was filed without notice to Defendants and before Defendants even were served with the Complaint. *See* Certificate of Service [ECF No. 17]; Waiver of Service [ECF No. 18]. In this Court, Local Civil Rule 6.1(d) dictates that any party seeking an *ex parte* order must submit an "affidavit of good and sufficient reasons why a procedure other than by notice of motion is necessary, and stating whether a previous application for similar relief has been made." No such affidavit was submitted here. Accordingly, the Court issued an Order, declining to enter the proposed order to show cause, directing service on Defendants not only of the motion (with all supporting papers), but also of the Complaint by which this case was initiated, setting a briefing schedule to allow Defendants to be heard, and scheduling a hearing for today to address the motion for a temporary restraining order. *See* Order [ECF No. 13].

Jordan and the Committee filed an opposition brief. *See* Opposition Brief [ECF No. 27]

("Def. Mem.").  They argue that Bragg cannot establish a likelihood of success on the merits because Jordan and the Committee are immune from suit under the Speech or Debate Clause of Article I of the United States Constitution.  Def. Mem. 5–14.  Defendants further argue that the subpoena has at least two valid legislative purposes.  First, they contend that the Committee is considering the viability of legislation to protect former Presidents and presidential candidates from politically motivated prosecutions by local district attorneys, such as by permitting those cases to be removed to federal court, out of a concern that such prosecutions "could have a profound impact on how Presidents choose to exercise their powers while in office."  Def. Mem. 3.  Second, Defendants argue that the Committee is permissibly investigating DANY's use of federal forfeiture funds in the investigation of President Trump, which could potentially influence the outcome of the 2024 presidential election.  Def. Mem. 8–9.

Pomerantz filed a "response" to Bragg's motion. *See* Pomerantz Response [ECF No. 30] ("Pomerantz Res."); *see also* Declaration of Mark F. Pomerantz [ECF No. 31] ("Pomerantz Dec."). Pomerantz describes himself as a "nominal[]" defendant.  Pomerantz Dec. ¶ 1.  He does not oppose Bragg's motion and, instead, joins in the request for an injunction.  *See* Pomerantz Dec. ¶ 1 ("I have no objection to the relief that the District Attorney has requested.  I consent to that relief, and indeed urge this Court to grant it.").[3]  It appears that Pomerantz is content to largely allow Bragg to speak for him.  *See* Pomerantz Res. 1 ("These are matters for the District Attorney . . . to argue."); *id.* at 5 ("We defer to the papers filed by the District Attorney on this motion to articulate why the subpoena threatens New York's sovereign power.").  Indeed, Bragg's counsel, Theodore J. Boutrous, Jr., filed a waiver of service on behalf of Pomerantz.  *See* Waiver of Service [ECF No. 18].

---

[3] Unless otherwise noted, references to "Defendants" in this Opinion refer only to Jordan and the Committee.

The day before the scheduled hearing, Bragg filed an eleventh hour reply brief, not authorized by the Court's Scheduling Order given the compressed time frame in which Plaintiff's motion was brought on.  The reply largely rehashes the same arguments made in the moving brief and, for the first time, addresses the Speech or Debate Clause.  *See* Reply Brief [ECF No. 41-1] ("Reply").  The reply brief was accompanied by a supplemental declaration attaching sixteen largely irrelevant exhibits, consisting of a hodge-podge of social media postings, news articles, television interviews, pleadings from unrelated lawsuits, and a transcript from the arraignment in the Trump prosecution.  *See* Exhibits 60–72 to the Second Boutrous Declaration [ECF Nos. 41-2 to 41-5].

The Court is in receipt of several unsolicited amicus briefs.  An assemblage of former members of Congress, former prosecutors, former government attorneys, and academics filed an amicus brief with the consent of Bragg.  *See* Letter Motion to File Amicus Brief [ECF No. 34]; Amicus Brief [ECF No. 37] ("First Amicus").  Amici argue that the Committee lacked authority to issue the subpoena and echo Bragg's refrain that the subpoena will "interfere with an ongoing criminal prosecution . . . brought by a state prosecutor."  First Amicus 1.  A separate group of former state and federal prosecutors filed another amicus brief, again with the consent of Bragg. *See* Letter Motion to File Amicus Brief [ECF No. 40] ("Second Amicus").   These amici assert that the subpoena "seriously challenges . . . the prosecutorial process."  Second Amicus 2.[4]

Bragg and his two sets of amici attack what they describe as federal interference in his criminal prosecution.  Pl. Mem. 1; First Amicus 3; Second Amicus 3.  There is no question that New York, a sovereign state in our federal system, has authority to enforce its criminal laws through its local prosecutors. The Court is mindful of potential federalism concerns.  However,

---

[4] The Court also received a "friend of the court letter" from James H. Brady, dated April 17, 2023.  *See* Letter [ECF No. 38].  The Court has reviewed and considered all of the unsolicited submissions.

the Court rejects the premise that the Committee's investigation will interfere with DANY's ongoing prosecution. The subpoena of Pomerantz, who was a private citizen and public commentator at the time Bragg indicted Trump, will not prevent or impede the criminal prosecution that is proceeding in New York state court.

## ANALYSIS

### I. Bragg Has Sufficiently Alleged Article III Standing

A threshold issue in this matter is whether Bragg has standing to maintain this action since the challenged subpoena is not addressed to Bragg or his office. *See All. For Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006) ("[A] district court must generally. . . establish that it has federal constitutional jurisdiction, including a determination that the plaintiff has Article III standing, before deciding a case on the merits."). The subpoena was issued to Pomerantz—*not* to Bragg. *See* Ex. 1. Pomerantz has not filed suit. Although he is named as a defendant, Pomerantz "asks this Court to grant [Bragg's] motion." Pomerantz Res. 1.

Bragg, as the party invoking federal jurisdiction, bears the burden of establishing standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The Supreme Court has "established that the 'irreducible constitutional minimum' of standing consists of three elements." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*

Where a plaintiff seeks to enjoin a subpoena issued to a third party and has "no alternative means to vindicate [his] rights," a plaintiff satisfies his burden of establishing standing. *U.S. Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1260 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 491 (1975); *see also Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019), *rev'd on other grounds sub nom.*, 140 S. Ct. 2019 (2020) ("[T]here is no dispute that Plaintiffs had

standing in the District Court to challenge the lawfulness of the Committees' subpoenas by seeking injunctive relief against the Banks as custodians of the documents.").

Bragg's stated interest in the subpoena is his claim that permitting Pomerantz to appear will undermine the pending criminal case against President Trump, intrude on the grand jury proceedings, and violate grand jury secrecy laws, among other things. These assertions are all without merit. Since Pomerantz was not at DANY when the grand jury indicted President Trump (and therefore has no information on that subject), *see* Pomerantz Res. 2, the only arguably valid interest Bragg has (to the extent it is not waived, *see infra* Section II.D) is in maintaining the confidentiality of deliberations within the office he now leads.

Determining whether Bragg has any "alternative means to vindicate" his rights is made difficult where, as here, the Court cannot predict what questions will be asked—or whether any rights of Bragg will be implicated. In that vein, Defendants contend that Bragg "has no standing whatsoever to stop Pomerantz from appearing before the Committee to answer . . . questions" that "do not involve purportedly privileged material in any way." Def. Mem. 18.

The Court concludes that Bragg sufficiently alleges standing. Jordan's letter to Pomerantz references "the New York County District Attorney's unprecedented prosecutorial conduct" and Pomerantz's "unique role as a special assistant district attorney." *See* Ex. 1 at 2. These areas of inquiry at least arguably implicate Bragg's interests. Because "general factual allegations of injury resulting from the defendant's conduct may suffice" at the *pleading* stage, the Court concludes that Bragg has established Article III standing sufficient to survive this *even earlier* stage of litigation. *Lujan*, 504 U.S. at 561; *cf. U.S. Servicemen's Fund*, 488 F.2d at 1260; *Deutsche Bank*, 943 F.3d at 635.

## II. Bragg Is Not Entitled to a Temporary Restraining Order

### A. _Legal Standard_

In the Second Circuit, the same legal standard governs the issuance of preliminary injunctions and temporary restraining orders. *See, e.g.*, *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 191 (S.D.N.Y. 2020). To obtain either, Bragg must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable injury, (3) the balance of hardships tips in his favor, and (4) that the public interest would not be disserved by the issuance of an injunction. *See Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).[5] Like a preliminary injunction, a temporary restraining order is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Where a party seeking a temporary restraining order fails to establish a likelihood of success on the merits, "there is no need to address the other prongs of the analysis." *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011). For the reasons outlined below, Bragg has not demonstrated a likelihood of success on the merits.

### B. _The Subpoena Serves a Valid Legislative Purpose_ _and Is Not Ultra Vires or Otherwise Unconstitutional_

Congressional committees have constitutional authority to conduct investigations and issue subpoenas because "each House has power 'to secure needed information' in order to legislate." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927)); *see Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975). This "power of inquiry—with process to enforce it—is an *essential* and *appropriate* auxiliary to the

---

[5] The Second Circuit has previously instructed that a district court may also grant a preliminary injunction when there are "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor" *and* "irreparable harm in the absence of the injunction." *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 184 (2d Cir. 2019). Neither party contends that this standard should apply here.

legislative function." *McGrain*, 273 U.S. at 174 (emphasis added). "The power of the Congress to conduct investigations is inherent in the legislative process." *Watkins v. United States*, 354 U.S. 178, 187 (1957).

Of course, this power is not limitless. "[T]here is no congressional power to expose for the sake of exposure." *Id.* at 200. Nor may Congress issue subpoenas "for the purpose of 'law enforcement,'" because that power is assigned "to the Executive and the Judiciary." *Mazars*, 140 S. Ct. at 2032 (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). However, the Supreme Court has described the congressional power of inquiry as "broad" and "indispensable." *Watkins*, 354 U.S. at 187, 215. Indeed, without its investigative powers, "Congress would be shooting in the dark, unable to legislate 'wisely or effectively.'" *Mazars*, 140 S. Ct. at 2031 (quoting *McGrain*, 273 U.S. at 175).

Congress may conduct inquiries "into the administration of existing laws, studies of proposed laws, and [particularly relevant here,] 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.'" *Mazars*, 140 S. Ct. at 2031 (quoting *Watkins*, 354 U.S. at 187). Importantly, a congressional subpoena is valid only if it is "related to, and in furtherance of, a legitimate task of the Congress." *Watkins*, 354 U.S. at 187. The subpoena must serve a "valid legislative purpose," *Quinn*, 349 U.S. at 161, and "concern[] a subject on which 'legislation could be had,'" *Eastland*, 421 U.S. at 506 (quoting *McGrain*, 273 U.S. at 177). The role of a court in evaluating a congressional subpoena is strictly limited to determining only whether the subpoena is "plainly incompetent or irrelevant to *any* lawful purpose . . . in the discharge of [the Committee's] duties." *McPhaul v. United States*, 364 U.S. 372, 381 (1960) (emphasis added) (quoting *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943)).

Jordan and the Committee have identified several valid legislative purposes underlying the subpoena.  *See* Def. Mem. 15–17.  First, they reference the Committee's interest in investigating the use of federal forfeiture funds in connection with DANY's investigation of President Trump.  *See* Def. Mem. 8, 17; *see also* Ex. 1 at 2; Exhibit V ("Ex. V") to the Tatelman Dec. [ECF No. 32-22].  There can be no doubt that Congress may permissibly investigate the use of federal funds, particularly where the result of the investigation might prompt Congress to pass legislation changing how such funds are appropriated or may be spent.  *See Sabri v. United States*, 541 U.S. 600, 608 (2004) ("The power to keep a watchful eye on expenditures and on the reliability of those who use public money is bound up with congressional authority to spend in the first place."); U.S. Const. art. I, § 8, cl. 1.  DANY has conceded that it used federal forfeiture funds in its investigation of President Trump.  *See* Ex. 19; Compl. ¶¶ 78, 81.  Defendants represent that the Committee is considering legislation to prohibit the use of federal forfeiture funds to investigate a current or former President.  Def. Mem. at 8; Ex. V.  This purpose, standing alone, is clearly sufficient to justify the subpoena and thereby to end this Court's inquiry.  On the record at the hearing on the motion for emergency relief, Bragg's counsel conceded that the investigation of DANY's use of federal funds is a valid legislative purpose.

Second, Defendants identify the possibility of legislative reforms to insulate current and former presidents from state prosecutions, such as by removing criminal actions filed against them from state to federal court.  *See* Def. Mem. 8–9.  Congress, of course, has authority to consider, and to investigate, this potential legislative reform.  *See Watkins*, 354 U.S. at 187 ("The [investigative] power of the Congress . . . encompasses inquiries concerning the administration of existing laws as well as *proposed or possibly needed* statutes." (emphasis added)); U.S. Const. art. I, § 8, cl. 18 (defining the congressional power "[t]o make all laws which shall be necessary and proper for carrying into execution the foregoing powers").  And Congress also has authority to

investigate legislative reforms to prevent local prosecutions that could potentially interfere with federal elections. *See Mazars*, 140 S. Ct. at 2031 (It is legitimate for Congress to conduct "inquiries into the administration of existing laws" and "proposed laws" that seek to address problems "in our social, economic or political system."). Although Bragg speculates that any such legislation would be unconstitutional, *see* Pl. Mem. 15, that issue is for another day. The Court will not, and indeed cannot, block congressional investigation into *hypothetical* future legislation based on Bragg's speculation that such legislation would not pass constitutional muster. *See Nashville, C. & St. L. Ry. v. Wallace*, 288 U.S. 249, 262 (1933) (courts may not make "abstract determination[s] . . . of the validity of a statute").[6]

C.  *The Subpoena Does Not Implicate the Sovereign Interests of New York*

Bragg suggests that these are not the Committee's *true* objectives. Instead, he contends that the subpoena is *actually* intended "to undermine and obstruct New York's criminal case against Mr. Trump and [to] retaliate against the District Attorney." Pl. Mem. 7. The Court cannot passively accept this contention. The Court is required to presume that a congressional committee's stated legislative object is "the real object." *McGrain*, 273 U.S. at 178 (When it appears that Congress is investigating on a subject matter in aid of legislating, "the presumption should be indulged that this was the real object."). Moreover, even if Bragg's hypotheses about the Committee's *real* motivations were correct, they are irrelevant. "It is not a court's 'function' to invalidate a congressional investigation that serves a legislative purpose." *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of the Treasury*, 575 F. Supp. 3d 53, 69 (D.D.C. 2021), *aff'd sub nom.*, 45 F.4th 324 (D.C. Cir. 2022) (quoting *Watkins*, 354 U.S. at 200). Indeed, the Supreme Court has instructed that "[s]o long as Congress acts in pursuance of its

---

[6] Plaintiffs make much of *Kilbourn v. Thompson*, 103 U.S. 168 (1880). *See* Pl. Mem. 7–8. But the Court concluded there that the subpoena was "clearly judicial" in nature. 103 U.S. at 192. The same is not true here.

constitutional power, the Judiciary *lacks authority to intervene on the basis of the motives which spurred the exercise of that power*." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959) (emphasis added). Whatever motives may underlie the Committee's subpoena, its "inquiry may fairly be deemed within its province." *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951). That is sufficient to resolve this inquiry.[7]

Plaintiff next urges this Court to apply the "heightened standard of review" outlined by the Supreme Court in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020). Pl. Mem. 13. In *Mazars*, the Supreme Court outlined a four-part analysis relevant in assessing "a subpoena *directed at the President's personal information*." 140 S. Ct. at 2035 (emphasis added). Because "[c]ongressional subpoenas for the President's personal information implicate[d] weighty concerns regarding the separation of powers," the Supreme Court instructed courts considering such subpoenas to: (1) "carefully assess whether the asserted legislative purpose warrants the significant step of involving *the President* and his papers," (2) "insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective," (3) "be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose," and (4) "be careful to assess the burdens imposed *on the President* by a subpoena." *Id.* at 2035–36 (emphasis added). The Court did not, as Bragg suggests, indicate that the four *Mazars* factors apply *whenever* someone argues that a subpoena "implicat[es] significant separation-of-powers concerns." Pl. Mem. 13. In any event, the same separation of powers concerns are *not* implicated here. The congressional subpoena in *Mazars* was directed at materials pertaining to the *sitting President of the United States*. In contrast, here, the subpoena was issued to a *private*

---

[7] Bragg notes that there is "no prior case in which Congress has attempted to subpoena a state prosecutor for the purpose of extracting information about an ongoing state prosecution." Pl. Mem. 12 (emphasis omitted). Defendants do not dispute this characterization or cite to any such case. However, there also is no prior case in which a former President of the United States has been criminally charged in a state trial court, suggesting *both* parties swim in untested waters.

*citizen* who is *no longer* employed by *any* state government and who has written a book and spoken extensively about the subject matter of the congressional inquiry.  The Court is not persuaded that *Mazars* applies to this case.[8]

Even assuming that *Mazars* were applicable, the Court would reach the same conclusion. With respect to the first factor, Bragg does not demonstrate that the subpoena issued to Pomerantz—a private citizen—will occasion a "constitutional confrontation."  *Mazars*, 140 S. Ct. at 2035 (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004)).  Congress has the power to compel individuals to testify.  *See Watkins*, 354 U.S. at 187–88 ("It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action.  It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation.");  *Quinn*, 349 U.S. at 160–61 ("There can be no doubt as to the power of Congress, by itself or through its committees, to investigate matters and conditions relating to contemplated legislation. . . . Without the power to investigate—including of course the authority to compel testimony, either through its own processes or through judicial trial—Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively." (citations omitted)).  Indeed, courts have even compelled individuals *actively* employed by the executive branch (who at least arguably hold executive privilege, and some of whom are attorneys obligated to protect privileged information) to appear for congressional depositions.  *See, e.g.*, *Meadows v. Pelosi*, No. 1:21-CV-03217 (CJN), 2022 WL 16571232 at *8– 13 (D.D.C. Oct. 31, 2022) (dismissing challenge by White House Chief of Staff to a congressional

---

[8] Despite having discussed *Mazars* in his moving brief, Bragg seeks a second chance at arguing its applicability in his reply brief, contending that the case broadly governs subpoenas "seeking a current or former president's information." Reply 8.  That is clearly incorrect.  In any event, the subpoena does *not* seek a current or former president's information—it seeks *Pomerantz's* testimony.  *See* Ex. 1.

subpoena requesting his appearance for a deposition); *Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 106 (D.D.C. 2008) ("[The former White House counsel] is not excused from compliance with the Committee's subpoena by virtue of a claim of executive privilege that may ultimately be made. Instead, she must appear before the Committee to provide testimony, and invoke executive privilege where appropriate."); *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 764 (D.C. Cir. 2020) ("The subpoena power is potent. Each House of Congress is specifically empowered to compel testimony from witnesses and the production of evidence in service of its constitutional functions, and the recipient of a subpoena is obligated by law to comply."). If those individuals could permissibly be deposed, the same is certainly true here.

Second, the subpoena seeks only Pomerantz's *testimony* (not any documents or materials). Jordan specifically noted that "*many* of the topics relevant to [the Committee's oversight]" were discussed—voluntarily and extensively—by Pomerantz in his book, as well as in several public interviews. Ex. 1 at 2 (emphasis added). The subpoena is not, as Bragg contends, an "overbroad fishing expedition." Pl. Mem. 17.

Third, Bragg criticizes Defendants' "flimsy evidence" of a valid legislative purpose. Pl. Mem. 17 (internal quotation marks omitted); *see also* Pomerantz Res. 3. But Defendants provide evidence that the Committee is investigating the use of federal forfeiture funds, *see* Ex. V, and considering the viability of legislation to protect former Presidents from politically motivated state prosecutions, *see* Exhibit W to the Tatelman Dec. [ECF No. 32-23].[9] Bragg suggests this evidence

---

[9] Although Pomerantz contends that he has "little if anything to say that will advance the purported legislative purpose," Pomerantz Res. at 5, it is not this Court's role to prescribe the most effective manner for congressional inquiry. *See Eastland*, 421 U.S. at 509 ("The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result.").

is insufficient but his conclusory assertions do not move the needle where, as here, *he* has the burden of demonstrating entitlement to an "extraordinary remedy." *Winter*, 555 U.S. at 24.

Bragg and Pomerantz insist that Pomerantz's testimony cannot advance any valid legislative purpose because, in essence, everything Pomerantz is prepared to say is already in his book and he does not have information about DANY's use of federal funds. Pl. Mem. 11, 22 ("[T]he Committee already has his book."); Pomerantz Res. 2; Reply 5. Bragg and Pomerantz are not entitled to unilaterally narrow the universe of acceptable inquiry to the information and mental impressions that Pomerantz decided to sell in the pages of his book. *See Eastland*, 421 U.S. at 509; *McGahn*, 968 F.3d at 764. If Pomerantz does not have any information about DANY's use of federal funds, he may say so if asked at his deposition.

Finally, Bragg's suggestion that the subpoena "would substantially burden both the New York criminal justice system itself and the District Attorney's Office" is without merit. Pl. Mem. 18. Pomerantz is a *former* prosecutor. He is not involved in the state prosecution in any way. Bragg provides no reason to conclude that a deposition of a former employee would interfere with DANY or any of its ongoing prosecutions. The pending prosecution will move forward in the ordinary course regardless of whether the Committee deposes Pomerantz. Further, Pomerantz was not even employed with DANY at the time President Trump was indicted. Pomerantz admits as much. Pomerantz Dec. ¶ 4. He has stated that the materials in his book would "have no bearing on the litigation of [the criminal prosecution of President Trump]" and would "not prejudice any investigation or prosecution of Donald Trump." *Inside Account* at 278–79. Moreover, Pomerantz emphasizes that he "was *not* involved in the decision to bring the pending indictment against Mr. Trump." Pomerantz Res. 5 (emphasis added). Bragg therefore does not satisfy his burden of demonstrating that the subpoena poses a threat "to a state executive officer, a state judicial proceeding, [or] our federal system itself." Pl. Mem. 14. The Court is further unmoved by Bragg's

purported concern at the prospect of "inject[ing] partisan passions into a forum where they do not belong." Pl. Mem. 19. By bringing this action, Bragg is engaging in precisely the type of political theater he claims to fear.

While the Court need not decide the ultimate merits of Bragg's claims at this stage, serious constitutional infirmities are evident with respect to a lawsuit against Defendants Jordan and the Committee. *See* Def. Mem. 5–9. The Speech or Debate Clause states: "for any Speech or Debate in either House," Senators and Representatives "shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. Although the Clause speaks only of "Speech or Debate," it has been interpreted to protect all "legislative acts." *See Doe v. McMillan*, 412 U.S. 306, 312 (1973) (citation omitted). The Clause provides individual members of Congress *and* congressional committees broad immunity from civil suits. *See Eastland*, 421 U.S. at 501–03; *Doe*, 412 U.S. at 313; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982); *Supreme Ct. of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 731–33 (1980). Because Jordan and the Committee are likely immune, Defendants contend that they are necessary parties who cannot be joined and that, under Federal Rule of Civil Procedure 19, the action cannot be maintained. *See* Def. Mem. 10–14. Bragg disagrees.[10] The Court need not resolve this issue, but the distinct possibility of immunity weighs against concluding that Bragg has shown a likelihood of success on the merits. In all events, Bragg confirms in his reply brief that the Court must consider whether there is a "legitimate legislative purpose" for the subpoena he seeks to quash. Reply 3. As explained above, Jordan and the Committee clearly have identified a legitimate legislative purpose, and accordingly the Court will not issue a temporary restraining order.

---

[10] Despite pervasive discussion of the Speech or Debate Clause in the relevant case law and governing authority, Bragg neglected to mention the Clause whatsoever in his moving brief. However, Bragg seeks an opportunity to address this "material issue[]" in his unauthorized reply brief. *See* Letter Motion for Leave to File Reply [ECF No. 41].

D.    *To the Extent They Have Not Been Waived, the Claimed*
      *Privileges Are Not Jeopardized by the Subpoena*

Plaintiff's assertion that the subpoena "seeks grand jury material" and "documents and communications protected by the attorney-client privilege and work product doctrine" does not salvage his motion.  Pl. Mem. 20.  As an initial matter, the subpoena does *not*, as Plaintiff suggests, "seek[]" *any* "material," "documents," *or* "communications."  Pl. Mem. 20.  The subpoena *only* seeks Pomerantz's *testimony*.  *See* Ex. 1.  Although Bragg assumes that the questioning will stray into impermissible territory, the Court declines Bragg's invitation to blindly speculate about what questions might *hypothetically* be posed to Pomerantz at the deposition.  *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) ("A claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580–81 (1985)); *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 85 (2d Cir. 2018) ("[F]ederal courts may not give an opinion advising what the law would be upon a hypothetical state of facts." (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937) (internal quotation marks omitted))).

Bragg's throw-everything-at-the-wall approach to privilege is unpersuasive.  As an initial matter, Bragg concedes that "Jordan represents that he *does not* seek information protected by New York's grand jury secrecy laws."  Pl. Mem. 20 (emphasis added).  Although Bragg vaguely asserts that the Committee's "inquiry *could* [still] include questions about grand jury matters," this Court will not quash a subpoena based solely on Bragg's seemingly endless string of "what ifs."  Pl. Mem. 21 (emphasis added).  Even if grand jury secrecy *were* implicated by the subpoena, Bragg's argument makes little sense because Pomerantz was not involved in securing the grand jury indictment.  Pomerantz Dec. ¶ 3.  Indeed, at the time Pomerantz left DANY, "there [had] been no New York state criminal prosecution of Donald Trump."  *Inside Account* at 278.  And even

assuming Pomerantz *did* have some relevant information about the grand jury, Pomerantz is clearly aware that he "cannot disclose details about grand jury proceedings" since he professes that he authored his book in such a way that his "account of the investigation did not violate the grand jury secrecy requirement." *Id.* at 195, 277.[11]

With respect to Bragg's various other claims of privilege,[12] the Court is unpersuaded that judicial intervention is needed to ensure that any privilege that might exist is preserved. Pomerantz is impressively credentialed. He had a long and successful career: he graduated from the University of Michigan Law School, served as a law clerk for a distinguished federal judge, clerked at the United States Supreme Court, was a law professor, worked as a federal prosecutor for the United States Attorney's Office for the Southern District of New York, and as a criminal defense attorney for many years, including as a senior partner at a prominent New York City law firm (Paul, Weiss, Rifkind, Wharton & Garrison). *See Inside Account* at 3–4. In short, Pomerantz is a very experienced, sophisticated, and extremely capable attorney. Moreover, the Committee's procedural rules permit two additional lawyers to accompany Pomerantz to the deposition. *See* Rules of Procedure of the Committee on the Judiciary, R. XI(k)(3) (2023) ("Rule XI").[13] This

---

[11] The Court notes that the secrecy of the grand jury proceedings in the pending criminal case was compromised before an indictment was even announced. *See* Kara Scannell *et al.*, *Donald Trump indicted by Manhattan grand jury on more than 30 counts related to business fraud*, CNN (Mar. 31, 2023, 7:35 AM), https://www.cnn.com/2023/03/30/politics/donald-trump-indictment/index.html.

[12] Specifically, Bragg contends that attorney-client privilege, attorney work product protection, law enforcement privilege, informant's privilege, public interest privilege, and deliberative process privileges are all implicated. Pl. Mem. 21–22. Although Bragg pays lip service to these other so-called privileges, his primary concern appears to be the possibility that Pomerantz might be asked to disclose the "internal deliberations" of DANY, which is a question of work product. *See* Pl. Mem. 21. Work product protection is not absolute, but rather offers a *qualified* protection to "documents and tangible things that are prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3). Of course, this is precisely what Pomerantz lays out in *People vs. Donald Trump: An Inside Account*.

[13] Although the rules only permit "personal, nongovernmental attorneys" to accompany Pomerantz, *see* Rule XI, this Court has no authority to rewrite the Committee's rules. *See Exxon Corp. v. F.T.C.*, 589 F.2d 582, 590 (D.C. Cir. 1978) ("[W]e are sympathetic to appellants' concern for safeguarding highly confidential information worth millions of dollars, but for this court on this record to establish any such requirement would clearly involve an unacceptable judicial intrusion into the internal operations of Congress.").

Court is confident that Pomerantz and his counsel are fully knowledgeable about the privilege and confidentiality obligations he owes to DANY and, indeed, are duty bound to ensure they are maintained.[14]  *See* Model Rules of Pro. Conduct 1.6 (duty of confidentiality); 1.9 (duties to former clients) (Am. Bar Ass'n 2023); *see also Inside Account* at 279 (noting that Pomerantz "overcame [his] angst" about "describing the inner dialogue of the investigation" because "the Trump investigation was in a class of its own").  The "recipients of legislative subpoenas . . . have long been understood to retain common law and constitutional privileges with respect to certain materials, such as attorney-client communications and governmental communications protected by executive privilege."  *Mazars*, 140 S. Ct. at 2032.

Pomerantz is now represented by a team of capable lawyers from his former firm Paul, Weiss.  *See* Notices of Appearance [ECF Nos. 28, 29].  Bragg provides no reason to assume those accomplished lawyers would not also be fully knowledgeable about Pomerantz's ethical obligations with respect to privilege and confidentiality.  Accordingly, the deposition should proceed in the normal course, question by question, and Pomerantz is free to object, personally or through his counsel, and decline to answer any questions when (and if) appropriate.  *See Miers*, 558 F. Supp. 2d at 106–07.  Indeed, Defendants confirm that "[t]o the extent that questions are asked that Pomerantz believes he is not permitted to answer, he would retain the ability to decline to answer or to assert an applicable privilege."  Def. Mem. 19.

Bragg expresses concern that the Committee's rules permit "a partisan decisionmaker" to "overrule privilege objections" at the deposition and "order a witness to answer a question."  Pl.

---

[14] Pomerantz has made it abundantly clear that he will seek to comply with Bragg's instructions and to invoke privilege.  *See* Pomerantz Res. 4 ("The District Attorney . . . instructed Mr. Pomerantz, in writing, to provide no information to the [Committee] in response to the subpoena.); *see also* Pomerantz Dec. ¶ 6 ("[I]f I were to testify, I believe that the District Attorney would instruct me to assert the various claims of privilege he has identified in his moving papers.").  This claimed deference to the District Attorney's command is a surprising about-face, particularly given that Pomerantz previously *declined* the District Attorney's request to review his book manuscript before publication.  *See* Compl. ¶ 90.

Mem. 23.  The Court cannot decide, before-the-fact, "what information or answers [Pomerantz] may validly be required to give or the validity of any objections he might make."  *Sanders v. McClellan*, 463 F.2d 894, 903 (D.C. Cir. 1972); *see also Ansara v. Eastland*, 442 F.2d 751, 753 (D.C. Cir. 1971) (noting that "courts [should] avoid use of extraordinary remedies that involve 'needless friction' with a coordinate branch of the government" where "the plaintiffs [sought] relief that would precede and seek to relate to the conduct of a *future* legislative hearing" (emphasis added) (citation omitted)).  But in the event that this situation does arise, Pomerantz has avenues for judicial review.  *See, e.g.*, *Watkins*, 354 U.S. at 214–16; *United States v. House of Representatives of U.S.*, 556 F. Supp. 150, 152 (D.D.C. 1983) ("[C]onstitutional claims and other objections to congressional investigatory procedures may be raised as defenses in a criminal prosecution.").

Pomerantz complains that he is in a "legally untenable position" because he will be forced to make a choice between "legal or ethical consequences" or "potential criminal and disciplinary exposure."  Pomerantz Res. 4–5.  The Court, again, is unable to surmise whether Pomerantz will *actually* face such a dilemma.  In addition, the Court notes that Pomerantz is in this situation because *he* decided to inject himself into the public debate by authoring a book that he has described as "appropriate and in the public interest."  *Inside Account* at 280.

Finally, Bragg cannot seriously claim that any information *already published* in Pomerantz's book and discussed on prime-time television in front of millions of people is protected from disclosure as attorney work product (or otherwise).  *See* Pl. Mem. 21–22.  On the record at the hearing on the motion for emergency relief, Bragg's counsel admitted that Pomerantz's book did not preserve the confidences of the District Attorney's Office.  While Bragg maintains that Pomerantz's inappropriate disclosures cannot waive DANY's privilege, such a claim is belied by DANY's inaction in response to Pomerantz's *known plan* to publish a book about DANY's

investigation into President Trump. If that information *ever* was protected from disclosure as attorney work product,[15] the protection has been *waived* by DANY. Bragg concedes that he was aware of Pomerantz's intention to publish the book *before* it was published. Compl. ¶ 90. Although Bragg contends that he "diligently sought to protect [the privilege]," he merely "remind[ed] Mr. Pomerantz of his obligations not to disclose confidential or privileged information and request[ed] the opportunity for prepublication review." Pl. Mem. 21. By Bragg's own admission, Pomerantz *declined* the request for pre-publication review and proceeded to publish the book anyway. Pl. Mem. 21–22. There is no evidence that DANY took *any action* before the book was published—such as seeking to enjoin publication or distribution.[16] Similarly, after publication, DANY *again* took no action. It did not request a gag order, seek an injunction, pursue Pomerantz for money damages, refer Pomerantz for an ethics inquiry, or even raise any concerns about the publication with Pomerantz. This repeated inaction constitutes acquiescence to the disclosure of any otherwise privileged information. *See, e.g.*, *Cruz v. Coach Stores, Inc.*, 196 F.R.D. 228, 230 (S.D.N.Y. 2000) (privilege waived where "Coach raised no objection when . . . Jaspan Associates . . . publicly filed a copy of the [purportedly privileged document and Coach] . . . neither sought its sealing by the Court nor raised any objection with Jaspan Associates."); *von Bulow by Auersperg v. von Bulow*, 114 F.R.D. 71, 76 (S.D.N.Y. 1987) ("An attorney's disclosure of communications with his client will constitute a waiver of the attorney-client privilege if the

---

[15] Pomerantz seemingly contends it was not, as he has publicly stated that he is "confident that all of [his] actions with respect to the Trump investigation, including the writing of [his] forthcoming book, are consistent with [his] legal and ethical obligations." Compl. ¶ 90; *see also Inside Account* at 279–80 ("The public debate about Trump's conduct, his unique public status, the circumstances under which my work ended, and the extensive news coverage about the progress of the investigation convinced me that writing this book was appropriate and in the public interest.").

[16] At the hearing on the motion for emergency relief, the Court repeatedly pressed Bragg to describe what, if any steps, DANY took to preserve its privilege after it became aware that Pomerantz intended to publish a book. In response to that questioning, Bragg's counsel represented for the first time that at some point, she copied the City's Department of Investigation on an email containing the letter that DANY sent to Pomerantz reminding him of his ethical obligations to DANY.

client has . . . acquiesced in the disclosure."). Because Bragg has *never* claimed that any information in the book was privileged, he may not do so now simply because it is convenient.

In sum, the Court is unwilling to hypothesize about, and prophylactically rule on, the permissibility of questions that may—or may not—arise at the deposition of Pomerantz. Bragg has not shown a likelihood of success on the merits. The Court therefore need not address the other prongs of the temporary restraining order analysis. *See Oneida*, 645 F.3d at 164.[17]

## CONCLUSION

For the foregoing reasons, the motion for a temporary restraining order enjoining the subpoena to depose Mr. Pomerantz and enjoining Mr. Pomerantz from appearing is DENIED.

In our federalist system, elected state and federal actors sometimes engage in political dogfights. Bragg complains of political interference in the local DANY case, but Bragg does not operate outside of the political arena. Bragg is presumptively acting in good faith. That said, he is an elected prosecutor in New York County with constituents, some of whom wish to see Bragg wield the force of law against the former President and a current candidate for the Republican presidential nomination. Jordan, in turn, has initiated a political response to what he and some of his constituents view as a manifest abuse of power and nakedly political prosecution, funded (in part) with federal money, that has the potential to interfere with the exercise of presidential duties and with an upcoming federal election. The Court does not endorse either side's agenda. The sole question before the Court at this time is whether Bragg has a legal basis to quash a congressional subpoena that was issued with a valid legislative purpose. He does not.

---

[17] In his Complaint, Bragg seeks a declaratory judgment that any *future* subpoenas served by Jordan or the Committee on Bragg or "any of his current or former employees or officials" are "invalid, unconstitutional, *ultra vires*, and/or unenforceable" and a "permanent and preliminary injunction enjoining enforcement of any such [future] subpoena." Compl. ¶ 127; *see* Compl. ¶ 20. To be clear, Bragg seeks this declaratory judgment for theoretical *future* subpoenas which Jordan or the Committee may issue against him or others. On the record at the hearing on the motion for emergency relief, Bragg's counsel represented that he is not seeking such a declaratory judgment at this time.

The parties are encouraged to speak with one another to reach a mutually agreeable compromise regarding how the deposition of Mr. Pomerantz will proceed. This Court will retain jurisdiction over this dispute and any ancillary claims arising out of the inquiry by the Committee relating to the use of federal funds in a manner that may influence the 2024 presidential election. In other words, Bragg may not file successive proceedings under a different index number if and when the Committee in fact issues another subpoena that he finds objectionable or if there are issues with respect to the Pomerantz deposition. The parties are HEREBY ORDERED to file a joint status report within 30 days of the date of this Order.

**SO ORDERED.**

**Date: April 19, 2023**
**New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**

Exhibit 12

## REGULATIONS FOR THE USE OF DEPOSITION AUTHORITY

1. Notices for the taking of depositions shall specify the date, time, and place of examination. Depositions shall be taken under oath administered by a member or a person otherwise authorized to administer oaths. Depositions may continue from day to day.

2. Consultation with the ranking minority member shall include three days' notice before any deposition is taken. All members of the committee shall also receive three days written notice that a deposition will be taken, except in exigent circumstances. For purposes of these procedures, a day shall not include Saturdays, Sundays, or legal holidays except when the House is in session on such a day.

3. Witnesses may be accompanied at a deposition by two designated personal, nongovernmental attorneys to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's two designated attorneys are permitted to attend. Other persons, including government agency personnel, may not attend.

4. The chair of the committee noticing the deposition may designate that deposition as part of a joint investigation between committees, and in that case, provide notice to the members of the committees. If such a designation is made, the chair and ranking minority member of the additional committee(s) may designate committee staff to attend pursuant to regulation 3. Members and designated staff of the committees may attend and ask questions as set forth below.

5. A deposition shall be conducted by any member or committee counsel designated by the chair or ranking minority member of the Committee that noticed the deposition. When depositions are conducted by committee counsel, there shall be no more than two committee counsel permitted to question a witness per round. One of the committee counsel shall be designated by the chair and the other by the ranking minority member per round.

6. Deposition questions shall be propounded in rounds. The length of each round shall not exceed 60 minutes per side and shall provide equal time to the majority and the minority. In each round, the member(s) or committee counsel designated by the chair shall ask questions first, and the member(s) or committee counsel designated by the ranking minority member shall ask questions second.

7. Objections must be stated concisely and in a non-argumentative and non-suggestive manner. A witness's attorney may not instruct a witness to refuse to answer a question, except to preserve a privilege. In the event of professional, ethical, or other misconduct by the witness's attorney during the deposition, the Committee may take any appropriate disciplinary action. The witness may refuse to answer a question only to preserve a privilege. When the witness has refused to

answer a question to preserve a privilege, members or staff may (i) proceed with the deposition, or (ii) either at that time or at a subsequent time, seek a ruling from the Chair either by telephone or otherwise. If the Chair overrules any such objection and thereby orders a witness to answer any question to which an objection was lodged, the witness shall be ordered to answer. If a member of the committee chooses to appeal the ruling of the chair, such appeal must be made within three days, in writing, and shall be preserved for committee consideration. The Committee's ruling on appeal shall be filed with the clerk of the Committee and shall be provided to the members and witness no less than three days before the reconvened deposition. A deponent who refuses to answer a question after being directed to answer by the chair may be subject to sanction, except that no sanctions may be imposed if the ruling of the chair is reversed by the committee on appeal.

8. The Committee chair shall ensure that the testimony is either transcribed or electronically recorded or both. If a witness's testimony is transcribed, the witness or the witness's attorney shall be afforded an opportunity to review a copy. No later than five days after the witness has been notified of the opportunity to review the transcript, the witness may submit suggested changes to the chair. Committee staff may make any typographical and technical changes. Substantive changes, modifications, clarifications, or amendments to the deposition transcript submitted by the witness must be accompanied by a letter signed by the witness requesting the changes and a statement of the witness's reasons for each proposed change. Any substantive changes, modifications, clarifications, or amendments shall be included as an appendix to the transcript conditioned upon the witness signing the transcript.

9. The individual administering the oath, if other than a member, shall certify on the transcript that the witness was duly sworn. The transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the committee in Washington, DC. Depositions shall be considered to have been taken in Washington, DC, as well as the location actually taken once filed there with the clerk of the committee for the committee's use. The chair and the ranking minority member shall be provided with a copy of the transcripts of the deposition at the same time.

10. The chair and ranking minority member shall consult regarding the release of deposition testimony, transcripts, or recordings, and portions thereof. If either objects in writing to a proposed release of a deposition testimony, transcript, or recording, or a portion thereof, the matter shall be promptly referred to the committee for resolution.

11. A witness shall not be required to testify unless the witness has been provided with a copy of section 3(k) of H. Res. 5, 118th Congress, and these regulations.

REGULATIONS FOR THE REMOTE PARTICIPATION
OF COMMITTEE WITNESSES

Except as provided by section 3(j) of H. Res. 5, 118th Congress and these
regulations, witnesses shall testify before a committee in person. No remote
testimony will be accepted from witnesses testifying in a government capacity.  In
the event the chair of a committee determines that testimony of a witness
appearing in a non-governmental capacity is necessary and such a witness is only
available to participate remotely due to extreme hardship or other exceptional
circumstances, the chair may allow the witness to participate remotely, with
written approval from the Majority Leader.

The official record of the committee proceeding shall include a letter from the chair
detailing the necessity of allowing the witness to participate remotely, a description
of why the witness could not participate in person, why such testimony was
necessary for purposes of fulfilling Congress's Article I responsibility, and a letter
from the Majority Leader approving of such remote participation.

The witness must agree to remain on the platform until excused by the chair. The
witness should conduct a pre-hearing technology test with staff designated by the
chair, to ensure the witness will have sufficient internet connection during the
hearing, and to minimize the possibility of any technical issues.

No witness appearing in a governmental capacity may participate remotely. No
witness testifying before a committee in response to a subpoena is permitted to
testify remotely, unless both the chair of the committee and the Majority Leader
authorize such testimony in writing and printed in the Congressional Record.

Any text based or private messaging function in the software platform used to
facilitate the participation of a remote witness must be disabled unless it is used to
provide technical support to the witness, which may be excluded from the public
video stream and will not be considered a committee record.

Only witnesses approved for remote participation may have participatory access on
the software platform.

Committees may only utilize a software platform certified by the Chief
Administrative Officer. The Chief Administrative Officer should inform committees,
including the ranking minority members, each time a software platform is certified.

Witnesses participating remotely should appear before a nonpolitical, professional
appropriate background that is minimally distracting to other members and

witnesses, to the greatest extent possible. It remains within the full discretion of the chair to enforce rules of decorum for committee proceedings.

Any committee report of activities submitted pursuant to clause 1(d)(1) of rule XI should include a list of hearings conducted with remote participation.

A witness participating remotely in a committee proceeding shall be visible onscreen within the software platform until excused by the chair. The witness shall disclose to the chair and ranking member any additional individual(s) present off screen.

Witness counsel shall be allowed access on the remote proceeding software platform if they are not in the physical presence of the witness. It is recommended that counsel facilitate a separate secure line of communication with the witness. A witness may not be unmuted by any other individual and should be allowed to use such secure line of communication while testifying to confer with counsel.

A witness may not allow an individual not invited to testify to speak on the platform. The committee chair may only provide an exception when the other individual is necessary to facilitate the witness's participation in the hearing (e.g. translators).

A chair may not authorize remote participation for more than one witness at a committee hearing without the approval of the Majority Leader in writing and printed in the Congressional Record.

# Exhibit 13



ALVIN L. BRAGG, JR.
DISTRICT ATTORNEY

**DISTRICT ATTORNEY**
**COUNTY OF NEW YORK**
ONE HOGAN PLACE
New York, N. Y. 10013
(212) 335-9000

March 31, 2023

By email

The Honorable Jim Jordan
Chairman, House Committee on the Judiciary

The Honorable Bryan Steil
Chairman, House Committee on House Administration

The Honorable James Comer
Chairman, House Committee on Oversight and Accountability

Dear Chairman Jordan, Chairman Steil, and Chairman Comer:

Yesterday, the District Attorney of New York County filed charges against Donald Trump for violations of New York law.[1] The charges filed yesterday were brought by citizens of New York, doing their civic duty as members of a grand jury, who found probable cause to accuse Mr. Trump of having committed crimes in New York.

Like any other defendant, Mr. Trump is entitled to challenge these charges in court and avail himself of all processes and protections that New York State's robust criminal procedure affords. What neither Mr. Trump nor Congress may do is interfere with the ordinary course of proceedings in New York State. Your first letter made an unprecedented request to the District Attorney for confidential information about the status of the state grand jury investigation—now indictment— of Mr. Trump. Your second letter asserts that, by failing to provide it, the District Attorney somehow failed to dispute your baseless and inflammatory allegations that our investigation is politically motivated. That conclusion is misleading and meritless. We did not engage in a point-by-point rebuttal of your letter because our Office is legally constrained in how it publicly discusses pending criminal proceedings, as prosecutorial offices are across the country and as you well know. That secrecy is critical to protecting the privacy of the target of any criminal investigation as well as the integrity of the independent grand jury's proceedings.[2]

---

[1] The charges contained in the indictment are merely allegations, and the defendant is presumed innocent unless and until proven guilty.

[2] *See, e.g., McKeever v. Barr*, 920 F.3d 842, 844 (D.C. Cir. 2019) ("The Supreme Court has long maintained that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings. That secrecy safeguards vital interests in (1) preserving the willingness and candor of witnesses called before the grand jury; (2) not alerting the target

The Honorable Jim Jordan, et al.
March 31, 2023
Page 2 of 6

## The Committees Lack Jurisdiction to Oversee a State Criminal Prosecution

Your recent letter states that the purpose of your inquiry is to conduct "an examination of the facts" relating to the investigation of Mr. Trump.[3] But Congress has no warrant for interfering with individual criminal investigations—much less investigations conducted by a separate sovereign. *See United States v. Lopez*, 514 U.S. 549, 561 (1995) ("Under our federal system, the States possess primary authority for defining and enforcing the criminal law."); *Younger v. Harris*, 401 U.S. 37, 44 (1971) ("This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of 'comity,' that is, a proper respect for state functions."); *cf. Gamble v. United States*, 139 S. Ct. 1960 (2019) (recognizing state sovereign interests in the criminal justice context). The Committees' attempted interference with an ongoing state criminal investigation—and now prosecution—is an unprecedented and illegitimate incursion on New York's sovereign interests.

Moreover, your examination of the facts of a single criminal investigation, for the supposed purpose of determining whether any charges against Mr. Trump are warranted, is an improper and dangerous usurpation of the executive and judicial functions. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) ("Congress may not issue a subpoena for the purposes of 'law enforcement' because "those powers are assigned under our Constitution to the Executive and the Judiciary."); *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 219, 224 (1995) ("The Framers of our Constitution lived among the ruins of a system of intermingled legislative and judicial powers" and accordingly created a system that separated "the legislative power to make general law from the judicial power to apply that law in particular cases."). Even worse, based on your reportedly close collaboration with Mr. Trump in attacking this Office and the grand jury process,[4] it appears you are acting more like criminal defense counsel trying to gather evidence for a client than a legislative body seeking to achieve a legitimate legislative objective.

## The Committees' Vague and Shifting Legislative Purpose is Insufficient

You suggest that your request has a valid legislative purpose because Congress may consider legislation to shield former presidents from state criminal investigations for "personal acts" that do not involve their conduct in office. You did not identify any such legislative purpose in your initial letter, suggesting that your proposal to "insulate current and former presidents"

---

of an investigation who might otherwise flee or interfere with the grand jury; and (3) preserving the rights of a suspect who might later be exonerated." (citations omitted; internal quotation marks omitted)); *People v. DiNapoli*, 27 N.Y.2d 229, 235 (1970) (identifying five policy reasons for maintaining the secrecy of grand jury proceedings).

[3] *See also* The Lead with Jake Tapper, CNN, Mar. 26, 2023 (https://www.cnn.com/videos/politics/2023/03/26/sotu-rep-comer-full.cnn) (Comer: "[Bragg] should come explain to us exactly what he's investigating").

[4] Annie Grayer et al., *Inside the backchannel communications keeping Donald Trump in the loop on Republican investigations*, CNN.com (March 28, 2023), https://tinyurl.com/mr3n675p.

The Honorable Jim Jordan, et al.
March 31, 2023
Page 3 of 6

from state criminal investigations is a baseless pretext to interfere with our Office's work.[5] Indeed, we doubt that Congress would have authority to place a single private citizen—including a former president or candidate for president—above the law or to grant him unique protections, such as removal to federal court, that are unavailable to every other criminal defendant. "[E]very President takes office knowing that he will be subject to the same laws as all other citizens upon leaving office. This is a feature of our democratic republic, not a bug." *Comm. on Ways and Means v. U.S. Dep't of Treasury*, 45 F.4th 324, 338 (D.C. Cir. 2022).

Even if you were seriously considering such legislation and had the constitutional authority to enact it (which you do not), your request for information from the District Attorney and his former attorneys concerning an ongoing criminal probe is unnecessary and unjustified. Congress has many sources from which it could seek information on the wisdom of this legislation, including from former federal or state prosecutors not involved in this pending matter. The "unique constitutional position" our Constitution affords the states with respect to the criminal law "means that Congress may not look" to active state investigations "as a 'case study' for general legislation." *Trump*, 140 S. Ct. at 2035-36 (2020). Likewise, it is unclear what pertinence the requested documents have to Congress's evaluation of whether to grant a former president or presidential candidate with immunity from prosecution for state crimes. The documents and information relating to the pending criminal case would be relevant only if Congress is intending to specifically prevent this prosecution—an intent that you purport to disclaim.[6]

## The DA's Office Uses Limited Federal Funds to Effectively Fight Crime & Help Victims

The Committees' initial rationale for its inquiry related to this Office's use of federal funds. Over the last decade and a half, this Office has *contributed* to the federal fisc. Indeed, the DA's Office has helped the Federal Government secure more than one billion dollars in asset forfeiture funds in the past 15 years. The DA's Office receives only a small fraction of those forfeited funds.

---

[5] This concern is heightened given that some committee members have explicitly stated an intent to interfere with the state proceeding. For example, responding to Trump's statement that he would be arrested, Representative Marjorie Taylor Greene stated that "Republicans in Congress MUST subpoena these communists and END this! We have the power to do it and we also have the power to DEFUND their salaries and departments!", Rep. Marjorie Taylor Greene (@RepMTG), Twitter (Mar. 18, 2023, 8:59 AM), https://twitter.com/RepMTG/status/1637076244708614144, and that Republicans who "do nothing to stop" the prosecution "will be exposed to the people and will be remembered, scorned, and punished by the base", Rep. Marjorie Tylor Greene (@mtgreenee), Twitter (Mar. 18, 2023, 7:57 AM) https://twitter.com/mtgreenee/status/1637060574314917888. *See also* Rep. Anna Paulina Luna (@realannapaulina), Twitter (Mar. 18, 2023, 3:42 PM), https://twitter.com/realannapaulina/status/1637177761622501191 ("Pay attention to who is being silent on what is currently happening to Trump.").

[6] Letter from Rep. Jim Jordan, H. Comm. on the Judiciary, et al. to Hon. Alvin L. Bragg, Jr., District Attorney, New York County (March 23, 2023) at 7 (asserting that "the Committees' oversight will in no way 'stop [the] prosecution or set limits on the management of a particular case'").

The Honorable Jim Jordan, et al.
March 31, 2023
Page 4 of 6

Our review of the Office's records reflect that, of the federal forfeiture money that the Office helped collect, approximately $5,000 was spent on expenses incurred relating to the investigation of Donald J. Trump or the Trump Organization. These expenses were incurred between October 2019 and August 2021. Most of those costs are attributed to the Supreme Court case, *Trump v. Vance*—subpoena-related litigation in which the DA's Office prevailed and which led to the indictment and conviction of Trump Organization CFO Allen Weisselberg and two Trump organizations. No expenses incurred relating to this matter have been paid from funds that the Office receives through federal grant programs.

<u>Federal Grant Programs</u>

Currently, the DA's Office participates in three federal grant programs relating to our casework.[7] Award letters relating to these programs are attached. The Office can provide additional documentation regarding these grants on a rolling basis to be agreed upon in the previously requested meet and confer.

*Stop Violence Against Women Act Program.* The DA's Office receives $50,000 in federal grant money yearly via New York State's Division of Criminal Justice Services during our current award period, which runs from January 1, 2021, to December 31, 2025, for work to hold accountable those who commit acts of violence against women. These funds are used to help pay a portion of the salaries for senior positions in the Special Victims Division of the Office, including those who prosecute the most serious acts of violence and who directly interface and help victims of crime through the process. We note that, according to the National Coalition Against Domestic Violence, New York has the third lowest rate of domestic violence victimization for women of all 50 states.[8]

*Victims of Crime Act, Victim and Witness Assistance Grant Program.* The DA's Office receives $583,111.04 in federal grant money yearly during our current award period, which runs from October 1, 2022, to September 30, 2025, from the Victims of Crime Act Victim and Witness Assistance Grant Program, which is sub-granted from the federal government through the New York State Office of Victim Services to our Office. All these funds are used by our Witness Aid Services Unit (WASU). WASU provides a variety of court-related services, social services, and counseling services designed to meet the needs of crime victims, witnesses, and their families. The Unit also provides information related to the prosecution of the case, assists victims in understanding the criminal justice system, and provides information regarding crime victims' rights. WASU ensures that crime victims, witnesses, and their families can access the

---

[7] In addition, to support the Federal Government's High Intensity Drug Trafficking Areas (HIDTA) program, the DA's Office receives funds and acts as the financial fiduciary recipient for grant funding for the New York/New Jersey HIDTA. Expenditure of these funds is directed by an executive board of law enforcement partners; the DA's Office does not control decision-making on the use of these funds.

[8] National Coalition Against Domestic Violence, State-By-State Statistics, available at: https://ncadv.org/state-by-state.

The Honorable Jim Jordan, et al.
March 31, 2023
Page 5 of 6

services they need to address their trauma and rebuild their lives, while also helping them navigate New York's complex court system. All these efforts help make our city safer; by ensuring victims participate in court processes, they help hold those who commit crimes accountable for their actions, and by addressing trauma they help prevent future criminality. Our Office's focus on public safety in every aspect of our work, including WASU, is one thing that helps explain why an expert analysis of the overall impact of the cost of crime per resident, taking into account the cost of both violent and property crime, found New York City the fifth safest large city in America.[9]

*Department of Justice, Justice Assistance Grant.* The DA's Office receives $204,730 in federal grant money during our current award period, which runs from October 1, 2020, to September 30, 2024, from the Department of Justice's Justice Assistance Grant program which is sub-granted from the City of New York. These funds go towards addressing violent and other felony crimes in our jurisdiction. With the help of these funds, New York City has the fifth lowest rate of homicides of the top 50 most populated cities in the United States.[10]

\*      \*      \*

Finally, as you are no doubt aware, former President Trump has directed harsh invective against District Attorney Bragg and threatened on social media that his arrest or indictment in New York may unleash "death & destruction." As Committee Chairmen, you could use the stature of your office to denounce these attacks and urge respect for the fairness of our justice system and for the work of the impartial grand jury. Instead, you and many of your colleagues have chosen to collaborate with Mr. Trump's efforts to vilify and denigrate the integrity of elected state prosecutors and trial judges and made unfounded allegations that the Office's investigation, conducted via an independent grand jury of average citizens serving New York State, is politically motivated. *See, e.g.*, Annie Grayer et al., *Inside the backchannel communications keeping Donald Trump in the loop on Republican investigations*, CNN.com (March 28, 2023), https://tinyurl.com/mr3n675p ("House GOP Conference Chair Elise Stefanik . . . and Trump spoke several times last week alone, where she walked him through the GOP's plans for an aggressive response to Bragg."). We urge you to refrain from these inflammatory accusations, withdraw your demand for information, and let the criminal justice process proceed without unlawful political interference.

---

[9] Deb Gordon, Safest Cities In America 2023: Violent Crime Rate Increases Drive Per Capita Cost of Crime, available at https://www.moneygeek.com/living/safest-cities/, analyzing 263 cities with populations of over 100,000 using FBI data and relying on academic measurement of the cost of crime to society.

[10] Bloomberg News analysis of murder rates in the top 50 most populated cities in America, using data from the Major Cities Chiefs Association, Federal Bureau of Investigation, local police departments, media reports, and the US Census Bureau, available at: https://www.bloomberg.com/opinion/articles/2023-03-03/pandemic-murder-wave-has-crested-here-s-the-postmortem.

The Honorable Jim Jordan, et al.
March 31, 2023
Page 6 of 6

If you will not withdraw your request, we reiterate our willingness to meet and confer with you or your staff about how we can accommodate your request without violating our obligations as prosecutors to protect the integrity of an ongoing criminal prosecution. We respectfully request that you provide us with a list of questions you wish to ask District Attorney Bragg and to describe the type of documents you think we could produce that would be relevant to your inquiry without violating New York grand jury secrecy rules or interfering with the criminal case now before a court. We trust you will make a good-faith effort to reach a negotiated resolution before taking the unprecedented and unconstitutional step of serving a subpoena on a district attorney for information related to an ongoing state criminal prosecution.

Respectfully Submitted,

Leslie B. Dubeck
General Counsel

cc:     Honorable Jerrold Nadler, Ranking Member, Committee on the Judiciary

        Honorable Joseph Morelle, Ranking Member, Committee on House Administration

        Honorable Jamie Raskin, Ranking Member, Committee on Oversight and Accountability

        Majority Staff, Committee on the Judiciary

        Minority Staff, Committee on the Judiciary

Exhibit 14



# Tweet

↺ Rep. Jim Jordan Retweeted



**Rep. Wesley Hunt Press Office** ✓
@RepWPH

Rep. Hunt joined @foxandfriends this morning to discuss @JudiciaryGOP's subpoena of Mark Pomerantz and Alvin Bragg's weaponization of the judicial system against President Trump.  WATCH ⬇️



10:09 AM · Apr 7, 2023 · **56.3K** Views

**169** Retweets  **11** Quotes  **652** Likes  **2** Bookmarks

---



**Carmine Sabia** ✓ @CarmineSabia · Apr 7
Replying to @RepWPH @Jim_Jordan and 2 others
Jordan's about to hold them accountable for everything.



conservativebrief.com
'Can Be Imprisoned': Jim Jordan 'Building Case' To Issue Criminal Referr…
The gloves are off.

💬 13   ↺ 1   ♡ 8   📊 359   ⬆️

---



**StopWokeCulture** 🇺🇸 @MkayUokay · Apr 7
Replying to @RepWPH @Jim_Jordan and 2 others
A couple of days ago @kilmeade was saying he had hoped Bragg would have gagged Trump, thereby reducing his ability to speak in his own defense.

💬 2   ↺   ♡   📊 94   ⬆️

---

## New to Twitter?

Sign up now to get your own personalized timeline!

 Sign up with Google

 Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

## Relevant people

 **Rep. Wesley Hunt …** ✓   **Follow**
@RepWPH
Press Office of Congressman Hunt proudly working for #TX38 and serving on @JudiciaryGOP @NatResources & @HouseSmallBiz. Tweets from Rep. Hunt are signed

 **House Committee on Natura…** ✓
@NatResources
U.S. House Committee on Natural Resources, led by Chairman Bruce Westerman.
**1,362** Following  **26.6K** Followers

Republicans | Est. 1813 | Chairman @Jim_Jordan

## What's happening

MLB · LIVE
**Astros at Twins**

Sports · Trending
**Albert Abreu**

Trending in United States
**14 REB**
1,424 Tweets

Sports · Trending
**Frank Vogel**

Sports · Trending
**Kenny Atkinson**

Show more

---

**Don't miss what's happening**
People on Twitter are the first to know.

Log in   Sign up

Case 6:1s-2329-0180 TRaMKVanDc 04/10/2023 135DP1404P1ag2343 of 283

Rep. Wesley Hunt Press Office on Twitter: "Rep. Hunt joined @foxandfriends this morning to discuss @JudiciaryGOP's subpoena ...

💬 1    🔁 1    ❤ 5    📊 101    📤

**Show more replies**

## More Tweets

**Ron DeSantis** ✔ @GovRonDeSantis · 8h    ⋯



💬 3,051    🔁 3,856    ❤ 42.4K    📊 1.1M    📤

**Jack Poso** 🇺🇸 @JackPosobiec · 16h    ⋯

BREAKING: UFC crowd breaks out in USA! USA! USA! chant as Trump rises and waves at the area



From nip00

### New to Twitter?

Sign up now to get your own personalized timeline!

 Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

### Relevant people

 **Rep. Wesley Hunt ...** ✔   **Follow**
@RepWPH

Press Office of Congressman Hunt proudly working for #TX38 and serving on @JudiciaryGOP @NatResources & @HouseSmallBiz. Tweets from Rep. Hunt are signed WPH.

 **FOX & friends** 🌟   **Follow**
@foxandfriends

America's #1 cable morning news show

 **House Judiciary G...** ✔   **Follow**
@JudiciaryGOP

Official Twitter for the House Committee on the Judiciary, Republicans | Est. 1813 | Chairman @Jim_Jordan

### What's happening

MLB · LIVE
**Astros at Twins**



Sports · Trending
**Albert Abreu**   ⋯

Trending in United States
**14 REB**   ⋯
1,424 Tweets

Sports · Trending
**Frank Vogel**   ⋯

Sports · Trending
**Kenny Atkinson**   ⋯

**Show more**

**Don't miss what's happening**
People on Twitter are the first to know.

Log in    Sign up

4/9/23, 3:32 PM
Case 6:23-cv-00180-ADA-DTG Document 135 Filed 04/14/23 Page 344 of 394
Rep. Wesley Hunt Press Office on Twitter: "Rep. Hunt joined @foxandfriends this morning to discuss @JudiciaryGOP's subpoena …
3/11





He is Risen!

We are free!

#ResurrectionSunday



💬 2,323    🔁 4,070    ❤️ 26.6K    📊 566.4K    ⬆️

 **Catturd ™** ✓ @catturd2 · 17h          ···
What a POS!

🗽 **New York Post** ✓ @nypost · 18h
Kamala Harris ripped for meeting expelled Tenn. Dems — and not mass
shooting victims trib.al/FRfj5F1



💬 1,395    🔁 4,810    ❤️ 26.3K    📊 766.3K    ⬆️

 **Jack Poso** 🇺🇸 @JackPosobiec · 23h          ···
BREAKING: Greg Abbott vows to pardon Sgt. Daniel Perry after conviction by
Soros prosecutor



**New to Twitter?**
Sign up now to get your own personalized timeline!

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and
Privacy Policy, including Cookie Use.

**Relevant people**

 **Rep. Wesley Hunt …** ✓    Follow
@RepWPH
Press Office of Congressman Hunt
proudly working for #TX38 and
serving on @JudiciaryGOP
@NatResources & @HouseSmallBiz.
Tweets from Rep. Hunt are signed
WPH.

 **FOX & friends** ✓    Follow
@foxandfriends
America's #1 cable morning news
show

 **House Judiciary G…** ✓    Follow
@JudiciaryGOP
Official Twitter for the House
Committee on the Judiciary,
Republicans | Est. 1813 | Chairman
@Jim_Jordan

**What's happening**

MLB · LIVE
**Astros at Twins**


Sports · Trending          ···
**Albert Abreu**

Trending in United States          ···
**14 REB**
1,424 Tweets

Sports · Trending          ···
**Frank Vogel**

Sports · Trending          ···
**Kenny Atkinson**

Show more

**Don't miss what's happening**
People on Twitter are the first to know.          Log in    Sign up

4/9/23, 3:32 PM
Case 6:1s2328-0180-TRaMK-VanDc—04/10/2023-13591P1804P1d/2345 of 295 of 5
Rep. Wesley Hunt Press Office on Twitter: "Rep. Hunt joined @JordanforMis in urging to issue @JudiciaryGOP's subpoena ...







🗨 1,057   ♻ 4,521   ♡ 23.4K   📊 844.6K   ⬆

 **Collin Rugg** ✓ @CollinRugg · 23h   •••

BREAKING: Greg Abbott announces he will pardon Daniel Perry who was convicted of murdering a BLM protester who threatened his life.

God bless Texas.



trendingpoliticsnews.com
BREAKING: Greg Abbott Announces He Will Pardon Daniel Perry After ...
Moments ago, Texas Governor Greg Abbott announced he will work to pardon the former Army Sergeant Daniel Perry, who was convicted of ...

 **Readers added context they thought people might want to know**   →

Unlike the president and other states, the Texas Constitution requires the parole board to recommend a pardon before a governor could act.
texastribune.org/2023/04/08/gre....
Greg Abbott:
twitter.com/GregAbbott_TX/...

Context is written by people who use Twitter, and appears when rated helpful by others. Find out more.

🗨 954   ♻ 4,055   ♡ 22.5K   📊 704K   ⬆

 **Benny Johnson** ✓ @bennyjohnson · 16h   •••

Massive crowd at UFC Miami chants "U-S-A" after Trump greets crowd 🇺🇸



**New to Twitter?**
Sign up now to get your own personalized timeline!

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

**Relevant people**

 **Rep. Wesley Hunt ...** ✓   Follow
@RepWPH
Press Office of Congressman Hunt proudly working for #TX38 and serving on @JudiciaryGOP @NatResources & @HouseSmallBiz. Tweets from Rep. Hunt are signed WPH.

 **FOX & friends** 🌟   Follow
@foxandfriends
America's #1 cable morning news show

 **House Judiciary G...** ✓   Follow
@JudiciaryGOP
Official Twitter for the House Committee on the Judiciary, Republicans | Est. 1813 | Chairman @Jim_Jordan

**What's happening**

MLB · LIVE
**Astros at Twins**   

Sports · Trending
**Albert Abreu**   •••

Trending in United States
**14 REB**
1,424 Tweets   •••

Sports · Trending
**Frank Vogel**   •••

Sports · Trending
**Kenny Atkinson**   •••

Show more

**Don't miss what's happening**
People on Twitter are the first to know.

Log in   Sign up

# Exhibit 15

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

April 6, 2023

Mr. Mark F. Pomerantz
Former New York County Special Assistant District Attorney
Free & Fair Litigation Group
128 E. Broadway, Unit 793
New York, NY 10002

Dear Mr. Pomerantz:

The Committee on the Judiciary is conducting oversight of the New York County District Attorney's unprecedented indictment of a former President of the United States and current declared candidate for that office. On March 22, 2023, we requested that you voluntarily cooperate with our oversight by providing relevant documents and testimony pertaining to your role as a special assistant district attorney leading the investigation into the former President's finances.[1] We received a reply letter dated March 27, 2023, stating that, at the instruction of the New York County District Attorney's Office, you would not cooperate with our oversight.[2] You enclosed a copy of a letter from the New York County District Attorney's Office directing you not to cooperate.[3]

The Supreme Court has recognized that Congress has a "broad and indispensable" power to conduct oversight, which "encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys in our social, economic or political system for the purpose of enabling Congress to remedy them."[4] Rule X of the Rules of the House of Representatives authorizes the Committee on the Judiciary to conduct oversight of criminal justice matters to inform potential legislation.[5] Congress has a specific and manifestly important interest in preventing politically motivated prosecutions of current and former Presidents by elected state

---

[1] Letter from Rep. Jim Jordan, H. Comm. on the Judiciary, to Mr. Mark F. Pomerantz, Former N.Y. Co. Special Assistant District Att'y (Mar. 22, 2023).

[2] Letter from Mr. Mark F. Pomerantz, Former N.Y. Co. Special Assistant District Att'y, to Rep. Jim Jordan, H. Comm. on the Judiciary (Mar. 27, 2023).

[3] Letter from Leslie B. Dubeck, Gen. Counsel, N.Y. Co. District Att'y Off., to Mr. Mark F. Pomerantz, Former N.Y. Co. Special Assistant District Att'y (Mar. 25, 2023).

[4] *See, e.g.*, *Trump v. Mazars LLP*, No. 19-715 at 11 (U.S. slip op. July 9, 2020) (internal quotation marks and citations omitted).

[5] Rules of the U.S. House of Representatives, R. X(l)(5) (2023).

Mr. Mark F. Pomerantz
April 6, 2023
Page 2

and local prosecutors, particularly in jurisdictions—like New York County—where the prosecutor is popularly elected and trial-level judges lack life tenure. Among other things, if state or local prosecutors are able to engage in politically motivated prosecutions of Presidents of the United States (current or former) for personal acts, this could have a profound impact on how Presidents choose to exercise their powers while in office. For example, a President could choose to avoid taking action he believes to be in the national interest because it would negatively impact New York City for fear that he would be subject to a retaliatory prosecution in New York City.

As a result, the New York County District Attorney's unprecedented prosecutorial conduct requires oversight to inform the consideration of potential legislative reforms that would, if enacted, insulate current and former Presidents from such politically motivated state and local prosecutions. These potential legislative reforms may include, among other things, broadening the existing statutory right of removal of certain criminal cases from state court to federal court. The local prosecution of a former President also raises the potential for conflict between the federal law-enforcement officials required by federal law to protect a former President and local law-enforcement officials required to enforce an indictment and exercise control of him throughout his presence in the local criminal justice system. The Committee may consider legislative reforms to address or remedy this potential conflict. In addition, the New York County District Attorney's Office has acknowledged that it used federal forfeiture funds in its investigations of President Trump, including during your tenure in that office and during the time when former President Trump was in office and a candidate for re-election.[6] The Committee may therefore consider legislation to enhance reporting requirements concerning the use of federal forfeiture funds or to prohibit the use of federal forfeiture funds to investigate a current or former President or presidential candidate.

Based on your unique role as a special assistant district attorney leading the investigation into President Trump's finances, you are uniquely situated to provide information that is relevant and necessary to inform the Committee's oversight and potential legislative reforms. Although the New York County District Attorney's Office has directed you not to cooperate with our oversight, you have already discussed many of the topics relevant to our oversight in a book you wrote and published in February 2023,[7] as well as in several public interviews to promote your book.[8] As a result, you have no basis to decline to testify about matters before the Committee that you have already discussed in your book and/or on a prime-time television program with an

---

[6] *See* Letter from Leslie B. Dubeck, Gen. Counsel, N.Y. Co. District Att'y Off., to Rep. Jim Jordan, H. Comm. on the Judiciary 4 (Mar. 31, 2023) ("[O]f the federal forfeiture money that the Office helped collect, approximately $5,000 was spent on expenses incurred relating to the investigation of Donald J. Trump or the Trump Organization. These expenses were incurred between October 2019 and August 2021.").

[7] MARK POMERANTZ, PEOPLE VS. DONALD TRUMP: AN INSIDE ACCOUNT (2023).

[8] *See, e.g.*, Rachel Maddow Show, *Trump case 'cried out for federal investigation': Pomerantz*, MSNBC (Feb. 7, 2023) ("As I mentioned in the book, this case cried out for federal investigation . . . . I don't know why there was never an intensive federal investigation of Trump's finances."); 60 Minutes, *Mark Pomerantz on investigating Donald Trump*, CBS NEWS (Feb. 5, 2023) ("[Bragg] did not say to slow down. He never said, 'I don't wanna be rushed. There's not enough time. I need more time to study the facts.' He said, 'Okay. You need a decision? You get a decision.' And the decision was no. 'You're not going forward.'").

Mr. Mark F. Pomerantz
April 6, 2023
Page 3

audience in the millions, including on the basis of any purported duty of confidentiality or privilege interest.

Your book discloses various details about the New York County District Attorney's Office's investigation of President Trump, including internal deliberations about the investigation. Indeed, you discuss how members of the Office viewed the credibility of a key witness in the case, and you note their concerns about the case's dim prospects. For example, in your book, you recount a "mini-revolt" that occurred following an internal Office meeting on September 21, 2021, about the investigations into President Trump.[9] You offer details about a disagreement between you and the Office's Major Economic Crimes Bureau Chief, Julieta Lozano, about Michael Cohen's credibility as a witness in the investigation.[10] You also complain about concerns expressed by Chris Conroy, the Office's Investigative Division Chief, during a meeting on November 12, 2021.[11] According to you, Conroy "spoke about his misgivings" about the Trump investigation, which stemmed from a recent case involving financial and accounting fraud charges that mirrored the charges that the Office was considering pursuing against President Trump.[12] That case apparently ended poorly for the New York County District Attorney's Office.[13] Like Lozano, Conroy also expressed concerns about Cohen's viability as a witness.[14] You accuse other lawyers of being "relentlessly negative, dwelling on all the difficulties and issues with the case, and refusing to acknowledge the positives" during an internal meeting on December 10, 2021, referring to your former colleagues as "conscientious objectors" merely for opining that the case was "weak" and pointing to its "many fatal flaws."[15] You ultimately dismiss their concerns about the investigation by suggesting that they were either too lazy to do the work, did not know the evidence, or were somehow afraid of bringing charges against President Trump.[16]

Your book, described as a "300-page exercise in score-settling and scorn,"[17] also reveals the extent to which the New York County District Attorney's Office's investigation of President Trump appears to have been politically motivated. Specifically, you describe your eagerness to investigate President Trump, writing that you were "delighted" to join an unpaid group of lawyers advising on the Trump investigations, and joking that salary negotiations had gone "great" because you would have paid to join the investigation.[18] You frivolously compare President Trump to mob boss John Gotti,[19] and claim that the District Attorney's Office was "warranted in throwing the book" at President Trump because, in your view, he "had become a master of breaking the law in ways that were difficult to reach."[20] You explain that this "collective weight" of President Trump's conduct over the years "left no doubt in [your] mind

---

[9] POMERANTZ, *supra* note 7, at 159.
[10] *Id.*
[11] *Id.* at 171.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.* at 191–92, 194.
[16] *Id.* at 160, 171–72.
[17] Lloyd Green, *People vs Donald Trump review: Mark Pomerantz pummels Manhattan DA*, THE GUARDIAN (Feb. 11, 2023).
[18] POMERANTZ, *supra* note 7, at 6, 21–22.
[19] *Id.* at 108–09.
[20] *Id.* at 112.

Mr. Mark F. Pomerantz
April 6, 2023
Page 4

that [President] Trump deserved to be prosecuted."[21] In other words, as a special assistant district attorney, you seem, for reasons unrelated to the facts of this particular investigation, to have been searching for any basis on which to bring criminal charges.[22]

Although you claim that you were "able to put aside [your] personal feelings about [President] Trump" during the investigation, the depth of your personal animosity towards him is apparent in your writing. You wrote of President Trump:

> I saw him as a malignant narcissist, and perhaps even a megalomaniac who posed a real danger to the country and the ideals that mattered to me. His behavior made me angry, sad, and even disgusted.[23]

You additionally "marveled at the thought" of being "at the center of what might become one of the most consequential criminal cases ever brought."[24] You reflect on your "only similar experience," which you indicated was the "indictment of Osama bin Laden and other members of al Qaeda for the bombing of the United States embassies in Kenya and Tanzania."[25] Drawing a parallel between these two vastly different matters speaks volumes about the mindset that you brought to the investigation of President Trump.

These perceptions appear to have colored your work as a special assistant district attorney, to the point that you even resigned because the investigation into President Trump was not proceeding fast enough for your liking.[26] In your resignation letter, you prejudged the results of the District Attorney's investigation, writing that "Donald Trump is guilty of numerous felony violations," and vowing not to be a "passive participant" to "a grave failure of justice."[27] Your public resignation reportedly left District Attorney Bragg "deeply stung," and caused him to issue an "unusual" public statement "emphasizing that the investigation into Trump and his business was far from over."[28] Your book also contributed to the "political pressure" on District Attorney Bragg to bring charges against former President Trump.[29]

---

[21] *Id.* at 112–13.

[22] *See also* Rachel Maddow Show, *Watch Rachel Maddow Highlights: Feb. 6*, YOUTUBE (Feb. 6, 2023) ("[W]e were trying to work quickly. Bringing a racketeering case, particularly one that includes [other crimes], it's such a big ball of wax that, ultimately, we decided, you know what, let's focus on a smaller, more contained set of charges. That's when we started to focus on the financial statements.").

[23] POMERANTZ, *supra* note 7, at 176.

[24] *Id.* at 194–95.

[25] *Id.*

[26] *Read the Full Text of Mark Pomerantz's Resignation Letter*, N.Y. TIMES (Mar. 23, 2022).

[27] *Id.*

[28] Mark Berman et al., *The prosecutor, the ex-president and the 'zombie' case that came back to life*, WASH. POST (Mar. 17, 2023).

[29] Luc Cohen, *Trump charges follow criticism of Manhattan prosecutor for not acting sooner*, REUTERS (Mar. 31, 2023).

Mr. Mark F. Pomerantz
April 6, 2023
Page 5

      Accordingly, for these reasons, and in light of your disregard of our earlier voluntary request, please find attached a subpoena compelling your appearance for a deposition.

Sincerely,

Jim Jordan
Chairman

cc:    The Honorable Jerrold Nadler, Ranking Member

Enclosure

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Mark F. Pomerantz
_____

You are hereby commanded to be and appear before the

Committee on the Judiciary
_____

_____

of the House of Representatives of the United States at the place, date, and time specified below.

☐ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: _____
>
> Date: _____          Time: _____

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: 2237 Rayburn House Office Building
>
> Date: April 20, 2023          Time: 10:00 a.m.

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____          Time: _____

*To* The U.S. Marshals Service, or **any** authorized Member or congressional staff
_____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 10th day of April , 2023 .

Attest: _____

_____
*Clerk*

_____
*Chairman or Authorized Member*

# PROOF OF SERVICE

---

Subpoena for

Mark F. Pomerantz
_____

Address _____

_____

before the  Committee on the Judiciary
_____

_____

*U.S. House of Representatives*
*118th Congress*

---

Served by (print name) _____

Title _____

Manner of service _____

_____

Date _____

Signature of Server _____

Address _____

_____

Exhibit 16

# Exhibit in Video Format and to be provided at the Court's discretion.

Exhibit 17

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

March 22, 2023

Mr. Mark F. Pomerantz
Former New York County Special Assistant District Attorney
Free & Fair Litigation Group
128 E. Broadway, Unit 793
New York, NY 10002

Dear Mr. Pomerantz:

New York County District Attorney Alvin Bragg is reportedly about to engage in an unprecedented abuse of prosecutorial authority: the indictment of a former President of the United States and current declared candidate for that office. This indictment comes after years of the District Attorney's office aggressively pursuing charges, including by appointing you as an unpaid "special assistant district attorney" to lead the investigation into every facet of President Trump's finances.[1] Last year, you resigned from the office over Bragg's initial reluctance to move forward with charges, shaming Bragg in your resignation letter—which was subsequently leaked—into bringing charges.[2] Based on your unique role in this matter, and your subsequent public statements prejudicing the impartiality of any prosecution, we request your cooperation with our oversight of this politically motivated prosecutorial decision.

The New York County District Attorney's Office has been investigating President Trump since at least 2018, looking for some legal theory on which to bring charges.[3] The facts surrounding the impending indictment have "been known for years."[4] Michael Cohen, President Trump's disgraced former lawyer, pleaded guilty over four years ago to charges based on the

---

[1] William K. Rashbaum et al., *A former federal prosecutor has joined the Manhattan D.A.'s team investigating the Trump family business*, N.Y. TIMES (Feb. 19, 2021); Ben Protess et al., *How the Manhattan DA's investigation into President Donald Trump unraveled*, N.Y. TIMES (March 5, 2022).

[2] *Read the Full Text of Mark Pomerantz's Resignation Letter*, N.Y. TIMES (Mar. 23, 2022) [hereinafter "Pomerantz Letter].

[3] Andrew Feinberg, *New York prosecutors warn Trump of possible indictment, report says*, THE INDEPENDENT (Mar. 10, 2023).

[4] Mark Berman et al., *The prosecutor, the ex-president and the 'zombie' case that came back to life*, WASH. POST (Mar. 17, 2023).

Mr. Mark F. Pomerantz
March 22, 2023
Page 2

same facts at issue in the impending indictment.[5] By July 2019, however, federal prosecutors determined that no additional people would be charged alongside Cohen.[6]

In January 2022, soon after Bragg took office, he expressed doubts about President Trump's case and suspended the investigation.[7] This decision caused you and your colleague, Carey Dunne, to resign in protest.[8] You penned a scathing resignation letter in which you baselessly accused President Trump of "numerous felony violations," and asserted it would be "a grave failure of justice" if Bragg did not pursue charges.[9] You urged Bragg to hold President Trump "fully accountable for his crimes," asserting that Bragg's decision "will doom any future prospects" for prosecution.[10] Your resignation letter found its way into the *New York Times*, word-for-word, and your criticisms of Bragg's investigation were widely reported by news outlets.[11] Your unrelenting pursuit of President Trump followed you into the private sector as you and Dunne started a law firm dedicated to "weighing ways" to bar President Trump from holding future office.[12] Just this month, you published a book excoriating Bragg for not aggressively prosecuting President Trump, laying bare the office's internal deliberations about the investigation and your personal animus toward President Trump.[13]

It now appears that your efforts to shame Bragg have worked as he is reportedly resurrecting a so-called "zombie" case against President Trump using a tenuous and untested legal theory. [14] Even the *Washington Post* quoted "legal experts" as calling Bragg's actions "unusual" because "prosecutors have repeatedly examined the long-established details but decided not to pursue charges."[15] In addition, Bragg's star witness—Michael Cohen—has a serious credibility problem as a convicted perjurer and serial fabricator with demonstrable prejudice against President Trump.[16] Under these circumstances, there is no scenario in which Cohen could fairly be considered an unbiased and credible witness.

The inference from the totality of these facts is that Bragg's impending indictment is motivated by political calculations. The facts of this matter have not changed since 2018 and no new witnesses have emerged.[17] The Justice Department examined the facts in 2019 and opted not

---

[5] Shawna Chen, *Timeline: The probe into Trump's alleged hush money payments to Stormy Daniels*, Axios (Mar. 18, 2023).

[6] *Id.*; *see* Berman et al., *supra* note 4.

[7] Shayna Jacobs et al., *Prosecutor who resigned over stalled Trump probe says ex-president committed felonies*, Wash. Post (Mar. 23, 2022).

[8] *Id.*

[9] Pomerantz Letter, *supra* note 2.

[10] *Id.*

[11] *Id.*

[12] Shayna Jacobs, *Lawyers who investigated Trump form group to oppose anti-democratic policies*, Wash. Post (Jan. 11, 2023).

[13] Mark Pomerantz, People vs. Donald Trump: An Inside Account (2023).

[14] Berman et al., *supra* note 4.

[15] *Id.*

[16] Christopher Lopez, *Progressive DA Alvin Bragg's case against Trump hinges on witnesses with 'credibility problems': Andy McCarthy*, Fox News (Mar. 19, 2023); Marisa Schultz, *Jim Jordan, Mark Meadows ask Justice Department to probe Cohen for perjury*, N.Y. Post (Feb. 28, 2019); *Michael Cohen pleads guilty to lying to Congress*, Assoc. Press (Nov. 29, 2018).

[17] Berman et al., *supra* note 4.

Mr. Mark F. Pomerantz
March 22, 2023
Page 3

to pursue further prosecutions at that time. Even still, according to reporting, the investigation "gained some momentum this year," and Bragg's office "convened a new grand jury in January to evaluate the issue."[18] The only intervening factor, it appears, was President Trump's announcement that he would be a candidate for President in 2024.[19]

Your actions, both as a special prosecutor and since leaving the District Attorney's office, cast serious doubt on the administration of fair and impartial justice in this matter. Your words in the *New York Times* have unfairly disparaged President Trump, an innocent and uncharged man, as a felon to millions of *Times* readers. Your book again unfairly disparaged President Trump, and now opens the door to examination about the District Attorney's office commitment to evenhanded justice. In light of this unprecedented and overzealous partisan investigation, Congress has a keen interest in these facts to inform potential legislation to improve the functioning and fairness of our criminal justice system, and to better delineate prosecutorial authority between federal and local officials. In addition, because the circumstances of this matter stem, in part, from Special Counsel Mueller's investigation,[20] Congress may consider legislative reforms to the authorities of special counsels and their relationships with other prosecuting entities.

Accordingly, to advance our oversight, please produce the following documents and information in your personal possession for the period January 1, 2017, to the present:

1. All documents and communications between or among the New York County District Attorney's Office and the U.S. Department of Justice, its component entities, or other federal law enforcement agencies referring or relating to New York County District Attorney's investigation of President Donald Trump;

2. All documents and communications between or among you and representatives of the New York County District Attorney's Office referring or relating to President Donald Trump; and

3. All documents and communications between or among you and representatives of the New York County District Attorney's Office referring or relating to your appointment and role as a Special Assistant District Attorney for New York County.

In addition, your testimony is necessary to advance our oversight and to inform potential legislative reforms. We therefore ask that you testify in a transcribed interview about these matters as soon as possible. Please provide this information and contact Committee staff to schedule your transcribed interview as soon as possible but not later than 10:00 a.m. on March 27, 2023.

Further, this letter serves as a formal request to preserve all existing and future records and materials relating to the topics addressed in this letter. You should construe this preservation

---

[18] *Id.*
[19] Max Greenwood, *Trump announces 2024 run for president*, THE HILL (Nov. 15, 2022).
[20] Ben Protess et al., *How Michael Cohen turned against President Trump*, N.Y. TIMES (Apr. 21, 2019).

Mr. Mark F. Pomerantz
March 22, 2023
Page 4

notice as an instruction to take all reasonable steps to prevent the destruction or alteration, whether intentionally or negligently, of all documents, communications, and other information, including electronic information and metadata, that are or may be responsive to this congressional inquiry. This instruction includes all electronic messages sent using your official and personal accounts or devices, including records created using text messages, phone-based message applications, or encryption software.

The Committee on the Judiciary has jurisdiction over criminal justice matters in the United States and matters involving threats to civil liberties pursuant to Rule X of the Rules of the House of Representatives.[21] If you have any questions about this request, please contact Committee staff at (202) 225-6906. Thank you for your prompt attention to this matter.

Sincerely,

Jim Jordan
Chairman

cc:     The Honorable Jerrold Nadler, Ranking Member

---

[21] Rules of the U.S. House of Representatives, R. X (2023).

# Exhibit 18

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

---

ALVIN L. BRAGG, JR., in his official capacity as District Attorney for New York County,

                    Plaintiff,

          v.

JIM JORDAN, in his official capacity as Chairman of the Committee on the Judiciary, COMMITTEE ON THE JUDICIARY OF THE UNITED STATES HOUSE OF REPRESENTATIVES, and MARK F. POMERANTZ,

                    Defendants.

---

**1:23-CV-03032-MKV**

**DECLARATION OF MARK F. POMERANTZ**

---

I, Mark F. Pomerantz, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.     I submit this declaration in support of the plaintiff's application for a temporary restraining order and a preliminary injunction barring the immediate enforcement of a subpoena served upon me by the House Judiciary Committee. Although I am nominally a defendant in this action, I have no objection to the relief that the District Attorney has requested. I consent to that relief, and indeed urge this Court to grant it.

2.     According to the letter I received from Rep. Jim Jordan (attached as Exhibit 1), the Chairman of the Judiciary Committee seeks my testimony with respect to its "oversight" of the District Attorney's recent indictment of Donald Trump. Rep. Jordan's letter cites Congress's purported interest in "preventing politically motivated prosecutions" of Presidents. The letter also refers to Congress's interest in regulating the District Attorney's Office use of federal forfeiture funds.

3.      I was not involved in the decision to seek Donald Trump's indictment on the charges filed against him.  I was sworn in as a special assistant district attorney in New York County on February 2, 2021.  I resigned from this position in the District Attorney's Office on February 23, 2022.

4.      According to published reports, the decision to recommend prosecution on the charges contained in the indictment took place long after my resignation.[1]  I have had no conversations about prosecuting Mr. Trump with the District Attorney or any member of the prosecution team following my resignation.  I also do not have any personal knowledge of the District Attorney's Office's use of federal forfeiture funds, including the use of any such funds during my tenure at the Office.

5.      The District Attorney's Office has formally instructed me, in writing, not to provide any information about my prior work for the Office to the Judiciary Committee in response to the subpoena.  Attached is a copy of a letter to me, dated April 11, 2023, from Leslie Dubeck, General Counsel to the District Attorney (Exhibit 2).  That letter instructs me, "as a former attorney and employee of the DA's office, to not provide any information to the Committee concerning [my] work at the DA's office."  Pomerantz Decl., Ex. 2.  Additionally, certain information is protected by the secrecy provisions of Article 190 of New York's Criminal Procedure Law, and some disclosures of grand jury information may be punishable as felonies.  Answering questions from the Judiciary Committee about my work for the District Attorney's Office therefore poses a legal risk to me if I disclose information that a prosecutor might regard as protected by grand jury secrecy, even if I

---

[1] *E.g.,* Jonah E. Bromwich, Ben Protess & William K. Rashbaum, *How Alvin Bragg Resurrected the Case Against Donald Trump*, N.Y. TIMES (Mar. 31, 2023), https://www.nytimes.com/2023/03/31/nyregion/alvin-bragg-trump-investigation.html

disagree.  Also, answering questions from the Judiciary Committee about my tenure as a prosecutor poses the risk that my testimony could be used to jeopardize or interfere with either the charged criminal case against Mr. Trump or other ongoing investigations.

6.     Absent some relief from this Court, I will find myself in an impossible position.  If I refuse to provide information to the Committee, I risk being held in contempt of Congress and referred to the Department of Justice for possible criminal prosecution.  If, on the other hand, I defy the District Attorney's instructions and answer questions, I face possible legal or ethical consequences, including criminal prosecution.  Further, if I were to testify, I believe that the District Attorney would instruct me to assert the various claims of privilege he has identified in his moving papers.  *See* Pl.'s Mem. of Law 20–22, ECF No. 8.  The District Attorney believes that I cannot waive the privileges that belong to him, and that my prior public statements do not constitute a privilege waiver by him or his Office.  I agree, but the Committee appears not to recognize the validity of the District Attorney's privilege claims, and Rep. Jordan's letter claims that my prior public statements require me to answer questions even about matters as to which the District Attorney claims privilege.  I risk being placed in this position even though I was not involved in the decision to bring the pending prosecution and cannot assist the Committee in accomplishing its purported purpose of exercising "oversight" of that prosecution.

7.     I believe that the Committee seeks my testimony not for any legitimate legislative purpose, but rather to impede and interfere with the District Attorney's Office's ongoing work, assist Mr. Trump in his defense, probe my political views, and harass me because I was the author of *People v. Donald Trump*, a book that Mr. Trump and some of his supporters do not like.  Even assuming, contrary to fact, that the Committee's

4

"oversight" interests are not pretextual, and that I had information that was pertinent to a legitimate legislative purpose, the subpoena to me should not be enforced. The institutional interests that have been proffered by the District Attorney, together with the personal burden placed on me as the recipient of the Committee's subpoena, vastly outweigh the need for my testimony.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: New York, New York
April 17, 2023

By: _____
Mark F. Pomerantz

Exhibit 19

Exhibit in Video
Format and to be
provided at the Court's
discretion.

Exhibit 20

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ALVIN L. BRAGG, JR., in his official capacity as District Attorney for New York County,

*Plaintiff*,

    v.

JIM JORDAN, in his official capacity as Chairman of the Committee on the Judiciary, et al.,

*Defendants*.

Case No. 23-cv-3032

## REPLY IN SUPPORT OF THE DISTRICT ATTORNEY'S MOTION
## FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

    I.    The Speech or Debate Clause Does Not Shield the Committee's Unlawful Subpoena From Scrutiny. ......................................................................................... 2

    II.   This Action Can and Should Proceed Whether or Not the Congressional Defendants Are Required Parties Under Rule 19. ........................................................ 6

    III.  *Mazars* Supplies the Proper Framework For Deciding This Case. ................................. 8

    IV.  Plaintiff Has Established a Likelihood of Irreparable Harm. ......................................... 9

**Cases**

*Bare v. Cruz,*
    2012 WL 1138591 (E.D. Pa. Apr. 2, 2012) ........................................................10

*Bean LLC v. John Doe Bank,*
    291 F. Supp. 3d 34 (D.D.C. 2018) ...................................................................8

*Bond v. United States,*
    564 U.S. 211 (2011) .......................................................................................8

*CP Solutions PTE, Ltd. v. Gen. Elec. Co.,*
    553 F.3d 156 (2d Cir. 2009) ......................................................................7, 8

*Eastland v. U.S. Servicemen's Fund,*
    421 U.S. 491 (1975) ...............................................................................2, 3, 7

*Flagler v. Trainor,*
    663 F.3d 543 (2d Cir. 2011) .............................................................................9

*Harrison v. New York,*
    2021 WL 1176146 (E.D.N.Y. Mar. 29, 2021) ...................................................9

*Imbler v. Pachtman,*
    424 U.S. 409 (1976) .......................................................................................9

*Kilbourn v. Thompson,*
    103 U.S. 168 (1881) .......................................................................................3

*McPhaul v. United States,*
    364 U.S. 372 (1960) ....................................................................................3, 5

*People v. Boss,*
    261 A.D.2d 1 (1st Dep't 1999) ........................................................................9

*People v. Cahill,*
    2 N.Y.3d 14 (2003) ........................................................................................9

*Pillsbury Co. v. Fed. Trade Comm'n,*
    354 F.2d 952 (5th Cir. 1966) ...........................................................................9

*Plaut v. Spendthrift Farm, Inc.,*
    514 U.S. 211 (1995) .......................................................................................4

*Tobin v. United States,*
    306 F.2d 270 (D.C. Cir. 1962) .........................................................................3

*Trump v. Deutsche Bank AG,*
    943 F.3d 627 (2d Cir. 2019) ............................................................................8

*Trump v. Mazars USA LLP*,
   140 S. Ct. 2019 (2020) ...................................................................................................2, 6, 8, 9

*Trump v. Mazars USA, LLP*,
   39 F.4th 774 (D.C. Cir. 2022) ..................................................................................................6, 9

*United States v. Sutton*,
   2022 WL 3340046 (D.D.C. Aug. 12, 2022) .........................................................................10

*United States v. U.S. House of Reps.*,
   556 F. Supp. 150 (D.D.C. 1983) ...........................................................................................3

*Watkins v. United States*,
   354 U.S. 178 (1957) ...........................................................................................................5, 7

*Younger v. Harris*,
   401 U.S. 37 (1971) ..............................................................................................................10

**Statutes**

2 U.S.C. § 194 ...........................................................................................................................7

**Other Authorities**

H.R. 2553 ..................................................................................................................................5

H.R. 2581 ..................................................................................................................................1

H.R. 2582 ..................................................................................................................................5

**Rules**

Fed. R. Civ. P. 19 ...............................................................................................................2, 6, 7

**Constitutional Provisions**

U.S. Const., Art. I, sec. 6, cl. 1 ........................................................................................1, 2, 5

U.S. Const., Art. III ..............................................................................................................2, 5

# INTRODUCTION

The subpoena to Mark Pomerantz is an unfounded and unconstitutional attempt to disrupt an ongoing state criminal prosecution that violates basic principles of federalism and exceeds Congress's powers under Article I.  The subpoena is one front in a campaign of harassment and intimidation that Chairman Jordan and the Judiciary Committee ("Congressional Defendants") have directed at the District Attorney—continuing this week with a "field hearing" in New York City staged ostensibly to discuss local crime statistics, Exs. B-62, B-62A, B-63, B-66, and the filing of the "ALVIN Act" to prohibit federal funding of the Manhattan District Attorney's office, retroactive to the start of Alvin L. Bragg Jr.'s tenure.  *See* Ex. B-70 (H.R. 2581 (Apr. 13, 2023)); B-65.[1]  Further confirming that their purpose is punitive and judicial, not legislative, the Congressional Defendants refused the District Attorney's request to adjourn the subpoena's April 20, 2023, return date to allow the Court reasonable time to address the significant constitutional questions at stake—and the parties to litigate an appeal if necessary.  *See* Ex. B-64.  They offered no explanation for why Mr. Pomerantz's testimony is so urgently needed—particularly where it is the start of a Congress and authority for this subpoena continues through 2024.

The Congressional Defendants respond that this Court has no power to address their unlawful subpoena because the Speech or Debate Clause provides "absolute" immunity even if they "acted unlawfully or with an unworthy purpose."  Opp. 7.  If credited, this argument would mean there is no limit on Congress's subpoena power:  the Chairman could subpoena the presiding judge in the pending state prosecution of Mr. Trump, or even this Court, to explain and account for judicial rulings.  And the Congressional Defendants argue that their immunity effectively

---

[1]  Citations to "Ex." are to exhibits attached to the First Declaration of Theodore J. Boutrous, Jr. (Dkt. 12).  Citations to "Ex. B-" are to exhibit attached to the Second Declaration of Theodore J. Boutrous, Jr.

extends to Mr. Pomerantz because the District Attorney cannot maintain suit in their absence under Federal Rule 19.  Neither argument is correct.  The heightened standard of review the Supreme Court imposed in *Trump v. Mazars USA LLP*, 140 S. Ct. 2019 (2020), for subpoenas implicating separation of powers principles would be little more than a dead letter if Congress, at its own whim, could invoke Speech or Debate immunity to evade all judicial review.

## ARGUMENT

I.      **The Speech or Debate Clause Does Not Shield the Committee's Unlawful Subpoena From Scrutiny.**

The Congressional Defendants assert that the "absolute immunity" afforded by the Speech or Debate Clause permits them to tread on New York's sovereign authority while evading judicial review.  Opp. 5.  But Speech or Debate immunity presupposes that Congress's "actions . . . fall within the sphere of legitimate legislative activity."  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501 (1975).  Subpoenas that invade the prerogatives of other branches of government not only fail to trigger this immunity; they require the Court to evaluate the subpoena under the heightened standard set forth in *Mazars*, 140 S. Ct. 2019.  But even assuming the Congressional Defendants may cloak themselves in the protections of the Speech or Debate Clause, that defense does not disable the Court from granting relief.  That is because an injunction and TRO would operate directly on Mr. Pomerantz, who unquestionably enjoys no such immunity.  The Congressional Defendants thus have a choice:  they can participate and be heard—as Congress has done in many previous subpoena actions—or they can stand on their immunity defense and watch from the sidelines as this proceeding unfolds without them.  But they cannot invoke the Speech or Debate Clause as a complete barrier to Article III judicial review of this congressional incursion into New York sovereignty.

The Supreme Court has repeatedly recognized that Speech or Debate immunity does not completely insulate congressional subpoenas from judicial review. Start with *Eastland*, a case that arose in the same procedural posture as this one. A Senate committee served a subpoena on a bank for respondent's bank records. Arguing that the demand would violate its First Amendment right to free association by revealing the names of its financial supporters, respondent sued the bank and ten senators to enjoin enforcement of the subpoena. 421 U.S. at 495. The Supreme Court concluded that the district court "properly entertained" the action to enjoin the subpoena because respondent—like the District Attorney here—lacked any other mechanism for enforcing its rights. *Id.* at 501 n.14. Respondent could not "resist and thereby test the subpoena" in a contempt proceeding because the Senate had directed its document demand to a third party—the bank. *Id.* The Court therefore permitted respondent to maintain its claim for injunctive relief to allow for a "judicial inquiry" into whether "a legitimate legislative purpose is present." *Id.*[2]

At a minimum, the District Attorney is entitled to the same inquiry the Supreme Court conducted in *Eastland*: whether the subpoena fits within "the sphere of legitimate legislative activity." 421 U.S. at 501. Even the Congressional Defendants acknowledge that Speech or Debate immunity does not shield a subpoena that is "plainly incompetent or irrelevant to any lawful purpose." Opp. 15 (quoting *McPhaul v. United States*, 364 U.S. 372, 381 (1960)). The Pomerantz subpoena fails to clear that low hurdle because the Committee's subpoena serves a "clearly judicial" rather than a legislative function. *Kilbourn v. Thompson*, 103 U.S. 168, 192 (1881). The Committee purports to be "conducting oversight" of the District Attorney's criminal

---

[2] *Eastland* also fully disposes of the Congressional Defendants' argument that the Court should avoid deciding any unnecessary constitutional issues on this motion because the subpoena can be challenged in a possible future contempt prosecution. *See* Opp. 14 (citing *United States v. U.S. House of Reps.*, 556 F. Supp. 150 (D.D.C. 1983)). But it is inappropriate to relegate constitutional questions reflecting a "contest . . . between different governmental units" to a criminal contempt proceeding. *Tobin v. United States*, 306 F.2d 270, 276 (D.C. Cir. 1962). Moreover, like the respondent in *Eastland*, the D.A. will have no such opportunity because the subpoena was not directed to him.

case against Mr. Trump, Ex. 1 (Dkt. No. 12-1), and intends to question Mr. Pomerantz "all about his work investigating the former President," Opp. 2. But ensuring that this ongoing prosecution is not "politically motivated" is the bailiwick of the New York courts, Ex. 1, not the U.S. Congress.

The Congressional Defendants argue that they have a valid legislative purpose because they are considering two bills designed to protect former presidents from state prosecutions—both conveniently thought up within days of the District Attorney's complaint. But the mere fact that this legislation is pending does not necessitate the conclusion that the subpoena serves a legislative rather than a judicial purpose. In *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995), the Supreme Court invalidated a federal statute that reinstated certain securities claims dismissed on statute of limitations grounds, holding that Congress had invaded the "judicial" power by "retroactively commanding the federal courts to reopen final judgments," *id.* at 215, 219. Just as a federal *statute* may qualify as "judicial" if it usurps the power of the federal courts, so too may a congressional *subpoena* if it usurps judicial oversight of an ongoing criminal case.

The Congressional Defendants disclaim that their purpose is to "interfere with" the District Attorney's criminal case. Opp. 16. But their many public proclamations, *see, e.g.*, Compl. (Dkt. No. 1) ¶¶ 2, 7-8, 89-91, 114-16, and their *own brief* concede that their purpose is to corroborate "widespread speculation" that the indictment of Mr. Trump was "politically motivated" by questioning Mr. Pomerantz about his investigation. Opp. 9.[3] And the bill that supposedly substantiates their legislative purpose—allowing removal of state criminal cases against former presidents to federal court—would apply to any cases pending at the time of enactment. Dkt. No.

---

[3] Indeed, the Committee's investigation appears to have been kickstarted as early as March 18, 2023, when Speaker Kevin McCarthy responded within hours to (incorrect) rumors of Mr. Trump's arrest by calling the still-pending investigation "an outrageous abuse of power by a radical DA" and "directing relevant committees to immediately investigate." Ex. B-72.

32-33 (H.R. 2553). This Court therefore need look no further than the Congressional Record to conclude the Committee's purpose is to disrupt the case against Mr. Trump.

The Congressional Defendants argue that Congress is also considering legislation to restrict state prosecutors from using federal funds to investigate a former president. Dkt. No. 32-22 (H.R. 2582). But even assuming that such regulation embodies a valid legislative purpose, the subpoena to Mr. Pomerantz is "plainly incompetent or irrelevant" to that purpose. *McPhaul*, 364 U.S. at 381. Mr. Pomerantz attested in a sworn declaration that he lacks "any personal knowledge of the District Attorney's Office's use of federal forfeiture funds, including the use of any such funds during my tenure at the Office." Dkt. No. 31 ¶ 4. The Speech or Debate Clause provides no cover for investigations with a "mere semblance of legislative purpose," nor does it shield investigations conducted for "the personal aggrandizement of the investigators," *Watkins v. United States*, 354 U.S. 178, 187, 198 (1957)—including the Congressional Defendants, who have turned this inquisition into the District Attorney's prosecution into a potent fundraising tool, Ex. B-67.

Nor does Speech or Debate immunity extend to congressional subpoenas that encroach on other branches of government—here, New York's executive and judicial departments. The Congressional Defendants argue that the Speech or Debate Clause "preserves the independence and integrity of the legislative process and reinforces the separation of powers." Opp. 5 (cleaned up). But here the Congressional Defendants are using the clause on offense rather than defense, claiming that they may insert themselves into a New York criminal case while evading Article III judicial review. Speech or Debate immunity is not license for Congress to disregard the very separation of powers the clause aims to secure.

The Supreme Court's decision in *Mazars* confirms precisely this point. In that case, President Trump sued both his accounting firm and U.S. Rep. Elijah Cummings, the chairman of

the House Oversight Committee, to enjoin a congressional subpoena for his personal financial information. Ex. B-69. The parties stipulated that the Committee would intervene for the purpose of substituting Mr. Cummings as a defendant. Ex. B-68. Notwithstanding that the Committee was sued as a defendant, the Supreme Court saw no Speech or Debate obstacle to imposing a new, heightened standard of review for congressional subpoenas that implicate substantial separation of powers concerns. *See Mazars*, 140 S. Ct. at 2034-36. The *Mazars* standard, indeed, would amount to nothing more than an empty vessel if it applied only when Congress consented to judicial review. Opp. 5. Neither the Supreme Court nor the D.C. Circuit on remand countenanced any such result. *See Trump v. Mazars USA, LLP* ("*Mazars II*"), 39 F.4th 774, 787 (D.C. Cir. 2022) (applying rigorous scrutiny to House subpoenas for former president's records).

## II. This Action Can and Should Proceed Whether or Not the Congressional Defendants Are Required Parties Under Rule 19.

Contrary to the Congressional Defendants' novel contention, they are not "required" parties under Rule 19, and even if they were and could not be joined, this action should still "proceed among the existing parties" "in equity and good conscience." Fed. R. Civ. P. 19.

**1.** ***Not Required Parties Under Rule 19(a)***. The Congressional Defendants claim they are required parties under the first prong of Rule 19(a)(1)(B) only—*i.e.*, that their absence "may as a practical matter impair or impede" their "ability to protect" "an interest" they have "relating to the subject of the action." *Id.* This argument has two problems. First, the Congressional Defendants lack any legitimate interest in enforcing an unconstitutional subpoena. See D.A. Br. 6-13.

Second, and more importantly, allowing this action to proceed will not "impair or impede" their "ability to protect" that putative interest. Fed. R. Civ. P. 19(a)(1)(B)(i). Courts have long evaluated the scope of Congress's subpoena power in criminal contempt proceedings, in which Congress does not participate as a party. If a witness fails to comply with a congressional

6

subpoena, the Speaker of the House "shall . . . certify" the case to "the appropriate United States Attorney," who may then bring a criminal case without any appearance by Congress. 2 U.S.C. § 194. Congress likewise was not a party to *Watkins v. United States*, 354 U.S. 178 (1957)—one of the Court's seminal subpoena decisions. Needless to say, Congress suffered no impairment to its interests in those cases. In any event, the Congressional Defendants have already fully briefed this motion—and reiterated the same positions aired in nearly a half dozen letters already in the record.

**2. *This Action Should Proceed In Equity And Good Conscience***. Regardless of whether the Congressional Defendants are required parties, this action should proceed "in equity and good conscience" between the remaining parties under Rule 19(b) for three reasons.

*First*, a "judgment rendered" in the Congressional Defendants' "absence would be adequate." Fed. R. Civ. P. 19(b)(3). Plaintiff seeks injunctive relief to prevent Mr. Pomerantz from testifying before Congress pursuant to an unconstitutional subpoena. Even if an injunction runs against Mr. Pomerantz and no one else, the injunction will be adequate.

*Second*, Plaintiff will lack an "adequate remedy if the action [is] dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(4). If the validity of the subpoena is not adjudicated here and Mr. Pomerantz testifies, the District Attorney will suffer irreparable harm without any opportunity for judicial review. *See Eastland*, 421 U.S. at 501 n.14. And Mr. Pomerantz will lack any vehicle to avoid the "impossible position" in which the subpoena places him—facing potential federal contempt charges if he defies the subpoena and potential New York state charges if he complies. Pomerantz Decl. ¶ 6 (Dkt. No. 31). As the Congressional Defendants' own case recognizes, Rule 19(b)'s "adequacy" factor "refers to the public stake in settling disputes by wholes, wherever possible." *CP Solutions PTE, Ltd. v. Gen. Elec. Co.*, 553 F.3d 156, 160 (2d Cir. 2009). Given the "procedural

posture in which this case comes to" the Court, "[i]t would make little sense" to require the parties to "start over" in a separate proceeding among the same parties over the very same subpoena. *Id.*

Third, the Congressional Defendants will not be prejudiced if this Court were to render judgment without them. They have thoroughly participated in this case. And any prejudice they claim to face if dismissed on immunity grounds would be obviated if they either intervened back into the case, *see Trump v. Deutsche Bank AG*, 943 F.3d 627, 633 (2d Cir. 2019); *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34 (D.D.C. 2018), or sought leave to file as amici, *see United States v. Bannon*, 21-cr-670 (D.D.C.), Dkt. Nos. 53, 65, 77—as Congress has done before.

## III.  *Mazars* Supplies the Proper Framework For Deciding This Case.

The Congressional Defendants are wrong that the *Mazars* framework applies only to "congressional subpoenas for the President's information." Opp. 15. In fact, it applies when the subpoena initiates a "clash between rival branches of government." *Mazars*, 140 S. Ct. at 2034. In *Mazars*, the inter-branch dispute raised "significant separation of powers issues." *Id.* The federalism concerns raised by the subpoena here are at least as weighty, and thus require the same "careful analysis" into the Congressional Defendants' asserted interest and appropriate respect for the District Attorney's sovereign law enforcement powers. *Id.* at 2035; *see also, e.g.*, *Bond v. United States*, 564 U.S. 211, 223-24 (2011) (recognizing importance of both separation of powers and federalism in protecting individual liberty).

Even if *Mazars* governed only subpoenas seeking a current or former president's information, that condition is satisfied. The Congressional Defendants have called Mr. Pomerantz to testify about his investigation into *Mr. Trump's financial records*. Ex. 1 at 2; *see* Exs. 36, 36-A, 58. It makes no difference that the Committee is led by Mr. Trump's allies rather than his rivals. *Mazars* applies any time Congress seeks a former president's information and sets up a

clash between "rival branches of government." *Mazars*, 140 S. Ct. at 2034-35; *see also Mazars II*, 39 F.4th at 787 (applying framework on remand to subpoenas for a *former* president's records).

## IV. Plaintiff Has Established a Likelihood of Irreparable Harm.

The Congressional Defendants mistake the nature of the irreparable harm caused by their subpoena. Opp. 23. Interrogating a former prosecutor about the "decision-making process" pertaining to an ongoing criminal prosecution and investigation necessarily creates irreparable harm. Opp. 9. It risks creating extra-judicial evidence and prejudging legal issues—including objections based on political motivation or the sufficiency of the evidence—that will be raised and should be decided by a New York judge.[4] It potentially creates prejudicial pretrial publicity that would, at minimum, burden the jury-selection process. *See People v. Cahill*, 2 N.Y.3d 14, 40 (2003); *People v. Boss*, 261 A.D.2d 1 (1st Dep't 1999).

And it risks chilling prosecutorial decisions about that case and future proceedings. That is why prosecutors are absolutely immune from civil suit: to ensure the "efficient, and just, performance of the prosecutorial function" is not "chilled." *Harrison v. New York*, 2021 WL 1176146, at *4 (E.D.N.Y. Mar. 29, 2021). The law thus strives to protect the prosecutor's ability to exercise "the independence of judgment required by his public trust." *Flagler v. Trainor*, 663 F.3d 543, 546 (2d Cir. 2011); *see also Imbler v. Pachtman*, 424 U.S. 409, 423 n.20 (1976); *Pillsbury Co. v. Fed. Trade Comm'n*, 354 F.2d 952, 964-65 (5th Cir. 1966). Whether or not Mr. Pomerantz's testimony is disclosed publicly, then, the interrogation causes irreparable harm.

In any event, the Committee offers no assurances that Mr. Pomerantz's testimony will remain confidential. In fact, the Committee's rules leave disclosure to the Committee's discretion,

---

[4] The judge presiding over the pending criminal matter has entered a pretrial briefing schedule that will conclude in September and intends to issue a decision by December 2023. Ex. B-71, at 22-23, 29.

all but ensuring anything Mr. Pomerantz says will become public.  *See* Dkt. No. 32-21 at 3.  Indeed, the very point of the deposition is to make information public so that the Committee can "expose this so that in two years, the American people . . . can get this right."  Dkt. Nos. 12-21, 12-22.

The Committee Rules also belie the argument that secret, privileged materials will be safe from disclosure because Mr. Pomerantz "would retain the ability to decline to answer or assert an applicable privilege."  Opp. 19, 23.  House regulations prevent the District Attorney's Office (the actual privilege holder here) from participating in the deposition and preserving privileges.  Dkt. No. 32-21, at 2-3.  Similarly, the House regulations allow Chairman Jordan himself to overrule privilege objections and compel Mr. Pomerantz to answer.  But Chairman Jordan has already decided:  He has ruled that "all" privileges District Attorney Bragg could invoke are "waived" by virtue of Mr. Pomerantz's book.  Opp. 22.  And that ruling is unappealable.  Pomerantz Decl. ¶ 6.[5]

The Congressional Defendants also ignore the record in summarily dismissing the harm to New York's dignitary interests.  The record confirms the purpose of the subpoena is to advance a plan to intimidate, harass, retaliate, and hold "accountable" District Attorney Bragg for enforcing New York's criminal law against a then-New Yorker, Mr. Trump.  See D.A. Br. 6-13.  The Congressional Defendants want the District Attorney—an official endowed with the sovereign authority of the State of New York by its laws and its people—to bend the knee and to "explain to us exactly what he is doing," Ex. 52 at 6:26-8:18.  That violates the Constitution's strict policy of "no interference" with state officers "charged with the duty of prosecuting offenders against the laws of the State," *Younger v. Harris*, 401 U.S. 37, 45 (1971).  And that violation is irreparable.

---

[5] The Congressional Defendants argue that the District Attorney will suffer no irreparable harm if Mr. Pomerantz reveals privileged discussions because prosecutors have no client and are not protected by the attorney-client privilege. Opp. 19-20.  Courts have uniformly rejected that staggering assertion.  *See Bare v. Cruz*, 2012 WL 1138591, at *4 (E.D. Pa. Apr. 2, 2012); *United States v. Sutton*, 2022 WL 3340046, at *3 (D.D.C. Aug. 12, 2022).

Dated:   April 18, 2023                    Respectfully submitted,

                                           GIBSON DUNN & CRUTCHER LLP


                                           /s/ Theodore J. Boutrous, Jr.
                                           Theodore J. Boutrous, Jr.
                                           333 South Grand Ave.,
                                           Los Angeles, California 90071
                                           Tel:  (213) 229-7804
                                           tboutrous@gibsondunn.com

                                           Mylan L. Denerstein
                                           Lee R. Crain
                                           200 Park Avenue
                                           New York, New York 10166
                                           Tel:  (212) 351-3850
                                           mdenerstein@gibsondunn.com
                                           lcrain@gibsondunn.com

                                           Katherine Moran Meeks (*pro hac vice*)
                                           1050 Connecticut Avenue, N.W.
                                           Washington, D.C. 20036
                                           Tel:  (202) 955-8258
                                           kmeeks@gibsondunn.com

                                           NEW YORK COUNTY DISTRICT
                                           ATTORNEY'S OFFICE

                                           Leslie Dubeck
                                           General Counsel to the New York County
                                           District Attorney
                                           One Hogan Place
                                           New York, New York 10013
                                           (212) 335-9000
                                           Dubeckl@dany.nyc.gov

                                           *Counsel for Plaintiff Alvin L. Bragg, Jr.*